UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

In re:

SORENTO ON YESLER OWNER, LLC,

    Debtor.

_____

SORENTO ON YESLER OWNER, LLC,

    Plaintiff,

    v.

YAMINAH ODDIE-JOHNSON, an individual, YAMINAH ODDIE-JOHNSON FOUNDATION, and YAMINAH ODDIE-JOHNSON TRUST,

    Defendants.

BANKR. NO. 24-13217-CMA

ADV. PROC. NO. 25-01081

DECLARATION OF MIKE BESSENYEY IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

I, Mike Bessenyey, declare as follows:

1.    I am over eighteen years of age and am otherwise competent to testify as to the matters stated herein.  Unless otherwise specified, I make this Declaration based on my own personal knowledge or the business records of Debtor.

2.    I am the President of Bonavista Real Estate Management.  Bonavista is the property manager for Debtor's multi-unit apartment building known as Sorento Flats, located at 1414 East Yesler Way in Seattle.

//

LAW OFFICES OF CHRISTOPHER L. YOUNG PLLC
92 LENORA ST. NO. 146
SEATTLE, WA 98121
(206) 407-5829

BESSENYEY DECLARATION - 1

3.    As part of my duties for Bonavista, I am familiar with and have access to the business records of Debtor with respect to Sorento Flats.  These records, such as lease agreements, are maintained as part of Debtor's regularly conducted activity of managing Sorento Flats.

4.    The **<u>Exhibit</u>** attached hereto is a true and correct copy of the Debtor's file on tenant Yaminah Oddie-Johnson.  This file includes a lease agreement (pp. 7-141), invoices for outstanding utility payments (pp. 5-6), and a notice to pay or vacate (pp. 1-2).

I DECLARE UNDER PENALTY OF PERJURY THAT THE FOREGOING IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE.

EXECUTED this 23rd day of September 2025 at Seattle, Washington.


*/s/ Mike Bessenyey*
Mike Bessenyey

LAW OFFICES OF CHRISTOPHER L. YOUNG PLLC
92 LENORA ST. NO. 146
SEATTLE, WA 98121
(206) 407-5829

BESSENYEY DECLARATION - 2

Case 25-01081-CMA    Doc 40-1    Filed 09/23/25    Ent. 09/23/25 11:25:27    Pg. 2 of 144

<div align="center">

**EXHIBIT**

</div>

LAW OFFICES OF CHRISTOPHER L. YOUNG PLLC
92 LENORA ST. NO. 146
SEATTLE, WA 98121
(206) 407-5829

BESSENYEY DECLARATION - 3

Case 25-01081-CMA    Doc 40-1    Filed 09/23/25    Ent. 09/23/25 11:25:27    Pg. 3 of 144

# 30-DAY NOTICE TO PAY RENT OR VACATE THE PREMISES

TO: _____Yaminah Oddie-Johnson_____

AND TO: _____all other occupants_____

ADDRESS: _____1414 E Yesler Way D216 Seattle, WA 98122_____

You are receiving this notice because the landlord alleges you are not in compliance with the terms of the lease agreement by failing to pay rent and/or utilities and/or recurring or periodic charges that are past due.

**(1) Monthly rent due for (list month(s)):**

October 2024 - June 2025               $ 9,045.00

**AND/OR**

**(2) Utilities due for (list month(s)):**

October 2024 - June 2025               $ 900.00

**AND/OR**

**(3) Other recurring or periodic charges identified in the lease for (list month(s)):**

-               $ 0.00

**TOTAL AMOUNT DUE:**               $ 9,945.00

**Note - payment must be made pursuant to the terms of the rental agreement or by electronic means including but not limited to, cashier's check, money order, or other certified funds.**

You must pay the total amount due to your landlord within thirty (30) days after service of this notice or you must vacate the premises. Any payment you make to the landlord must first be applied to the total amount due as shown on this notice. Any failure to comply with this notice within thirty (30) days after service of this notice may result in a judicial proceeding that leads to your eviction from the premises.

**RIGHT TO LEGAL COUNSEL: CITY LAW PROVIDES RENTERS WHO ARE UNABLE TO PAY FOR AN ATTORNEY THE RIGHT TO FREE LEGAL REPRESENTATION IN AN EVICTION LAWSUIT. If you need help understanding this notice or information about your renter rights, call the Renting in Seattle Helpline at (206) 684-5700 or visit the web site at** www.seattle.gov/rentinginseattle

If you cannot pay rent, during or within 6 months after the end of the Mayor's moratorium on evictions, your inability to pay is a defense to eviction that you may raise in court.  If you cannot pay rent due during the civil emergency proclaimed by Mayor Durkan on March 3, 2020, your inability to pay is a defense to eviction that you may raise in court. City law requires a landlord to offer a reasonable schedule for repayment of unpaid rent that accrued between March 3, 2020, and six months following the termination of the civil emergency proclaimed by Mayor Durkan on March 3, 2020. If your landlord does not offer such a repayment plan or give you 14 days to accept a reasonable repayment plan before proceeding with an unlawful detainer action, you may raise this as a defense to eviction in court.

The Washington state Office of the Attorney General has this notice in multiple languages as well as information on available resources to help you pay your rent, including state and local rental assistance programs, on its web site at **https://www.atg.wa.gov/landlord-tenant**.

State law provides you the right to legal representation and the court may be able to appoint a lawyer to represent you without cost to you if you are a qualifying low-income renter.  If you believe you are a qualifying low-income renter and would like an attorney appointed to represent you, please contact the Eviction Defense Screening Line at 855-657-8387 or apply online at **https://nwjustice.org/apply-online**.

For additional resources, call 2-1-1or the Northwest Justice Project CLEAR Hotline outside of King County (888) 201-1030 weekdays between 9:15 am – 12:15 pm, or (888) 387-7111 for seniors (age 60 and over).  You may find additional information to help you at **https://www.washingtonlawhelp.org**.  Free or low-cost mediation services to assist in non-payment of rent disputes before any judicial proceedings occur are also available at dispute resolution centers throughout the state.  You can find your nearest dispute resolution center at **https://www.resolutionwa.org**. State law also provides you the right to receive interpreter services at court.

OWNER/LANDLORD: Bonavista Management   DATE: June 10, 2025

**WHERE TOTAL AMOUNT DUE IS TO BE PAID:**

**(owner/landlord name)** Bonavista Management

**(address)** 950 N 72nd St Ste 100 Seattle WA 98103



**Housing Connector Applicant Letter of Support**

To whom this may concern,

This letter serves as confirmation that **Haley Montowski** with **Compass Housing Alliance** is a Community Partner of Housing Connector and **Yaminah Oddie - Johnson** is eligible for all of the benefits provided by Housing Connector.

| Applicant | Community Partner |
|---|---|
| **Yaminah Oddie - Johnson** | Haley Montowski |
| yparadigm3@gmail.com | hmontowski@compasshousingalliance.org |
| 206-556-1699 | (509) 560-9044 |

Please process this application using the alternate Housing Connector screening criteria as outlined in our Memorandum of Understanding.

If you have any questions or concerns, please contact Housing Connector about this applicant at leasing@housingconnector.com.

Date generated:  01-23-2024
Housing Connector Renter ID: HC-YO233533-3vDusYAE

To get in touch with the Housing Connector team please contact us at
**www.housingconnector.com | 206.800.4040 | info@housingconnector.com**



**4 April 2024**
Compass Housing Alliance
Program: Jan & Peter's Place
220 Dexter Ave N
Seattle, WA 98109

**Promissory Note**

Haley Montowski, Housing Case Manager
Compass Housing Alliance at Jan & Peter's Place Women's Shelter
220 Dexter Ave N
Seattle, WA 98109

To Whom This May Concern:

This note is to confirm that Compass Housing Alliance will be providing rental assistance to Yaminah Oddie – Johnson to help cover the **$1,299.00** last month rent and **$500.00** security deposit for 1414 E Yesler Way D312 located in Seattle, WA 98112. Ms. Oddie-Johnson will be covering the application fee and utilities amount herself.

Please feel free to contact me should you need additional information. I can be reached by phone at 204-474-1674 or by email at HMontowski@compasshousingalliance.org.

Thank you,

Haley Montowski
Housing Case Manager
Compass Housing Alliance at Jan & Peter's Place Women's Shelter

# YES ENERGY MANAGEMENT

For inquiries about your utility billing statement please contact our 24 hour 7 days a week YES Customer Service at (877) 511-6727 or by email at yescs@yesenergymgmt.com You can also visit our website at www.yesenergymgmt.com

**SORENTO FLATS**

**Community Message:** If you would like to start receiving a paper statement you can opt in through your resident portal or by calling the YES customer service number at the top of your statement. YES Energy Management will never contact you for collections of your utility payments. All payments should be made through your resident portal or to your leasing office.

**RESIDENT NAME:** Yaminah Oddie-Johnson
**RESIDENT ID:** t0019921
**ADDRESS:** 1414 E Yesler Way D216 Seattle, WA 98122
**UNIT NUMBER:** D216

**BILLING PERIOD:** 6/12/2025 - 7/12/2025
**BILLING DAYS:** 31 Days
**STATEMENT DATE:** 8/25/2025
**DUE DATE:** 09/01/2025

## -ACCOUNT DETAIL-

| CHARGE SUMMARY | COST SUB-TOTAL |
|---|---|
| Total Trash Charges | 15.52 |
| Total Water Charges | 11.59 |
| Total Sewer Charges | 25.90 |
| Rent (09/2025) | 1,005.00 |
| Utility Meter Charges (09/2025) | 100.00 |
| Utility Billing Service | 4.00 |

| WATER PROFILE | | |
|---|---|---|
| Current | Last Month | Last Year |
| $11.59 | | |

| | |
|---|---|
| **CHARGE SUB TOTAL** | 1,162.01 |
| **PREVIOUS BALANCE** | 12,175.00 |
| **PAYMENTS** | 0.00 |
| **AMOUNT DUE** | **13,337.01** |

---

**Detach Payment Coupon Here**

1414 E Yesler Way
Seattle, WA  98122

To pay by mail please detach and return payment coupon
To pay online visit https://sorentoseattleflats.com/

**YAMINAH ODDIE-JOHNSON**
1414 E Yesler Way D216
Seattle, WA 98122

# YES ENERGY MANAGEMENT

276

**SORENTO FLATS**

| | |
|---|---|
| **RESIDENT ID** | t0019921 |
| **STATEMENT DATE** | 8/25/2025 |
| **DUE DATE** | 09/01/2025 |
| **AMOUNT DUE** | 13,337.01 |
| **AMOUNT ENCLOSED** | |

Remit To
**SORENTO FLATS**
1414 E Yesler Way

Seattle, WA 98122

## DETAIL CHARGE SUMMARY

| Utility | Period | Billing Units | Rate | Sub Total ($) | Total ($) |
|---|---|---|---|---|---|
| **Total Trash Charges** | | | | | **15.52** |
| Trash Charge | 6/12/2025 - 7/12/2025 | 31 days | 0.5006452 | 15.52 | 15.52 |
| **Total Water Charges** | | | | | **11.59** |
| Water Charge | 6/12/2025 - 7/12/2025 | | | 10.25 | 10.25 |
| Water Base Charge | 6/12/2025 - 7/12/2025 | 31 days | 0.0432258 | 1.34 | 1.34 |
| **Total Sewer Charges** | | | | | **25.90** |
| Sewer Charge | 6/12/2025 - 7/12/2025 | | | 25.90 | 25.90 |

**IMPORTANT INFORMATION ABOUT YOUR BILL**

Your community's utility billing statement preference is set to "E-Bill Only" effective as of 03/01/2021. If you would like to opt back in to paper you can select the "Opt Out of E-Bill" option within your YES e-bill message, call the YES customer service center, or update via your community's online portal.

# Vero Management LLC

1414 E Yesler Way • Unit A • Seattle, WA 98122
(253) 880-7873

# 1. SORENTO FLATS RESIDENTIAL RENTAL LEASE AGREEMENT

## 1.1 WASHINGTON STATE RESIDENTIAL RENTAL AGREEMENT

This **"Rental Agreement"** is made this 04/22/2024 between: Sorento on Yesler and Yaminah B. Oddie-Johnson (Tenant Names) (hereinafter **"Tenant"**) and **Vero Management** (hereinafter **"Landlord"**) as agent for the Owner. In the event that multiple individuals are identified as Tenants, they shall each be jointly and severally liable for the obligations set forth in this Rental Agreement.

## 1.2 PREMISES

The Landlord does hereby rent to Tenant, and Tenant does hereby rent from Landlord, those certain Premises described as follows: Apartment # D216 being a unit in that certain apartment Complex known as: Sorento on Yesler located at:
 1414 E Yesler Way
 Seattle, WA 98122
The Premises are to be occupied as and for a dwelling, and for no other purpose, solely by the Tenant(s) listed above and the following occupants: . In this Rental Agreement, the word "Premises" refers to the Tenant's apartment and the word "Complex" refers to the entire Apartment Complex including its parking lot or garage (if applicable), landscaping, hallways, elevators, and common areas.

## 1.3 TERM

This Rental Agreement is either:
☑ For a tenancy for a fixed "Term" of approximately 12 months , commencing on the 05/01/2024 , (the "Commencement Date") and ending 04/30/2025 .

 Upon expiration of the above-stated initial term of Lease, this Agreement shall revert to a month-to-month tenancy on the same terms and conditions as this Agreement except as may be amended by Owner upon thirty days' written notice.

All tenancies shall end on the last day of the calendar month.

## 1.4 RENT

"Rent" comprises Base Monthly Rent and the Additional Charges for Utilities, Storage and Pet Rent set forth in this Paragraph.
A. Base Monthly Rent. Tenant covenants and agrees to pay to the Landlord for said Premises a Base Monthly Rent of $ $1,005.00 for each month during the term of this Rental Agreement.
B. Additional Charges: In addition to Base Monthly Rent, Tenant will also pay Landlord for the following:
i) Utilities: $100.00per month for the following utilities: electric, gas, water, sewer, garbage, internet.
ii) Storage: $NAper month for storage, storage space# N/A.
iii) Pet Rent: $ 0.00 per month for Pet Rent.
Total Rent: $

| | |
|---|---|
| Rent Income | $1,005.00 |
| Flat Rate Utility | $100.00 |
| **Total:** | **$1,105.00** |

.

C. In addition to Tenant's covenant to Landlord to pay for the utilities set forth in Section 4 above, Tenant also agrees to pay all other utility charges individually metered or charged to Tenant's specific apartment before delinquency or default. Landlord shall not be liable for the failure of any utility services whether paid to Landlord or directly to the utility company
D. In the event the tenancy shall commence on any day other than the first day of the calendar month, the Rent shall be collected from the date of commencement to and including the last day of such partial month and this prorated amount will be due and payable on the second month of tenancy. The prorated Base Monthly Rent and Additional Charges for the partial month shall be: $

. A minimum of one (1) full month's Rent must be paid prior to occupancy (plus applicable deposits and fees). The foregoing proration is calculated by taking total monthly charges, divided by the number of days in the month, multiplied by the number of days of occupancy.
E. All Rent is due and payable, in advance, on or before the first day of each month. Rent shall be paid online using **pay portal given to tenant** or as Landlord may otherwise designate. Tenant may pay Rent by check, money order or cashiers check. Any late Rents received after the sixth day of any month shall be subject to a Late Fee of seventy-five dollars ($75.00). Tenant agrees to pay this Late Fee along with a thirty-five dollar ($35.00) Handling Fee for all payments returned (NSF), each time, for any reason and a fifty dollar ($50.00) Notice Fee for processing of any Notice to Pay Rent or Vacate or other notice provided for by Washington State Law. Payment shall be in the form of

Case 25-01081-CMA    Doc 40-1    Filed 09/23/25    Ent. 09/23/25 11:25:27    Pg. 10 of 144

cashier's check or money order in any instance where Rent is received after the 10th of a month, following issuance of a Notice to Pay Rent or Vacate, or following any NSF payment and must include any notice issuance, late payment, utility, pet rent, processing and storage fees. After delivery of one NSF payment, all future payments will only be accepted by cashier's check or money order. If incurred, the Late Fee, Handling Fee, and Notice Fee may be paid from the security deposit in the Landlord's discretion.

## 1.5  LAST MONTH'S RENT

4. LAST MONTH'S RENT: Tenant has deposited or will deposit with Landlord the sum of $1105.00 as a prepaid credit defined as "Last Month's Rent" to be applied to the last month of tenancy. Unless otherwise agreed in writing, Last Month's Rent shall be paid prior to occupancy. Tenant may only apply this prepayment to the lawful last month of the tenancy (not of Resident's actual occupancy) following valid termination of the Agreement by its own term, by written notice, by abandonment, or by court order. If Rent is increased prior to the Agreement's
termination, Tenant will be required to pay any shortage between original Last Month's Rent and the increased Rent amount.

## 1.6  EARLY TERMINATION OF TENANCY AND ADDITIONAL TENANTS

The following provisions apply to the extent permitted by SMC 7.24.030: A $250.00 Change of Tenant Fee will be charged whenever a Tenant is added or removed from this Rental Agreement. New Tenant must submit Application/Screening, applicable application fee and receive approval from Manager. A Change of Tenant Addendum must be signed by all Tenants prior to occupancy. Any unauthorized occupant or violation of these terms is subject to termination. If incurred, the Change of Tenant Fee may be paid from the security deposit in the Landlord's discretion.

Should Landlord agree to any assignment or change in occupancy, the vacating Tenant(s) agree that any prepayment or refundable deposit will be assigned to the successor Tenant(s), and any refund shall be made solely to the successor
Tenant(s) at the termination of tenancy.
This Agreement and Tenant's liability shall not terminate until all occupants of the Premises have vacated. In the event Tenant vacates the unit before expiration of the term set out in Paragraph 2 above (regardless of whether notice is provided), Tenant shall, in addition to any other damages, cleaning, or repair, be liable for a lease break fee of $1,000.00 along with the forefit of any additional rent deposits. Landlord and Tenant agree that the lease break fee and additional rent deposits is payable as liquidated damages for the cost of advertising and releasing the Premises, the exact amount of which would be difficult to ascertain.

## 1.7  SECURITY DEPOSIT

As security for the performance by Tenant of all Tenant's obligations hereunder, Tenant
has deposited or will deposit with Landlord the sum of $ $500.00 as a "Security Deposit," and NA as "Additional Rent Deposit" to secure Tenant's faithful performance of all Tenant's obligations, including payment of rent, under this Agreement. Unless otherwise agreed in writing, the Security Deposit shall be paid, in full, upon execution of this Agreement prior to occupancy. The amount of the Security Deposit does not limit Landlord's rights or Tenant's obligations hereunder. The Security Deposit shall be deposited by the Landlord in a separate trust account with Heritage Bank, at 10500 NE 8th Street, Unit 1500, Bellevue, WA 98004. The Security Deposit shall not accrue interest payable to the Tenant. In no event shall Tenant be permitted to apply any portion of his Security Deposit towards his Last Month's Rent. In the event the Tenant fails to comply with the obligations of this Rental Agreement, Tenant understands that all or part of the Security Deposit may be applied to cure such breach or otherwise retained by the Landlord upon termination of the tenancy, in the Landlord's sole discretion. A refund of any portion of the Security Deposit to the Tenant is conditioned as follows:
i. Tenant shall be responsible to clean and restore the Premises to the condition in which they were found at the commencement of this tenancy, (less normal wear and tear), as evidenced by the attached Apartment Inspection Report, which Tenant shall sign prior to occupancy. Tenant agrees soiling of the Premises (e.g. by dirt, food residue, grease and grime, etc.) does not constitute not normal wear and tear. Tenant is advised to have the carpets and window coverings of the Premises professionally cleaned prior to this Rental Agreement's termination. TENANT UNDERSTANDS AND AGREES THAT IF TENANT DOES NOT CLEAN THE PREMISES TO LANDLORD'S STANDARDS, THEN LANDLORD MAY HAVE THE CARPET, WINDOW COVERINGS, AND UNIT PROFESSIONALLY CLEANED AT TENANT'S EXPENSE AT THE END OF THIS TENANCY. Tenant further agrees to pay for said cleaning as billed by Landlord or to allow such cleaning costs to be deducted from the Security Deposit at the expiration or
termination of the tenancy. Tenant understands and agrees that the Security Deposit does not limit the Tenant's obligation to restore the Premises if the cost of restoration exceeds the amount of the Security Deposit.
ii. Tenant shall return to Landlord all keys, FOBs and garage door remotes provided during tenancy. Tenant will be charged a replacement fee for any keys, FOBs, garage door remotes, etc. that are not returned at the end of tenancy.
iii. Tenant will be responsible for painting costs on the following prorated basis: If painting is required and Tenant resided in Premises; Less than 12 months the Tenant will be responsible for 100% of costs. Less than 24 months the Tenant will be responsible for 50% of costs.

Note: 1) If Tenant smokes in apartment, Tenant shall pay 100% of painting charges and costs of removing smoke damage regardless of duration of tenancy.
2) Painting of apartment is not permitted, if Tenant paints apartment Tenant will be responsible for 100% of re-painting cost at Landlord's discretion regardless of duration of tenancy.

iv. Tenant shall have remedied or repaired, to Landlord's satisfaction, any damage caused by Tenant to the Complex, the Premises or the furnishings.
v. Tenant shall have replaced any lost or missing items of furnishings or equipment, including personal property of the Landlord.
vi. Tenant shall have complied with all the provisions of this Rental Agreement.

vii. Tenant shall have paid all Rent, fees and other monies due and payable under the terms of this Rental Agreement, or otherwise owing as a result of unpaid Rent, damage, cleaning, late payment, utilities, keys or other charges assessed following a breach of the terms of this agreement.

At the conclusion of tenancy, Tenant shall provide Landlord with a single forwarding address to which the deposit accounting and any refund or charge is to be sent. Any refund will be by a single check payable to all individual Tenants named on the Rental Agreement, or their successors as may be approved by Landlord (if applicable), and the persons named on the check shall apportion any refund among themselves. Within the time allowed by law after the Termination of Tenant's tenancy, Landlord shall mail to Tenant (at last address for Tenant known to Landlord) a full and specific statement of the basis for retention of any or all of the Security Deposit, together with the payment of any refund due to Tenant. Such Termination shall be deemed to have occurred at the time when: i) Tenant deliver the keys to Landlord, or ii) Landlord determines that Tenant has abandoned the Premises. Landlord shall have the right to proceed against the Tenant to recover sums exceeding the amount of the Tenant's Security Deposit for damages resulting from the Tenant's breach of this Rental Agreement or which are otherwise due to Landlord under the Laws of the State of Washington. Such damages may include, without limitation, costs of cleaning, painting and/or repairing the Premises, replacement of missing items, wall repair, hardwood floor refinishing, carpet replacement, lost Rent and/or Additional Charges.

## 1.8  NO ASSIGNMENT

Tenant shall not assign this Rental Agreement or sub-let the Premises, or any part thereof. Tenant shall not use or advertise their unit for the purpose of Airbnb, VRBO, or any other rental purposes to any persons not on the Agreement.

## 1.9  LIABILITY AND INSURANCE

A. Landlord disclaims any and all alleged warranties or representation that it will be liable to Tenant or Tenant's Invitees for any damages or losses to person or property caused by residents of the Complex or other persons. The term Tenant's "Invitees" shall include, without limitation, Tenant's: family, agents, guests, employees, servants, or any other person, entering onto the Complex at Tenants behest or in relation to the Tenant. Tenant understands that Landlord and its legal representatives do not guarantee, warrant, or assure Tenant's personal security and are limited in their ability to provide protection. Tenants acknowledge that security devices or measures may fail or be thwarted by criminals or by electrical or mechanical malfunction. Therefore, Tenant acknowledges that they should not rely upon the presence of such devices or measures and should protect themselves and their property as if these devices or measures did not exist. Tenant understands that any proactive steps Landlord has taken are neither a guarantee nor a warranty that there will be no criminal acts or that tenant will be free from the violent tendencies of third persons. Tenant has been informed and understands and agrees that personal safety and security are tenant's own personal responsibility.

B. Tenant is not a beneficiary of any insurance policy maintained on the Premises by Landlord. Tenant understands that Tenant is no co-insured and will not benefit from any such policy maintained by Landlord. Tenant agrees to maintain a renter's insurance policy as set out in the following paragraph to protect tenant's personal property and potential liability.

C.  Tenant shall maintain a policy of renters insurance at all times during the Term to: i) protect Tenants personal property in the event of loss or damage from fire, water, theft

or other occurrence and ii) cover Tenants liability for damage caused to the Premises or to others by Tenant's acts or negligence. Such policy shall be on such terms as Landlord may reasonably require. Tenant shall provide Landlord with proof of such policy prior to occupancy, shall provide proof that said policy is current upon demand by landlord, and shall notify Landlord prior to any change or termination of such policy. Tenant shall cause Landlord and Manager to be named as an additional interest with respect to the policy, such that the company writing said policy will give Landlord ten (10) days prior written notice of any cancellation or lapse of the effective date or any reduction in the amounts of such insurance. Such notice shall be sent to Agent's address at the top of the first page of this Agreement. Tenant releases Landlord and their respective employees, agents, contractors, and owners, from responsibility for, and waives its entire claim of recovery for any loss or damage arising from, any cause covered by insurance carried or required to be carried by Tenant. Tenant shall notify its insurer of this waiver of subrogation and shall cause its insurance carrier to waive all rights of subrogation against Landlord. Tenant is responsible for all damage caused to the Premises as a result of the acts or negligence of Tenant, its guests and Invitees, including but not limited to fire, water and glass breakage. Tenant shall be responsible for repair and replacement of any damage caused thereby, regardless of whether the breakage or damage was caused intentionally, negligently, unintentionally or by happenstance. Failure to comply with the terms of this paragraph shall be a material default of the Agreement. In the event Tenant fails to comply with the terms of this paragraph, Landlord may, without waiving any rights Landlord may have, acquire a renter's policy or equivalent coverage on Tenant's behalf, and Tenant shall immediately reimburse Landlord for the cost thereof.

## 1.10  USE

The Tenant covenants that it will not carry on or permit upon said Premises any nuisance, or use the same nor allow the same to be used for illegal purposes, nor in violation of any law of the United States, the State of Washington or any ordinance of the City of Seattle, including the use of illegal drugs or the distribution thereof. The Premises may be inhabited by the Tenant as a residence only, provided that the Premises may also be used as an in-home office by Tenant if and to the extent such use is permitted under applicable law.

## 1.11  POSSESSION

In the event of the inability of the Landlord to deliver possession of the Premises at the time of the commencement of the term of this Rental Agreement, Landlord shall not be liable for any damage caused thereby, nor shall this Agreement thereby become void or voidable or shall the term therein specified be in any way extended, but in such event, Tenant shall not be liable for any Rent until such time as Landlord can deliver possession. Tenant shall deliver up possession of the Premises to Landlord at the end of his tenancy as provided herein, which shall

include the return of all keys, FOBS, and garage or gate openers to Landlord and the removal of all personal property belonging to Tenant and Tenant's Invitees.

## 1.12  CASUALTY LOSS

Should the Premises be totally destroyed or rendered uninhabitable by fire, lightening,
earthquake, flood or any other casualty, this Rental Agreement shall be deemed to be terminated as of the date of such casualty. Should fire, lightning, earthquake, flood, windstorm, or any other casualty partially damage the Premises or the building in which the Premises are located, the Landlord may elect to terminate this Rental Agreement at his sole discretion. If Landlord elects to repair the damaged Premises, the Rent shall be abated in the same ratio that such portion of the Premises is rendered for the time being unfit for occupancy, and not used or occupied by Tenant, shall bear to the whole unit.

## 1.13  BREACH

As provided by law and except as otherwise prohibited, the prevailing party will be entitled to recover its reasonable attorneys' fees and court costs incurred in the event any action, suit or proceeding commenced to enforce the terms of this Agreement. This Rental Agreement shall be governed by and construed in accordance with the laws of the State of Washington. It is agreed that venue for any legal action brought to enforce the terms of this Agreement shall be exclusively in the Superior Court with jurisdiction over the county in which the Premises are located.

## 1.14  LANDLORD'S ACCESS

Tenant shall allow Landlord free access to the Premises in order to: i) inspect the
Premises, make necessary repairs, alterations and/or improvements, or ii) exhibit the Premises to prospective purchasers, mortgagees, tenants and/or contractors. Landlord shall have the right to enter the Premises during reasonable hours upon twenty-four (24) hours written notice to Tenant for the purpose of exhibiting the Premises for lease or sale and upon forty-eight (48) hours written notice for any and all other "Lawful Purposes." Such Lawful Purposes shall include, without limitation, the right to repair, alter, upgrade, improve or rehabilitate the Premises. Should Tenant unreasonably interfere with Landlord's right to enter the Premises as provided by Washington State Law, Tenant may be fined one hundred dollars ($100) for each such violation. Landlord may also recover other damages which result from such interference by Tenant along with attorney fees and court costs. Tenant further understands and agrees that in order to investigate and/or repair any and all potential emergencies, Landlord is legally entitled to enter the Premises at any time without notice.

## 1.15  LIENS AND SALES

Landlord may mortgage the Premises or Property or grant deeds of trust with respect thereto. Tenant agrees to execute such reasonable estoppel certificates as may be required by a mortgage or deed of trust beneficiary stating that the Agreement is in full force and effect and certifying the dates to which Rent and other charges have been paid. This Agreement is subject and subordinate to any mortgage or deed of trust which is now a lien upon the Complex or the Premises, as well as to any mortgages or deeds of trust that may hereafter be placed upon the Complex or Premises and to any or all advances to be made or amounts owing thereunder, and all renewals, replacements, consolidations and extensions thereof. Tenant shall execute and deliver, within ten (10) days after demand therefore, whatever instruments may be required from time to time by any mortgagee or deed of trust beneficiary for any of the
foregoing purposes.

## 1.16  NON-WAIVER OF BREACH AND SEVERABILITY

The failure of Landlord to insist upon the strict performance of any term of this Rental Agreement, or to exercise any option hereunder in one or more instances, shall not
be construed to be a waiver or relinquishment of any of Landlord's rights under this agreement. Rather, all such rights options and provisions shall remain in full force and effect for the entire duration of term of this Rental Agreement. If any provision of this Rental Agreement is found by a court of competent jurisdiction to be illegal, invalid, or unenforceable under present or future laws effective during the term hereof, the validity of the remaining provisions of this agreement shall not be affected thereby and shall remain in full force and effect. Furthermore, it is the intention of the parties that in
lieu of each provision that may be found illegal, invalid or unenforceable, that a substitute provision as similar in practical and/or commercial effect be added which is also legal, valid and enforceable.

## 1.17  GENERAL TERMS

There are no oral agreements which supplement this Rental Agreement and all previous discussions and negotiations are merged herein and superseded hereby. This Rental Agreement shall not be modified except by an instrument in writing signed by Landlord. In the event of multiple Tenants, each is jointly and severally liable for all terms of this Rental Agreement. Tenant states that he or she is of legal age to enter into this Rental Agreement. Time is of the essence in every term of this agreement. Neither this Rental Agreement nor any memorandum thereof may be recorded without the written consent of Landlord.

## 1.18  APPLICATIONS/SCREENING

Tenant authorizes Landlord to obtain supplementary credit reports at any time
during Tenant's occupancy of the Premises at Landlord's expense. Tenant warrants and affirms the accuracy of all information contained in Tenant's "Rental Application" which Tenant filled out prior to execution of this Rental Agreement. A subsequent determination that Tenant provided false or inaccurate information on the Rental Application is a breach of the terms of this Rental Agreement and in such event, Landlord may take legal action to terminate this Rental Agreement.

## 1.19  INTENT & INCORPORATION

It is the intent of this Rental Agreement to comply with all City, County, State and
Federal laws, rules and regulations governing the landlord and tenant relationship which are in effect now and those laws which may be enacted in the future. If any clause or part of this Agreement is found to violate any such law, the remaining portions of this Agreement shall continue to be in full force and effect. All applicable portions of the State of Washington Landlord Tenant Code and relevant Ordinances of the City of Seattle are incorporated herein by reference and made a part
hereof.

By initialing below, you acknowledge and agree to the terms in Section 1.

X
Yaminah B. Oddie-Johnson

# 2. Rules and Regulations

## 2.1  RULES AND REGULATIONS

The Rules and Regulations attached to this Rental Agreement are acknowledged by the Tenant and are included as part of this Rental Agreement. Landlord may post additional requirements at or around the Complex that relate to use of a particular component of the Complex; these rules are incorporated into and made a part of this Agreement whether posted at the time of signing or later adopted. Other reasonable rules, regulations and policies may be promulgated from time-to-time upon written notice by Landlord shall apply immediately upon such notice.

A. SANITARY CONDITIONS: Tenant shall keep the Premises in a clean and sanitary condition; properly dispose all rubbish, garbage, and other organic/flammable waste from his/her unit at reasonable and regular intervals and assume all costs of extermination/fumigation for infestation caused by Tenant. Tenant shall immediately report all indications of infestation to Landlord.

B. HOUSEHOLD PETS: Except for companion or service animals as defined in by law, Tenant shall not maintain pets or animals (including mammals, reptiles, birds, fish, rodents and insects) upon the Premises, nor allow visitors or guests to do so, without authorized pet agreement provided and signed by Landlord.

C. NOISE: Tenants, family and guests shall have due regard for the peace, comfort and enjoyment of other residents. Musical instruments, radios, television sets, sound equipment, etc., shall be operated at a sound level that cannot be heard outside of the Tenant's individual apartment and any disturbance of other tenants minimized during "Quiet Hours" which cover the hours between the hours between 10:00 p.m. and
8:00 a.m.

D. ANTENNAS: No wires, aerial antennas for radio or television, or wires, ropes, etc. for clothes drying etc. shall be installed on the roof, decks or other parts of the Complex.

E. GUESTS: No more than two (2) guests shall stay overnight at any time in any unit. Guests are limited to a two-week stay and must park their vehicles on the street.

F. MOVING: No moving in to or from the Premises will take place during "Quiet Hours" which cover the hours between the hours between 10:00 p.m. and 8:00 a.m. Tenant is responsible for any damage caused to the Complex or common areas as a result of moving furniture and other belongings.

G. WINDOWS &amp; BALCONY &amp; SIGNAGE: Dust mops, rugs, tablecloths and clothing shall not be shaken, cleaned or left in any of the public areas or any window, door, deck or landing. Exterior windowsills and ledges shall not be used for storage of bottles, food, etc. Tenant shall not use the windows, doors, balcony, or ledges for any signage whatsoever. Tenant shall not store or use a gas or charcoal grill in the
Premises or Complex. Tenant may use grills that may be provided by Landlord as a common amenity in compliance with all rules and regulations of Landlord and Manager.

H. ALTERATIONS: Tenant shall not make any change to or alter the Premises or the Complex in any manner whatsoever including, without limitation, all fixtures, wiring, door locks, and cable TV or phone outlet, without prior written permission by Manager. No credit will be given for repairs, painting, alterations, etc. made by Tenant. Approval must be obtained prior to hanging any heavy object on the walls. Building materials may contain asbestos. It is strictly prohibited to disturb floor tiles, pipe insulation, and the ceiling in an apartment or any common area, including but not limited to installation of hooks for hanging plants or decorations. Tenant shall be responsible for abating or correcting any damage or costs resulting from violation of this provision. Only use picture hooks to hang pictures, mirrors and decorative

items on the walls. Do not use glue/paste-backed or stick- on hanger hooks.

I. PLUMBING: Tenant shall immediately report all plumbing defects to Manager. Tenant shall be required to pay for damage to and/or plugging of plumbing due to their neglect or misuse. Other than toilet paper, Tenant is not to use the toilet to dispose of any trash or other materials, i.e. feminine hygiene products, wipes, paper towels, condoms etc.

J. GARBAGE/RECYCLING: All garbage, papers, boxes or refuse are to be deposited in containers that are provided and lids replaced. All wet garbage and animal waste must be bagged or wrapped. Tenant shall dispose of all animal waste directly in the garbage dumpster and not into the common area waste receptacles. Garbage dumpsters are potentially dangerous and entering dumpsters is prohibited. All recyclable materials

shall be placed in designated receptacles (not beside the receptacles) and all boxes are to be broken down. Violation of recycling and food waste regulations shall result in a fine of twenty-five dollars ($25) in addition to reimbursement for any fine assessed by a governmental agency or service provider.

K. STORAGE: No storage of personal property shall be allowed in the halls or common areas in or around the Complex. No storage of personal belongings or furnishings will be permitted on decks, porches or public areas. Storage areas may not be inhabited at any time.

L. LANDSCAPE: The Tenant or their guests shall not alter, disturb, pollute, litter, damage or interfere in any way with the ground treatment without the advance, written consent of the Landlord.

M. COMMON AREAS: Tenant and their guests shall use all recreation and other common areas in a

responsible manner. Tenant is responsible for use of any equipment by Tenant and their guests. Tenant shall reimburse Landlord for any vandalism or damages to the Complex or its amenities caused by either Tenant or their guests anywhere in or about the Complex. Tenant and guests shall not create any noise or disturbance in common halls, stairways, sidewalks, garages, storage areas, decks or parking areas, or other common or public areas in or about the Complex.

N. CIVILITY: All Tenants shall conduct themselves in a civil manner. All Tenants and their Invitees and guests shall refrain from using foul language or exhibiting offensive behavior while on the grounds of the Complex. All Tenants shall minimize noise in the halls and common areas so as not to disturb other Tenants.

O. WATER BEDS: Water beds are not permitted to be used on the Premises under any circumstances.

P. WINDOW COVERINGS: No Venetian blinds, awnings, draw shades or non-conforming curtains or drapes shall be installed on exterior windows without the prior written permission of the Landlord.

Q. COMPLAINTS: All complaints, requests and maintenance defects shall be made in writing directly to the Landlord.

R. SMOKING: Smoking and vaping is not permitted in the interior or exterior of the apartments or grounds or in common areas (halls, garage, laundry, etc.). The Complex is an entirely Non-Smoking facility. If the Premises have to be repainted, the carpets replaced or other remedial actions taken as a result of smoking/tobacco or marijuana odors, Tenant shall be responsible for the costs of any and all such remedial actions. Tenant shall not be permitted to grow any forms of marijuana on the Complex or the Premises. Washington State law prohibits smoking within 25 feet of any entrance or window to the Complex.

S. INCENSE: Tenant shall not burn incense or otherwise cause and/or strong odors to permeate the Premises. If the Premises have to be repainted, the carpets replaced or other remedial actions taken as a result of such odors, Tenant shall be responsible for the costs of any and all such remedial actions.

T. HALLWAYS &amp; GARAGE STALLS: No baby carriages, bicycles, boxes, shoes, rugs or any other items may be left in the hallways or in the assigned carports or parking stalls.

U. LOCKOUTS: Tenant agrees to pay a  seventy five-dollar ($75) service charge should the Landlord be sent to unlock your door if Tenant has locked himself out of the Premises and/or the Complex. Notwithstanding the foregoing, Landlord is not being obligated to do so. Each person on the Agreement is permitted one key or FOB each to the Premises, the Complex and the mailbox. Each additional or replacement key or FOB shall

cost twenty-five dollars per key or FOB ($25). Should Tenant hire a locksmith to open a lock, Tenant is responsible for the entire cost including damages and replacement.

V. FIRE/GRILLS: Open flames of any kind are strictly prohibited in the Premises and on the entire Complex other than in fireplaces and gas fired grills that may be provided by Landlord in common areas as a shared amenity. Without limiting the general prohibition set out above, Tenant shall not use any gas, briquette or other type of non-electric cooking source except for gas fired ranges and grills provided by Landlord and

then only in a safe manner in accordance with all laws and manufacturer guidelines. Tenant shall ensure that the electric stove, gas range, and other appliances such as irons are never left on unless actively attended as this can lead to severe risk of fire.

W. PORTABLE HEATERS OR APPLIANCES: No portable heaters, portable dishwashers, window mounted air conditioners, portable laundry washing, or drying equipment or similar appliances of any kind shall be used on the Premises without prior written consent of the Landlord.

X. LIGHT BULBS: When replacing light bulbs, only sixty (60) watt bulbs or their equivalent should be used, as larger bulbs might be too large for existing electrical installations. Tenant is responsible for the replacement of burnt out light bulbs.

Y. COMMON AREA SECURITY: Tenant shall support the common security of the Complex. Tenant shall report suspicious activities to the Landlord either on site or by telephone. Tenant shall not allow any other person to improperly follow him/her into the Complex and will not issue entry keys or security codes (if applicable) to any other persons.

AA. SHARED FIREPLACE AND/OR GAS GRILL. Should Landlord provide a fireplace as a shared amenity, only firewood shall be permitted in the fireplace. No artificial substances, such as Duraflame® logs are permitted. Ashes must be disposed of in metal containers, after ensuring the ashes are cold. Tenant shall follow all of Landlord's rules in operating any shared grill or fireplace and will use such amenities only if qualified to operate them in a safe manner. Tenant will inspect the grill, fireplace, and surrounding area for safety prior to use or allowing Tenant's guests to use them. Tenant assumes all risks of using any shared grill or fireplace. Nothing in this paragraph AA shall be construed to allow use of any fireplace within the Premises or any use of any gas or charcoal grill except as may be provided by Landlord as a shared amenity.

6

By initialing below, you acknowledge and agree to the terms in Section 2.

X
Yaminah B. Oddie-Johnson

# 3. Fire Safety and Protection

## 3.1 FIRE SAFETY AND PROTECTION COMPLIANCE

The above described unit has been equipped with one or more smoke detection device(s) as required by RCW 43.44.110(3). It is Tenant's responsibility to maintain the smoke detection device in proper operating condition in accordance with the manufacturer's recommendations, including providing replacement batteries as required.

A. The above described smoke detection device(s) are: ☑ **hard-wired**, or ☐ **battery operated**. If battery operated, the unit(s) has been checked and is properly operating at the commencement of tenancy. Under the law, it is the Tenant's responsibility to maintain the smoke detection device(s) in proper operating condition in accordance with the manufacturer's recommendations, including providing it with replacement batteries as needed. A fine of not more than TWO HUNDRED DOLLARS is imposed for failure to comply with these provisions of RCW 43.44.140(3). Failure to maintain the smoke detector is also grounds for termination of tenancy. However, if liability or damages occur because of a Tenants' failure to maintain the unit, you may leave yourself open to potential lawsuits (see WAC 212-10-050). Tenant also agrees to test the smoke detector for proper operation once a month and report any malfunctions to the Landlord.

B. The subject property ☑ **does** ☐ **does not** have a fire sprinkler system.

C. The subject property ☑ **does** ☐ **does not** have a fire alarm system.

D. The subject property **does** have a non-smoking policy. The entire Complex is non-smoking (see above).

E. The subject property ☑ **does** ☐ **does not** have an emergency notification plan for its occupants. The emergency notification plan, if any, has been provided to Tenant and Tenant's initials acknowledge receipt.

F. The subject property ☐ **does** ☑ **does not** have an emergency relocation plan. The emergency relocation plan, if any, has been provided to Tenant and Tenant's initials acknowledge receipt.

G. The subject property ☐ **does** ☑ **does not** have an emergency evacuation plan. The emergency evacuation plan, if any, has been provided to Tenant and Tenant's initials acknowledge receipt.

## 3.2 CARBON MONOXIDE DETECTOR INFORMATION NOTICE

The above described unit has been equipped with one or more carbon monoxide detection device(s) as required by RCW 19.27.530. It is Tenant's responsibility to maintain the carbon monoxide detection device in proper operating condition in accordance with the manufacturer's recommendations, including providing replacement batteries as required.

The above-described carbon monoxide detection device(s) are:

☑ **hard-wired**, or ☐ **battery operated**. If battery operated, the unit(s) has been checked and is properly operating at the commencement of tenancy. Under the law, it is the **Tenant's** responsibility to maintain the carbon monoxide detection device(s) in proper operating condition in accordance with the manufacturer's recommendations, including providing it with replacement batteries as needed. Failure to maintain the carbon monoxide detector is grounds for termination of tenancy. However, if liability or damages occur because of a Tenants' failure to maintain the unit, you may leave yourself open to potential lawsuits. Tenant also agrees to test the carbon monoxide detector for proper operation once a month and report any malfunctions to the landlord.

By initialing below, you acknowledge and agree to the terms in Section 3.

X _YOJ_
Yaminah B. Oddie-Johnson

# 4. Mold Discosure

## 4.1 MOLD DISCLOSURE

**What are molds?** Molds are tiny microscopic organisms that digest organic matter and reproduce by releasing spores. Molds are a type of fungi and there are over 100,000 species. In nature, mold helps decompose or break-down leaves, wood and other plant debris. Molds become a problem when they go where they are not wanted and digest materials such as our homes.

**What makes molds grow in my home?** Mold enters your home as tiny spores. The spores need moisture to begin growing, digesting and

destroying. Molds can grow on almost any surface, such as wood, ceiling tiles, wallpaper, paints, carpet, sheet rock, and insulation. The mold grows best when there is lots of moisture from a leaky roof, high humidity, or flood. There is no way to get rid of all molds and mold spores from your home. But you can control mold growth by keeping your home dry.

**Can I be exposed to mold?** When molds are disturbed, they release spores into the air. You can be exposed by breathing air containing these mold spores. You can also be exposed through touching moldy items, eating moldy food or accidental hand to mouth contact.

**Do molds affect my health?** Most molds do not harm healthy people. But people who have allergies or asthma may be more sensitive to molds. Sensitive people may experience skin rash, running nose, eye irritation, cough, nasal congestion, aggravation of asthma or difficulty breathing. People with an immune suppression or underlying lung disease, may be at increased risk for infections from molds. A small number of molds produce toxins called mycotoxins. When people are exposed to high levels of mold mycotoxins they may suffer toxic effects, including fatigue, nausea, headaches, and irritation to the lungs and eyes. If you or your family members have health problems that you suspect are caused by exposure to mold, you should consult with your physician.

**When is mold a problem?** You know you have mold when you smell the "musty" odor or see small black or white specks along your damp bathroom or basement walls. Some mold is hidden growing behind wall coverings or ceiling tiles. Even dry, dead mold can cause health problems, so always take precautions when you suspect mold. Mold is often found in areas where water has damaged building materials and furniture from flooding or plumbing leaks. Mold can also be found growing along walls where warm moist air condenses on cooler wall surfaces, such as inside cold exterior walls, behind dressers, headboards, and in closets where articles are stored against walls. Mold often grows in rooms with both high water usage and humidity, such as kitchens, bathrooms, laundry rooms, and basements. If you notice mold or know of water damaged areas in your home, it is time to take action to control its growth.

**When should I sample for mold?** You don't need to sample for mold because in most cases you can see or smell mold. Even a clean, dry house will have some mold spores, but not enough to cause health problems. If you smell mold it may be hidden behind wallpaper, in the walls or ceiling, or under the carpet. If you suspect you have hidden mold be very careful when you investigate, protect yourself from exposure in the same manner as you would for a clean-up. See the chart below.

**Can I control mold growth in my home?** Yes you can. Dry out the house and fix any moisture problems in your home:

◇ Stop water leaks, repair leaky roofs and plumbing. Keep water away from concrete slabs and basement walls.

◇ Open windows and doors to increase air flow in your home, especially along the inside of exterior walls. Use a fan if there are no windows available.

◇ Make sure that warm air flows into all areas of the home. Move large objects a few inches away from the inside of exterior walls to increase air circulation.

◇ Install and use exhaust fans in bathrooms, kitchens, and laundry rooms.

◇ Ventilate and insulate attic and crawl spaces. Use heavy plastic to cover earth floors in crawl spaces.

◇ Clean and dry water damaged carpets, clothing, bedding, and upholstered furniture within 24 to 48 hours, or consider removing and replacing damaged furnishings.

◇ Vacuum and clean your home regularly to remove mold spores.

◇ Check around your windows for signs of condensation and water droplets. Wipe them up right away so mold can't start to grow.

**What can I use to clean up mold?** Clean up mold and take care of the problem by following the advice above to keep your home dry and keep mold out. Act fast! Mold damages your home as it grows. Clean it up as soon as possible.

**Size the Moldy Area.** Decide if you have a large or small area of mold. A small area is less than about ten square feet, or a patch three feet by three feet square. To clean a small area, follow the advice below. You may use a cotton face mask for protection. If you have a lot of mold damage (more than ten square feet) consider hiring a cleaning professional. If the moldy area has been contaminated by sewage or is in hidden places, hire a professional. To find a professional, check under "Fire and Water Damage Restoration" in your Yellow Pages. If you decide to clean up on your own, follow the guidance below.

**Use Protection.** Wear goggles, gloves, and breathing protection while working in the area. For large consolidated areas of mold growth, you should wear an Occupational Safety and Health Administration (OSHA) approved particle mask.

**Seal the Area.** Seal off area from the rest of your home. Cover heat registers or ventilation ducts/grills. Open a window before you start to clean up.

**Remove Items**. Remove all your furnishings to a mold-free area. Clean the surrounding moldy area then follow cleaning directions below for the items you removed and the new space.

**Bag Moldy Trash.** Bag all moldy materials and tie off the top of the bag. Bring them outdoors and place in your garbage container right away.

**Scrub Surfaces**

◇ First wash with a mild detergent solution, such as laundry detergent and warm water. Allow to dry.

◇ (Optional step) Then wipe with a solution of 1/4 cup bleach to one gallon of water. Wait 20 minutes and repeat. Wait another 20 minutes.

◇ Last apply a borate-based detergent solution and don't rinse. This will help prevent mold from growing again. A borate-based laundry or dish washer detergent has "borate" listed on the ingredients label.

**Clean and Wash.** Give the entire area a good cleaning, vacuum floors, and wash any exposed bedding or clothing.

**Monitor**. Check regularly to make sure mold has not returned to the clean-up area.

**What cleans moldy furniture and other items?**

◇ For wood, metal, plastic, glass, ceramics, and other objects that don&#39;t absorb water but are washable - wipe them with a solution of lukewarm water and laundry detergent.

◇ For clothes, bedding, and other materials that absorb water and are washable - wash them in the laundry.

◇ For beds, sofas, and other furniture that absorb water but are not washable - these items may need to be discarded. Or, try to save them by vacuuming well and allowing to air out. If there is no odor it may be okay. Mold can come back, so watch for any mold growth or mold related health problems. Discard the item if you suspect mold is growing inside or outside the item.

**Should I paint over mold?** No. Don't paint or caulk over mold. The mold will grow under the paint and the paint will peel.

**I'm a renter or landlord, what help can you provide for a mold problem?** Mold problems in buildings are a result of water and moisture problems. Excess moisture comes from leaks or condensation. Tenants and landlords both have responsibilities for addressing water and moisture problems that can cause mold. Generally, fixing leaks is the landlord's responsibility and reducing condensation is the renter&#39;s

8

responsibility. See our mold resources for renters and landlords (www.doh.wa.gov/rentermold).

**Who are my local contacts for more information about mold?** In Washington, you can contact your local county health department (www.doh.wa.gov/localhealth) for more information about mold. If you live outside of Washington State, try contacting your county or state health department.

**More Information**
◈ Mold and Indoor Air Quality Information Line: 360-236-3090
◈ Mold, CDC (www.cdc.gov/mold)
◈ Mold, EPA (www.epa.gov/mold)

By initialing below, you acknowledge and agree to the terms in Section 4.

X
Yaminah B. Oddie-Johnson

# 5. Disclosures and Attachements

## 5.1 FORM LIST

Landlord provides Tenant with the following disclosures and attachments, which are attached hereto and made a part hereof. Tenant shall sign or date, as applicable, all disclosures and attachments hereto prior to occupancy.

- ☐ Co-signer Agreement Addendum (if applicable)
- ☑ Concession Addendum (if applicable)
- ☑ Non-Hardwood Floor Addendum (if applicable)
- ☐ Lead based Paint Addendum (only for Complexes constructed prior to 1978)
- ☐ Pet Agreement Addendum (if applicable)
- ☑ Deposit Payment Schedule Addendum (if applicable)
- ☑ Copy of Tenant's Renter's Insurance (Required)
- ☐ Fire Safety Emergency Notification Plan (if applicable)
- ☐ Fire Safety Emergency Relocation (if applicable)
- ☐ Fire Safety Emergency Evacuation (if applicable)
- ☑ Bed Bug & Flea Addendum (if applicable)
- ☑ Crime Free Addendum (if applicable)
- ☑ Rental Registration and Inspection Ordinance (RRIO) Certificate (Required)
- ☑ SDCI Summary of Seattle Landlord-Tenant Laws (Required)

- ☑ Smoke Free Addendum (Required):

- ☐ Emotional Support Animal (if applicable):

By initialing below, you acknowledge and agree to the terms in Section 5.

X
Yaminah B. Oddie-Johnson

# 6. Key Agreement

## 6.1 KEY ACKNOWLEDGEMENT

Tenant acknowledges receipt of a total of 1 keys to the Premises, 1entry keys to the Complex,1entry FOBS to the Complex, 1 mailbox keys and N/A garage door remotes. Tenant shall not have such keys copied.

FOR SECURITY REASONS KEYS WILL ONLY BE ISSUED TO THOSE LISTED ON THE LEASE.

By initialing below, you acknowledge and agree to the terms in Section 6.



X _____
   Yaminah B. Oddie-Johnson

# 7. Deposit Payment Schedule

## 7.1 TENANT ACKNOWLEDGEMENT

Resident Name(s): Yaminah B. Oddie-Johnson

Cosigners:

Building Name:  Sorento on Yesler  Unit #: D216

Address:
 1414 E Yesler Way
 Seattle, WA 98122

Tenant has been informed of the provision of SMC 7.24 which permit the payment of deposits, non-refundable fees and last month's rent in installments. Tenant has elected:

☐   to pay in a lump sum at the inception of tenancy.

☑   to pay over the maximum time permitted by the ordinance

☐   different payment schedule that the parties have mutually agreed upon and outlined below



X _____
   Yaminah B. Oddie-Johnson

## 7.2 INSTALLMENT TYPES

**Maximum length for a term lease of 6 months or greater:** The total deposit, non-refundable move-in fees, and last month's rent pre-payment may be paid in six consecutive equal monthly installments.

**Maximum length for a term lease less than 6 months:** The total deposit, non-refundable move-in fees, and last month's rent pre-payment may be paid in no more than 4 months, or a specified duration of equal installments depending on the length of tenancy.

**Maximum length for month-to-month tenancy:** The total deposit, non-refundable move-in fees, and last month's rent pre-payment may be paid in no more than 2 months. The first payment is due at the inception of tenancy, and the second payment is due on the first day of the second month or period of their tenancy.

The total **pet deposit** (if applicable) may be paid in no more than **3** consecutive, equal monthly installments.

## 7.3 PAYMENT SCHEDULE

| Payment Schedule | | | | | | |
|---|---|---|---|---|---|---|
| | MONTH 1 | MONTH 2 | MONTH 3 | MONTH 4 | MONTH 5 | MONTH 6 |
| Payment Due Date | April 2024 | May 2024 | June  2024 | July  2024 | August 2024 | Sept 2024 |
| Security Deposit | NA | NA | NA | NA | NA | NA |
| Last Months Rent | $184.16 | $184.16 | $184.16 | $184.16 | $184.16 | $184.20 |
| Pet Deposit | NA | NA | NA | NA | NA | NA |
| Total: | $184.16 | $184.16 | $184.16 | $184.16 | $184.16 | $184.20 |

Landlords may not impose any fee, charge any interest, or impose other costs if a tenant elects to pay in installments.

A tenant's failure to pay a security deposit and non-refundable move-in fee according to an agreed payment schedule is a breach of the rental agreement and subjects the tenant to a 10-Day notice pursuant to RCW 59.12.030(4).

*NOTE: The tenant cannot elect to pay the security deposit and non-refundable move-in fees in installments if:

(a) the total amount of the security deposit and non-refundable move-in fees are equal to, or less than, 25% of the first full month's rent, and

(b) payment of last month's rent is not required at the inception of the tenancy.

I / We agree to the addition of the provisions identified herein to our Apartment Rental Contract.

By initialing below, you acknowledge and agree to the terms in Section 7.

X  *YOJ*
Yaminah B. Oddie-Johnson

Case 25-01081-CMA    Doc 40-1    Filed 09/23/25    Ent. 09/23/25 11:25:27    Pg. 20 of 144

# Vero Management LLC

1414 E Yesler Way • Unit A • Seattle, WA 98122
(253) 880-7873

# 8. Bed Bug & Flea Addendum

## 8.1 BED BUG & FLEA AGREEMENT

| Yaminah B. Oddie-Johnson |
| --- |
| 1414 E Yesler Way<br>Seattle, WA 98112 |
| Sorento on Yesler |

The Mrs. Benisha Randle has inspected the unit prior to lease and has no knowledge of current or past bed bug infestation.

It is agreed between Sorento on Yesler and Yaminah B. Oddie-Johnson as follows:

Yaminah B. Oddie-Johnson declare that all furnishings and other personal items being brought in to the unit are free from bed bugs: ☑

Resident agrees to comply with the following responsibilities pertaining to the prevention and treatment of possible bed bug & or flea

infestations:

1. Resident shall practice good housekeeping and maintenance habits, including:

a. Resident shall not use or bring second-hand furnishings, appliances, etc. which have not first been inspected for the presence of bed bugs. If rented furnishings are to be used Resident is obligated to ensure the rental company has established procedures to prevent bed bug & or flea infestation and performs inspections of their inventory.

b. Resident shall cover all mattresses and box springs with impermeable covers to prevent bed bug nesting or flea infestation.

c. Resident shall check for bed bugs within their personal belongings prior to re-entering rental unit when returning from stays outside the unit.

2. Resident shall report any problems or suspicion of problems immediately, including:

a. Report any suspected bed bug infestations immediately.

b. Report any maintenance needs immediately to minimize the possibility of harboring bed bugs & or fleas within cracks, holes or otherwise, or allowing bed bugs & or fleas to travel from unit to unit.

3. Resident shall cooperate and comply with all pest control efforts and requirements, including, but not limited to:

a. Allowing access to pest control company when proper notice is given, as requested by Mrs. Benisha Randle , and comply with all requests related to pest control company treatments.

b. Sealing all items prior to them being removed from the unit for cleaning and sterilization or to prevent spread/further infestation.

c. Removing all bedding, drapes, curtains, and non-fixed rugs.

d. Checking and / or removing mattresses and box springs.

e. Removing all items from dressers, nightstands, and closets.

f. Vacuuming all floor areas, furniture, mattresses and box springs, and inside all storage furnishings.

g. Wash all machine-washable items and dry items on high heat setting. Any other items necessitating cleaning which cannot be done by Resident must be taken to a professional dry cleaning company for cleaning and decontamination.

4. Resident agrees to reimburse landlord for all treatment costs if it is determined that a bed bug & or flea infestation began within Resident's unit.

5. Resident agrees to reimburse Vero Management LLC for expenses arising from any action, claim, loss, damage and/or expenses, including attorney's fees, incurred by Vero Management LLC as a result of Resident and / or their guests' failure to comply with the terms of this Addendum and Lease / Rental Agreement.

6. Resident agrees that a failure to comply with the terms of this Addendum shall constitute a material breach of the Lease / Rental

Agreement and may subject the Resident to court action, including unlawful detainer / eviction proceedings.

By signing below, you acknowledge and agree to the terms in Section 8.

X *Yaminah Oddie-Johnson*
     Lessee                IP Address: 174.224.193.209
                             04/22/2024 01:11pm PDT

# Vero Management LLC

1414 E Yesler Way • Unit A • Seattle, WA 98122
(253) 880-7873

# 9. Rental Concessions Addendum

## 9.1  RENTAL CONCESSION ADDENDUM

This agreement is an Addendum and part of the Rental or Lease Agreement dated  05/01/2024  between Landlord  Sorento on Yesler  and Lessee(s)  Yaminah B. Oddie-Johnson with reference to the property located at
 1414 E Yesler Way
 Seattle, WA 98122
, unit #  D216

Lessee is offered a concession of $ $257.50 Free April Rent April24th - April 30th 2024.

Resident understands and agrees that his/her rights to benefit from the concession are contingent upon his/her full completion of the lease length noted as the lease terms.

If resident does not comply with the terms of their lease in full, Lessee shall repay Landlord for full value of the rental concession.

By signing below, you acknowledge and agree to the terms in Section 9.

X *Yaminah Oddie-Johnson*
Lessee                                    IP Address: 174.224.193.209
                                          04/22/2024 01:11pm PDT

# Vero Management LLC

1414 E Yesler Way • Unit A • Seattle, WA 98122
(253) 880-7873

# 10. Crime Free Addendum

## 10.1 TERMS & CONDITIONS

It is agreed between  Sorento on Yesler  and  Yaminah B. Oddie-Johnson  as follows:

1. ILLEGAL DRUGS: Resident hereby agrees to keep the premises free of illegal drugs during the term of the Resident's tenancy. Resident agrees that illegal drugs will not be used, stored, manufactured, or kept on the Premises by the Resident, any family member residing on the Premises, or any guest, or invitee during the term of the Agreement. Resident will keep the Premises "drug free" at all times.

2. SUBSTANCE ABUSE: Resident agrees that Resident, any family member residing on the Premises and any guest or invitee shall not use controlled substances (including alcohol and prescription medications) in a manner that will either:

a) disturb the peace and quiet enjoyment of the other Residents or neighbors to the Premises; or

b) endanger the health, safety, or well-being of Resident, any family member residing on the Premises, or any guest or invitee.

3. ILLEGAL GANG ACTIVITY: Resident agrees that Resident, any family member residing on the Premises, or any guest or invitee shall not be a member of an illegal gang, nor shall Resident, any family member, or any guest or invitee engage in any gang related activity on the Premises during tenancy. For the purposes of this Addendum, the term "illegal gang" refers to a group, or member of a group, of people involved in organizing illegal activity or anti-social behaviors.

4. GRAFFITI: Resident agrees that Resident, any family member residing on the Premises, or any guest or invitee shall not deface any property on property grounds.

5. CRIMINAL ACTIVITY: Resident, any family member residing on the Premises, or any guest or invitee shall not engage in criminal activity, including prostitution, threats, intimidation, possession of dangerous weapons, unlawful discharge of firearms, or any breach of the lease agreement that jeopardizes the health, safety and welfare of the Owner / Agent or other Resident or involving imminent or actual property damage.

6. DOMESTIC VIOLENCE: Resident agrees that any incident meeting the definition of domestic violence causing physical harm will result in Termination of Tenancy of the perpetrator according to RCW 59.18.575 of the Residential Landlord-Tenant Act of Washington State (59.18).

| Acknowledgment: |
|---|

Resident agrees that violation of any of the above terms constitutes a nuisance and is grounds for eviction and / or other legal action by the Owner / Agent.

I / We agree to the addition of the provisions identified herein to our WA State Lease / Rental Agreement & Security Deposit Receipt.

DATED this 04/22/2024.

IN WITNESS WHEREOF, the parties have executed this Agreement the day and year first above written.

By signing below, you acknowledge and agree to the terms in Section 10.

X *Yaminah Oddie-Johnson*
_____
Lessee                              IP Address: 174.224.193.209
                                    04/22/2024 01:11pm PDT

Case 25-01081-CMA    Doc 40-1    Filed 09/23/25    Ent. 09/23/25 11:25:27    Pg. 24 of 144

# Vero Management LLC

1414 E Yesler Way • Unit A • Seattle, WA 98122
(253) 880-7873

# 11. SORENTO FLATS WI-FI AGREEMENT

## 11.1  TERMS & CONDITIONS

This agreement is between  Sorento on Yesler  and  Yaminah B. Oddie-Johnson  at
 1414 E Yesler Way
 Seattle, WA 98112

Resident agrees :

Resident agrees that they are authorize to use the FastMesh Network per FastMesh's terms of Use. These terms are posted at the following website and user agrees to follow said terms.  http://fastmesh.com/tofa-m

User agrees to keep access codes private and should user share access codes with any guests, they agree to be held responsible for any conduct, use, or web traffic their guests generates.

If a user gives a access to a guest who is not following the FastMesh terms of use, they should reach out to FastMesh immediately at support@fastmesh.com

Access codes may change from time to time

DO NOT POST ACCESS CODE PUBLICLY.

By signing below, you acknowledge and agree to the terms in Section 11.

X _Yaminah Oddie-Johnson_
    Lessee                    IP Address: 174.224.193.209
                                 04/22/2024 01:11pm PDT

# Vero Management LLC

1414 E Yesler Way • Unit A • Seattle, WA 98122
(253) 880-7873

# 12. Non- Hardwood Flooring Addendum

## 12.1 VINYL FLOORING

This Addendum is by and between Vero Management LLC as "Landlord", and Yaminah B. Oddie-Johnson as "Tenant" for incorporation into and

attachment to that certain Lease/Rental Agreement between the parties hereto dated 04/22/2024 for the rental of D216 of

1414 E Yesler Way
Seattle, WA 98122

Your unit contains vinyl flooring. You will be held financially responsible for the direct cost to repair any damage done to the floors during your tenancy, excluding normal wear. Any existing damage or stains must be noted on the

"Apartment Inspection Report" at move-in time.

## 12.2 RULES ADDITIONAL

• IF THE FLOORING IS DAMAGED DURING YOUR TENANCY, YOU ARE RESPONSIBLE.

• Most damage is done while moving furniture. Do not slide or drag furniture on the vinyl floor – it will scratch the floor and leave

permanent marks.

• Caster cup protection devices or padding disks must be placed under all furniture with legs or feet that are not on carpet.

• Do not set any plant pots or any other container on the carpeted or vinyl floors that could possibly leak water. If you spill any fluids

on the flooring clean it up immediately.

• Remember that if you spill any fluid on the carpet, you may need to roll the carpet and carpet pad back to make sure that the fluid

does not damage the finish on the floor.

• If bound carpets were furnished with your apartment they can not be removed, replaced, or otherwise rolled up off the floor without

written permission from the Landlord.

• Please be aware that noise travels more easily through hard surface floors. Please- no heavy footsteps (consider removing your shoes

while in the apartment). Noise from stereos, televisions, squeaky beds and even normal conversation travels easier through the floor

when it is not carpeted.

• If there is no carpet in the bedroom, we recommend that you obtain throw rugs to protect the floor and help reduce noise. Be extra

careful about footsteps and voices in the bedroom after 10:00 o'clock at night out of consideration for your neighbor below.

• When cleaning the floors, use only products specifically suited for use on the type(s) of flooring present.

By signing below, you acknowledge and agree to the terms in this section.

By signing below, you acknowledge and agree to the terms in Section 12.

X *Yaminah Oddie-Johnson*
     Lessee           IP Address: 174.224.193.209
                          04/22/2024 01:11pm PDT

18

# Vero Management LLC

1414 E Yesler Way • Unit A • Seattle, WA 98122
(253) 880-7873

# 13. REQUIRED INSURANCE ADDENDUM TO LEASE AGREEMENT

## 13.1 REQUIRED INSURANCE ADDENDUM TO LEASE AGREEMENT

This Addendum is attached to and becomes a part of the Residential Lease Agreement. For the duration of the Lease, Lessee is required to maintain and provide the following minimum required insurance coverage:

- $100,000 Limit of Liability for Lessee's legal liability for damage to Lessor's property for no less than the following causes of loss: fire, smoke, explosion, backup or overflow of sewer, drain or sump, and water damage ("Required Insurance").

Lessee is required to furnish Lessor with evidence of Required Insurance prior to occupancy of leased premises and at the time of each lease renewal period. If at any time Lessee does not have Required Insurance, Lessee is in breach of the Lease and Lessor shall have, in addition to any other rights under the Lease, the right but not the obligation to purchase Required Insurance coverage protecting the sole interest of the Lessor and seek contractual reimbursement from the Lessee for all costs and expenses associated with such purchase. This may be referred to as "force placed insurance".

Lessee may obtain Required Insurance or broader coverage from an insurance agent or insurance company of Lessee's choice. If Lessee furnishes evidence of such insurance and maintains the insurance for the duration of the Lease, then nothing more is required. If Lessee does not maintain Required Insurance, the insurance requirement of this Lease may be satisfied by Lessor, who may purchase such coverage through the Lessor's Legal Liability Insurance Policy ("LLIP"). The coverage provided under the LLIP will provide the Required Insurance coverage listed above. An amount equal to the total cost to the Lessor for the LLIP coverage shall be charged to Lessee by the Lessor as a recoverable expense under the Lease. Some important points of this coverage, which Lessee should understand are:

1. LLIP is designed to fulfill the insurance requirement of the Lease. Lessor is the Insured under the LLIP. This is single interest forced placed insurance. Lessee is not an Insured, Additional Insured or beneficiary under the LLIP. All loss payments are made to the Lessor.
2. LLIP coverage is <u>NOT</u> personal liability insurance or renters insurance. LLIP does not cover the Lessee's personal property (contents), additional living expenses or liability arising out of bodily injury or property damage to any third party. If Lessee requires any of these coverages, then Lessee should contact an insurance agent or insurance company of Lessee's choice to obtain personal liability insurance or renters insurance to protect Lessee's interests.
3. Coverage under the LLIP may be more expensive than the cost of Required Insurance obtainable by Lessee elsewhere. At any time, Lessee may contact an insurance agent or insurance company of their choice for insurance options to satisfy the Required Insurance under this Lease.
4. If Lessee has purchased Renters Insurance and at any time allows such Renters Insurance to lapse in breach of the Lease Agreement, Lessor may purchase Lessor Insurance without notice and add the total cost associated therewith to Lessee's monthly rent payment.
5. Licensed insurance agents may receive a commission on the LLIP.
6. The total cost to the Lessee for the Lessor obtaining LLIP shall be ($9.50) per month, subject to no proration. This is an amount equal to the actual premium charge to the Lessor including any premium taxes and fees due to state governing bodies. Additionally, an Administration Fee in the amount of Three Dollars ($3.00) to be retained by the Lessor for processing and handling will be charged.
7. In the event that loss or damage to Lessor's property exceeds the amount of Required Insurance, Lessee shall remain contractually liable to Lessor for such amount. In the event of liability to any other party for bodily injury or property damage, Lessee shall remain liable to such other party.
8. It shall be the Lessee's duty to notify Lessor of any subsequent purchase of Renters Insurance.

As used in this Addendum: "Lease" may be interchangeable with "Lease Agreement"; "Lessee" may be interchangeable with "Resident" or "Tenant", and "Lessor" may be interchangeable with "Landlord" or "Owner".

Scheduling of the premises under the LLIP is not mandatory and Lessee may purchase Required Insurance from an insurance agent or insurance company of Lessee's choice at any time and coverage under the LLIP will be terminated by the Lessor.

By signing below, you acknowledge and agree to the terms in Section 13.

X *Yaminah Oddie-Johnson*
      Lessee             IP Address: 174.224.193.209
                                04/22/2024 01:11pm PDT

20

# Vero Management LLC

1414 E Yesler Way • Unit A • Seattle, WA 98122
(253) 880-7873

# 14. Smoke Free Environment Agreement

## 14.1  TERMS & CONDITIONS

| Yaminah B. Oddie-Johnson |
| --- |
| 1414 E Yesler Way<br>Seattle, WA 98112 |
| Sorento on Yesler |

The rental property at the above address has been designated as a: "Smoke Free Residence" requiring all Residents/Occupants, guests and invitees to not engage in  smoking within the above mentioned dwelling.

◇ "Smoke Free Building" requiring all Residents/Occupants, guests and invitees to not engage in smoking within all units and the common areas of subject property.

◇ Smoking is prohibited in all public areas of residential properties in accordance with RCW 70.160.075. Smoking in public is allowed only if done in excess of 25 feet from an entrance/exit.

Resident(s) agree(s) to comply with this addendum and understand(s) that the enforcement upon its guests and invitees will be Resident's responsibility. Non-compliance with the smoke free addendum may result in one or more of the following actions by Owner / Agent:

☑
1. Service of a 10 Day Notice to Comply with Agreement or Vacate

☑
2. Forfeiture of all or part of your security deposit due to any resulting smoke damage/odor

☑
3. Eviction action in enforcement of the lease terms and this addendum.

By checking all boxes you are fully aware of the consequences listed in this section.

By signing below, you acknowledge and agree to the terms in Section 14.

X *Yaminah Oddie-Johnson*
Lessee                                  IP Address: 174.224.193.209
                                        04/22/2024 01:11pm PDT

Case 25-01081-CMA    Doc 40-1    Filed 09/23/25    Ent. 09/23/25 11:25:27    Pg. 30 of 144



# RRIO Certificate of
# Property Registration

**Property Information**

Property Name:          Sorento On Yesler

Address:                1414 E Yesler WAY# 157

Registration Record No.:  001-0134813

**Tenant's Contact for Repairs**

Contact Name:           Nadezhda Maksimchuk
                        Vero Mamangement LLC

Address:                1414 E Yesler Way
                        Unit A
                        Seattle, WA 98122

Phone:                  253-880-7873

Registration Date:      October 13, 2023

Registration Expires:   October 13, 2025

This RRIO Certificate of Property Registration indicates that the property listed above has registered rental housing units at this location which meet the requirements of the City of Seattle's Rental Registration and Inspection Ordinance (RRIO) program as required by Seattle Municipal Code Chapter 22.214. Issuance of this certificate indicates that all rental housing units on this property either meet basic housing standards or will meet such standards prior to rental. For more information regarding these standards please see www.seattle.gov/RRIO.

<u>Owner Responsibilities</u>: **Within 30 days after the Seattle DCI RRIO program issues a RRIO Certificate of Property Registration, a copy shall be delivered to the tenants in each rental housing unit or shall be posted and remain posted in one or more places readily visible to all tenants. A copy of the current RRIO Certificate of Property Registration shall be provided to all new tenants at or before the time they take possession of the rental housing unit.**

www.seattle.gov/RRIO

Code Compliance Division
Seattle Department of Construction and Inspections

700 5th Avenue, 20th Floor
P.O. Box 34019, Seattle WA 98124-4019
(206) 684-4110    TTY: 7-1-1 or (206) 233-7156

Case 25-01081-CMA    Doc 40-1    Filed 09/23/25    Ent. 09/23/25 11:25:27    Pg. 31 of 144

**Vero Management LLC**

1414 E Yesler Way • Unit A • Seattle, WA 98122
(253) 880-7873

# 15

# DPD04_RRIOPropertyRegistrationCertificate_AA_20231013_110503.pdf

X *Yaminah Oddie-Johnson*
    Lessee              IP Address: 174.224.193.209
                                   04/22/2024 01:13pm PDT





# PROTECT YOUR SEWER
## Know what NOT to flush!

Did you know that all the "used" water in your home goes through your wastewater (sewer) pipes? Whatever you "flush" down the **toilet, sink, garbage disposal, or dishwasher** all combines together.

**Flushing the *wrong* things**—things not designed to break down or be handled through the wastewater system—can cause debris to build up in pipes and eventually create a sewer backup—an expensive health hazard for you, and possibly your neighbors!

**You can protect your home's sewer pipes and the public system by being careful about what you flush.**

## WHAT *SHOULD* YOU FLUSH?

**Basically, 2 things (besides water):**

▶ Toilet paper, and
▶ Human waste

Flushing anything else tempts trouble—not just for your home, but for the public system and the environment as well.

## WHAT *NOT* TO FLUSH:

**These are some of the WORST sewer culprits:**

▶ **Disposable wipes**—any kind, even if labeled "flushable." Wipes don't break down in the sewer line. These have become one of the #1 causes of sewer backups.

▶ **F.O.G. (fats, oils and grease)**—cooking oil and grease flushed through the sink or dishwasher, or greasy scraps sent through the garbage disposal. F.O.G. cools and congeals down the line, sticking to pipes.

▶ **Feminine sanitary products**—tampons, applicators or pads

▶ **Diapers** or nursing pads

▶ **Dental floss**

▶ **Paper towels or tissues**

▶ **Hair**

▶ **Cotton balls or Q-tips**

▶ **Condoms**

**Do your sewer a favor:** always put these (and any other waste items) in the trash—not down your toilet or drain!



Everything flushed through your plumbing system ends up in the same place— your sewer line.

Flushed oils and grease cool and congeal. Flushed debris builds up. Over time, sewer flow is blocked, which can result in a sewer backup.

**Questions about any of this information?** Contact us at (425) 398-4403 or dispatch@nud.net.

# SEWER CARE FAQS: WHAT SHOULD I DO WITH...

## F.O.G. WASTE:

Common sources of F.O.G. waste include:
- ► Oil from cooked meats and fish
- ► Gravies, sauces and soups
- ► Cooking oil, butter, shortening, lard and margarine
- ► Milk, cream, sour cream and mayonnaise
- ► Oily or greasy food scraps



**Did you know?**

50% of sewage overflows are caused by improper disposal of F.O.G.

You can avoid a situation like this by using these safe disposal tips.

## DISPOSING OF F.O.G. PROPERLY:



**1 Scrape & wipe before washing**

Keep F.O.G. out of pipes by pre-wiping dishes with your napkin—you can compost scraps and food-soiled paper.



**2 Avoid garbage disposals—use a strainer**

Catch oily, greasy and starchy food waste before it enters your pipes—you can compost scraps.



**3 For heavy grease: COOL IT—CAN IT—TRASH IT**

Pour cooled fats, oils, and grease into a container with a lid and place in the trash or compost.



**Instead of tossing your used cooking oil, recycle it!**

A local collection tank is located at the North Kirkland Community Center at 12421 103rd Ave NE. All cooking oils are recycled into biodiesel fuel by General Biodiesel.

## PRESCRIPTION MEDICATIONS:

Wastewater treatment plants are not designed to remove medications. Flushed medications can affect our region's aquatic life—and our water and food quality.



Prescription meds flushed down the toilet or sink are sent to our waterways, affecting aquatic wildlife and water quality.



**To flush meds properly, use a designated disposal site.**

Instead of flushing medications down your toilet or drain, use a safe medicine disposal box. Many local police stations and health care centers make these available.

Visit **www.medicinereturn.org** to find the location nearest you.

## CLEANING PRODUCTS, CHEMICALS & OTHER HOUSEHOLD WASTES:



**Whatever you pour down the drain enters our waterways and water environment.**

Don't flush liquid chemicals like bleach, cleaning fluids or paint thinners down the sink or toilet. Learn how to dispose of common household wastes safely at **apps.lhwmp.org/GetRidOfIt/**.

**Watch for the traveling wastemobile in your local area!**
For wastemobile schedule and what you can drop off, visit: **www.hazwastehelp.org/HHW/wastemobile.aspx**.

# Vero Management LLC

1414 E Yesler Way • Unit A • Seattle, WA 98122
(253) 880-7873

# 16

## Drain_Care_-_Do_Not_Flush.pdf

X *Yaminah Oddie-Johnson*

Lessee         IP Address: 174.224.193.209
04/22/2024 01:13pm PDT



# Got Mold?
## Frequently Asked Questions About Mold

### What are molds?

Molds are tiny microscopic organisms that digest organic matter and reproduce by releasing spores. Molds are a type of fungi and there are over 100,000 species. In nature, mold helps decompose or break-down leaves, wood and other plant debris. Molds become a problem when they go where they are not wanted and digest materials such as our homes.

### What makes molds grow in my home?

Mold enters your home as tiny spores. The spores need moisture to begin growing, digesting and destroying. Molds can grow on almost any surface, including; wood, ceiling tiles, wallpaper, paints, carpet, sheet rock, and insulation. The mold grows best when there is lots of moisture from a leaky roof, high humidity, or flood. There is no way to get rid of all molds and mold spores from your home. But you can control mold growth by keeping your home dry.

### Can I be exposed to mold?

When molds are disturbed, they release spores into the air. You can be exposed by breathing air containing these mold spores. You can also be exposed through touching moldy items, eating moldy food or accidental hand to mouth contact.

### Do molds affect my health?

Most molds do not harm healthy people. But people who have allergies or asthma may be more sensitive to molds. Sensitive people may experience skin rash, running nose, eye irritation, cough, nasal congestion, aggravation of asthma or difficulty breathing. People with an immune suppression or underlying lung disease, may be at increased risk for infections from molds.

A small number of molds produce toxins called mycotoxins. When people are exposed to high levels of mold mycotoxins they may suffer toxic effects, including fatigue, nausea, headaches, and irritation to the lungs and eyes. If you or your family members have health problems that you suspect are caused by exposure to mold, you should consult with your physician.

### When is mold a problem?

You know you have mold when you smell the "musty" odor or see small black or white specks along your damp bathroom or basement walls. Some mold is hidden growing behind wall coverings or ceiling tiles. Even dry, dead mold can cause health problems, so always take precautions when you suspect mold.

Mold is often found in areas where water has damaged building materials and furniture from flooding or plumbing leaks. Mold can also be found growing along walls where warm moist air condenses on cooler wall surfaces, such as inside cold exterior walls, behind dressers, headboards, and in closets where articles are stored against walls. Mold often grows in rooms with both high water usage and humidity, such as kitchens, bathrooms, laundry rooms, and basements. If you notice mold or know of water damaged areas in your home, it is time to take action to control its growth.

### When should I sample for mold?

You don't need to sample for mold because in most cases you can see or smell mold. Even a clean, dry house will have some mold spores, but not enough to cause health problems. If you smell mold it may be hidden behind wallpaper, in the walls or ceiling or under the carpet. If you suspect you have hidden mold be very careful when you investigate, protect yourself from exposure in the same manner as you would for a clean-up.



Washington State Department of
Health

## Can I control mold growth in my home?

Yes you can. Dry out the house and fix any moisture problems in your home:

- Stop water leaks, repair leaky roofs and plumbing. Keep water away from concrete slabs and basement walls.
- Open windows and doors to increase air flow in your home, especially along the inside of exterior walls. Use a fan if there are no windows available.
- Make sure that warm air flows into all areas of the home. Move large objects a few inches away from the inside of exterior walls to increase air circulation.
- Install and use exhaust fans in bathrooms, kitchens, and laundry rooms.
- Ventilate and insulate attic and crawl spaces. Use heavy plastic to cover earth floors in crawl spaces.
- Clean and dry water damaged carpets, clothing, bedding, and upholstered furniture within 24 to 48 hours, or consider removing and replacing damaged furnishings.
- Vacuum and clean your home regularly to remove mold spores.
- Check around your windows for signs of condensation and water droplets. Wipe them up right away so mold can't start to grow.

## What can I use to clean up mold?

Clean up mold and take care of the problem by following the advice above to keep your home dry and keep mold out. Act fast! Mold damages your home as it grows. Clean it up as soon as possible.

### Size the Moldy Area

Decide if you have a large or small area of mold. A small area is less then about ten square feet, or a patch three feet by three feet square. To clean a small area, follow the advice below. You may use a cotton face mask for protection.

If you have a lot of mold damage (more then ten square feet) consider hiring a cleaning professional. If the moldy area has been contaminated by sewage or is in hidden places hire a professional. To find a professional, check under "Fire and Water Damage Restoration" in your Yellow Pages. If you decide to clean up on your own, follow the guidance below.

### Use Protection

Wear goggles, gloves, and breathing protection while working in the area. For large consolidated areas of mold growth, you should wear an Occupational Safety and Health Administration (OSHA) approved particle mask.

### Seal the Area

Seal off area from the rest of your home. Cover heat registers or ventilation ducts/grills. Open a window before you start to clean up.

### Remove Items

Remove all your furnishings to a mold-free area. Clean the surrounding moldy area then follow cleaning directions below for the items you removed and the new space.

### Bag Moldy Trash

Bag all moldy materials and tie off the top of the bag. Bring them outdoors and place in your garbage container right away.

### Scrub Surfaces

Scrub hard surfaces:

- First wash with a mild detergent solution, such as laundry detergent and warm water. Allow to dry.
- (Optional step) Then wipe with a solution of 1/4 cup bleach to one gallon of water. Wait 20 minutes and repeat. Wait another 20 minutes.
- Last apply a borate-based detergent solution and don't rinse. This will help prevent mold from growing again. A borate-based laundry or dish washer detergent has "borate" listed on the ingredients label.

### Clean and Wash

Give the entire area a good cleaning, vacuum floors, and wash any exposed bedding or clothing.

### Monitor

Check regularly to make sure mold has not returned to the clean-up area.


Washington State Department of Health

Case 25-01081-CMA    Doc 40-1    Filed 09/23/25    Ent. 09/23/25 11:25:27    Pg. 39 of 144

## What cleans up moldy furniture?

How to clean you moldy furniture depends on how it reacts to water. See chart below:

| Reaction to Water | Items | Recommendations |
| --- | --- | --- |
| Doesn't absorb water and is washable. | Wood, metal, plastic, glass, and ceramics objects. | Wipe with a solution of lukewarm water and laundry detergent. |
| Absorbs water and is washable. | Clothes and bedding. | Wash in laundry. |
| Absorbs water but not washable. | Beds, sofas and other furniture. | These items may have to be discarded. Or, try to save by vacuuming well and allowing to air out. If there is no odor it may be okay. Mold can come back, so watch for any mold growth or mold related health problems. Discard the item if you suspect mold is growing inside or outside the item. |

## Should I paint over mold?

No. Don't paint or caulk over mold. The mold will grow under the paint and the paint will peel.

## Must landlords tell tenants about mold?

Yes! In 2005, the Washington State legislature approved Senate Bill 5049 which requires landlords to notify their tenants about mold. See our resources landlords can use to comply with this mold notification requirement at www.doh.wa.gov/ehp/ts/iaq/renter.htm.

## Who are my local contacts for more information about mold?

In Washington, you can contact your county health department (www.doh.wa.gov/LHJMap/LHJMap.htm) for more information about mold. If you live outside of Washington State, try contacting your county or state health department (www.doh.wa.gov/Links/links2.htm#State).

## Need more mold information?

- CDC has frequently asked questions, identifying mold problems and cleanup, and workplace resources at www.cdc.gov/mold.
- EPA offers resources for homeowners, schools, and building managers at www.epa.gov/mold.
- Northwest Clean Air Agency "Mold in Your Home" videos are available in English and Spanish at www.nwcleanair.org/aqPrograms/indoorAir.htm.

For persons with disabilities, this document is available in other formats. To make a request, call 1-800-525-0127 or 1-800-833-6388 (TTY/TDD).



Washington State Department of Health

Case 25-01081-CMA    Doc 40-1    Filed 09/23/25    Ent. 09/23/25 11:25:27    Pg. 40 of 144

# Vero Management LLC

1414 E Yesler Way • Unit A • Seattle, WA 98122
(253) 880-7873

## 17

## Mold_Pamphlet.pdf

X *Yaminah Oddie-Johnson*

Lessee                  IP Address: 174.224.193.209
04/22/2024 01:16pm PDT



# Renting in Seattle
# RENTER'S HANDBOOK

Seattle Department of Construction & Inspections

January 2024

Case 25-01081-CMA    Doc 40-1    Filed 09/23/25    Ent. 09/23/25 11:25:27    Pg. 42 of 144

2

## DON'T FORGET TO REGISTER TO
# VOTE!

# YOUR VOICE MATTERS!

**www.kingcounty.gov/depts/elections**



## WELCOME HOME!

**There's a lot to do when moving to a new home. Updating your voter registration is one of those important tasks to remember.**

BALLOTS



### ALREADY REGISTERED?

**Here are 5 easy ways to update your address:**

- If you have a current Washington State driver license or state ID card, go online!

- Mail the registration form included with this Renter's Handbook.

- E-mail elections@kingcounty.gov with your name, date of birth, old residential and mailing address, and your new residential and mailing address.

- Call 206-296-VOTE (8683). Services are available in 120 languages.

- Go in-person to King Coutny Election headquarters in Renton or the Voter Registration Annex in Seattle.

**REMEMBER TO CHANGE YOUR ADDRESS AT LEAST 29 DAYS BEFORE ELECTION DAY. CHECK THE VOTER'S CALENDAR.**



### NEED TO REGISTER?

**There are 3 ways to register to vote:**

- If you have a current Washington State driver license or state ID card, go online!

- Mail the registration form included in this Renter's Handbook. (See center pull-out.)

- Go in-person to King County Election headquarters in Renton or the Voter Registration Annex in Seattle.

# Welcome!



## What Is the Renter's Handbook?

Welcome to Renting in Seattle. Your landlord is required to provide you with a printed copy of this Renter's Handbook when you sign your initial rental agreement. Electronic copies are allowed at lease renewal, annually for month-to-month renters and whenever the City publishes updated versions.

The Renter's Handbook gives you a good overview of both your renter rights and obligations and contains tips and helpful resources to make renting in Seattle an informed experience. Keep this handbook where it's easy to reference.

Check out our web site www.seattle.gov/rentinginseattle it delivers the rent-cycle regulations and fair housing laws, for both renters and housing providers, specific to each audience.

When you need additional information or guidance call the Helpline (206) 684-5700 Monday – Friday during business hours. Phone interpretation available

Seattle is a Welcoming City that values inclusion and equity. City employees do not ask about citizenship status and serve all residents regardless of immigration status.

Lastly, this handbook is not intended as legal advice but an aid to understanding the City's rental housing codes.

Happy Renting!

**3rd edition**



**Seattle** Department of Construction & Inspections

# Table of Contents

| | |
|---|---|
| **FINDING A HOME** | 6 |
| Rental Registration | 8 |
| Minimum Standards | 9 |
| Fair Housing Access | 11 |
| Protected Classes | 13 |
| **READY TO RENT** | 14 |
| Tenant Screening | 14 |
| First In Time Application | 16 |
| Income to Rent Ratio | 17 |
| Service Animals | 18 |
| **MOVING IN** | 21 |
| Move-In checklist | 21 |
| Rental Agreement | 22 |
| Move-In Cost | 23 |
| Utility Accounts | 26 |
| **WHILE YOU RENT** | 30 |
| Landlord/Tenant Duties | 32 |
| Adding Roommates | 34 |
| Landlord Notices | 36 |
| Rental Assistence Pledges | 43 |
| **MOVING OUT** | 44 |
| Just Cause Eviction Ordinance | 46 |
| Eviction Defenses | 49 |
| Unlawful Detainer | 50 |
| Security Deposit | 51 |
| **Final Thoughts** | 52 |
| **Renter Resources** | 54 |
| **Index** | 55 |
| **Notes** | 58 |

# FINDING A HOME

Finding the right place for you is not an exact science and people find their homes in lots of different ways. Many listings are available free online. Sometimes, driving or walking around a neighborhood can yield results where 'For Rent' signs are posted. Beware of online scams that ask for money or wire transfers. Never agree to rent a place before you see it. If a deal feels too good to be true, it probably is! You can report suspected rental scams to the Federal Trade Commission at **www.consumer.ftc.gov**.

Affordable housing can mean a lot of different things. Generally, it is housing that is tied to your income level, often, but not always, based on area rents. Some low-income housing is federally funded and/or provided by non-profit housing organizations. The City's Office of Housing maintains a list of affordable housing units, search a list at **www.seattle.gov/housing/renters/find-housing**.

Often there are waitlists for affordable housing options. Seattle Housing Authority (SHA) both owns low-income housing units and has a rent subsidy program called 'Housing Choice Vouchers'. You can find out more about SHA at **www.seattlehousing.org**, or you can visit their office location in downtown Seattle at 190 Queen Anne Avenue North. You can call the Community Information Line at 2-1-1 for a list of affordable housing providers over the phone if you don't have access to a computer.





# RENTAL REGISTRATION

Since 2014, Seattle's *Rental Registration Inspection Ordinance* (RRIO) requires all rental properties to register with the City.  Some exceptions apply to the requirement including owner-occupied homes that rent rooms, housing stock owned by Seattle Housing Authority or licensed facilities such as assisted living homes. Other owner-occupied rental home exemptions are listed below.

Landlords are required to self-certify that their rental unit meets the basic habitability standards described on the registration checklist.  Priority is given to health and safety compliance. Inspections are required every 5-10 years and can be completed by a City inspector or by a private housing inspector approved by the City. Registration renewal is required every two years.

You can search the address of a rental unit at **www.seattle.gov//rrio** to check if it is registered.  Failure to register can result in fines and impacts the landlord's ability to serve eviction notices.

## Owner-Occupied Exemptions

Generally, landlords sharing their home with tenants or occupying a home on the same property such as an adu/dadu (attached/detached accessory dwelling unit) are exempt from some rental regulations and fair housing laws.

Certain circumstances can impact some exemptions such as using a property management company or having a notice of violation for housing standards.

Be aware of differences to make an informed decision. Most important to note, is owner-occupant landlords have just cause to terminate a month-to-month tenancy with 20 days' advance notice or to not offer a lease renewal.

For more details, see the following regulations that have exemptions for owner-occupant landlords:

- Fair Housing - pg. 11- 12, 17-18
- First in time – pg.16
- Move in costs – pg. 24-25
- Adding roommates – pg. 34-35
- Just Cause - pg. 46-48
- Eviction defenses – pg. 49

8

# Minimum Standards

It's important to know what to look for in a potential home besides your personal preferences. Seattle has minimum safety and maintenance standards for rental housing in the City's Housing and Building Maintenance Code. The following is a basic explanation of those standards.

## Space and Occupancy

This category covers the minimum size of housing units and includes dimensions of sleeping rooms. It also covers light and ventilation requirements, like windows, fans, and sanitation. For example, a sleeping room must be at least 70 square feet with an additional 50 square feet for each person in excess of two.

## Structural

Elements such as foundations, chimneys, masonry and roofs must be solid and stable. The building needs to be weathertight, damp-free, rodent-proof, and maintained in good repair.

## Mechanical

All housing units must have a permanently installed heating source (space heaters alone are not sufficient). Electrical equipment, including wiring, and appliances must be properly installed and safely maintained. The unit must be safely lit and have sufficient electrical outlets.



9

### Fire and Safety

Stairs must be safely constructed and have appropriate handrails. Smoke and carbon monoxide detectors are required. An exterior door or properly sized window for emergency exit (known as egress) is required in all rooms used for sleeping. There are lots of additional requirements for larger, multi-unit buildings.

### Security

Entry doors must have a deadbolt and have a peep hole or window so you can see who is at the door. Locks must be changed when there is a change of tenancy. Buildings must be secure enough to reasonably prevent criminal actions to residents and their belongings.



### Good to Know!

Other general safety things to watch out for in older buildings and homes are the potential hazards of peeling lead paint and asbestos when it is friable (crumbling and not contained). If a unit has bedrooms below ground like basement rooms, are there large/low enough windows or exterior doors for egress? If not, those rooms should not be advertised nor used as bedrooms, as they do not meet safety standards.

Case 25-01081-CMA    Doc 40-1    Filed 09/23/25    Ent. 09/23/25 11:25:27    Pg. 51 of 144



# Fair Housing Access

Seattle's Fair Housing laws strive to ensure everyone has equal access to housing. You have many protections against discrimination even before you decide to sign a lease. These include source of income; criminal history, exclusionary advertising/steering of potential tenants as well as disability rights to reasonable accommodation/modification.

It is illegal for a housing provider to, intentionally or otherwise, steer certain renters to or from a rental listing. A listing that says 'will suit a quiet couple' is potentially discriminatory because it appears to exclude applicants based on their 'parental status,' for example.

Landlords must include specific information when advertising a unit for rent. Advertisements must:

- Include the criteria that will be used for screening and the minimum standard to move forward in the application process.

- Describe all information and documents the landlord will use in screening.

- Provide information explaining how you can request additional time to complete an application for things like interpretation or a reasonable accommodation for a disability.

### Source of Income Protections

Seattle has protections for renters with a source of income other than employment. Housing providers cannot deny you a rental unit or treat you differently because your income comes from social security, alimony, retirement, disability etc. or if you are relying on a rental subsidy program like a Housing Choice Voucher. If your landlord has a rent to income ratio requirement they must subtract any subsidy you receive before making the calculation. See pg. 17 for more on income-to-rent ratio.

Case 25-01081-CMA    Doc 40-1    Filed 09/23/25    Ent. 09/23/25 11:25:27    Pg. 52 of 144

## Fair Chance Housing

Seattle's *Fair Chance Housing Ordinance* offers protections to address bias and barriers people with criminal backgrounds face when attempting to secure rental housing.

Advertising of rental units cannot ban applicants with a criminal history.

Adult applicants may be screened against the sex offender registry. A landlord could potentially disqualify an applicant on the registry only if:

1. The offense was committed as an adult.

2. A legitimate business reason exists. A connection would need to be demonstrated between the policy/practice and the safety of residents/property.

The following are some of the factors informing a landlord's consideration:

- Nature and severity of the offense
- Number and types of convictions
- Age at time of conviction
- Evidence of good tenant history
- Time since date of conviction
- Supplemental information

Homeowners renting units on the property where they live like an attached apartment or backyard cottage are exempt from these screening restrictions. see pg. 8.

If you see rental housing advertising that does not comply with Fair Chance housing laws, you can call the Helpline at (206) 684-5700 to report it.



Case 25-01081-CMA    Doc 40-1    Filed 09/23/25    Ent. 09/23/25 11:25:27    Pg. 53 of 144

# Protected Classes

Seattle's Fair Housing Laws are designed to ensure everyone has equal access to housingand are based on protected classes.

- Race
- Color
- Ancestry
- Sex
- Disability
- Creed
- Religion
- Age
- Retaliation
- Alternative sources of income
- National origin
- Caste

- Marital status
- Political ideology
- Parental status
- Sexual orientation
- Gender identity
- Use of a service animal
- Use of a Housing Choice Voucher or other subsidy programs
- Military status or veteran
- Criminal history
- Citizenship and immigration status
- Pregnancy outcomes



Case 25-01081-CMA    Doc 40-1    Filed 09/23/25    Ent. 09/23/25 11:25:27    Pg. 54 of 144

# READY TO RENT

Renting can be a competitive business, especially for more affordable units. Being prepared in advance can really help.

- Know your credit score and any potential issues that might show in a screening report. You can manage that information with your application and explain the circumstances to support your application. You can access your credit report at **www.annualcreditreport.com**
- Know your rights before you submit an application.
- Have the following information ready for your application:
  - Current and previous addresses including landlord information
  - Names and birth dates of all occupants
  - Employment and income verification
  - Vehicle information
  - References, both personal and housing related
  - Pet information

## Tenant Screening

Housing providers must make clear in advance the criteria they will use to screen your application and the reasons that would result in denying your application. You are entitled to a copy of the screening report.

You can only be charged the actual cost of the application screening. The customary cost in Seattle is approximately $25-$45 per adult.

If your application is denied, the housing provider must give you a written notice stating the reasons. This is called an 'adverse action' notice and is required by both City and State law.



## Holding Deposit

When you apply to rent a unit, the housing provider may want to charge you a deposit to hold the unit while screening your application.

The maximum holding deposit a landlord may charge is 25% of one month's rent. A receipt explaining the terms is required.

If you are offered the unit and decide you don't want it, you will likely forfeit your holding deposit. The deposit is fully refundable if your application is not successful or the unit fails a housing inspection connected to a rental subsidy program.

If you sign a rental agreement for the unit, the holding deposit must be applied to the first month's rent or move-in costs (security deposit and pet deposit).





# First-in-Time Application

The *First-in-Time Ordinance* requires landlords to offer a rental agreement to the first qualified applicant who submits a complete application. Housing providers must cooperate fully with applicants using a housing subsidy such as completing required paperwork, etc.

Landlords must:

- Date and time stamp applications in the order received

- Screen applications in chronological order one at a time

- Give applicants a minimum of 72 hours for additional information on an otherwise complete application

- Provide 48 hours for a response to an offer of a rental agreement after which time the landlord can proceed screening the next applicant in line



16

# Income to Rent Ratio

A landlord cannot deny you housing because your income comes from a source or sources other than employment. If part of the eligibility requirement is a rent to income ratio, and your income is from other sources or subsidies, your landlord must follow these steps in making the calculation:

## STEP 1

Determine tenant total monthly income by adding all verifiable sources of income.

**Monthly Income**

Social Security: $400

One-time Veteran Stipend: $300

Child Support: $200

**Tenant Total Income: $900**

## STEP 2

Determine tenant portion of rent by subtracting all verifiable subsidies received from the monthly rent.

**Rent: $1200**

Veteran Assistance Subsidy: $1000

**Tenant rent portion: $200**

## STEP 3

Calculate tenant required income by multiplying tenant rent portion by your ratio. Determine qualifications by subtracting tenant total income from tenant required income.

**In 3:1 ratio tenant required income is $600**

Veteran Assistance Subsidy: $1000

**Tenant meets the 3:1 Income Requirement**

Case 25-01081-CMA    Doc 40-1    Filed 09/23/25    Ent. 09/23/25 11:25:27    Pg. 58 of 144



# Service Animals

Service animals are broadly defined in Seattle and include emotional support, companion, therapy animals, and more. Fair housing rules require reasonable accommodations for service animals.

- A housing provider can ask for verification of the disability-related need for your service animal, from a qualified third party such as a medical provider or someone qualified to verify the connection.

- Service animals are not considered pets and cannot be prohibited from rental units. 'No Pet' policies do not apply to service animals.

- Training or certification of a service animal is not required.

- A housing provider cannot charge a deposit, fee, or additional rent for a service animal.

- You are responsible for your service animal's behavior and any damage they cause to your rental unit and the property.



18

## Accessibility

Housing accessibility allows renters with disabilities to live independently. Grab bars, ramps, extra width for wheelchairs, designated parking are some examples. If you have a disability, you can ask for a reasonable accommodation or modification.

An accommodation is a change in rules, policies, practices, or services to allow you the equal opportunity to use and enjoy a rental unit. An example of reasonable accommodation is to make an exception to a parking policy so a person using a wheelchair can have a spot closest to their unit.

A reasonable modification allows you to make physical changes to the property that are necessary to make the rental property accessible. You are responsible for paying for reasonable modifications unless the landlord receives federal funds. An example of a reasonable modification is asking permission to widen the bathroom doorway to accommodate a large scooter.

If you have questions or want to file a complaint, contact the Helpline (206) 684-5700.



Case 25-01081-CMA    Doc 40-1    Filed 09/23/25    Ent. 09/23/25 11:25:27    Pg. 60 of 144



# MOVING IN

Moving is a busy and often stressful time. Things can easily be overlooked. It is important to be careful and pay attention to the details at this stage as it sets the tone for your entire tenancy.

## Move-in Checklist

This is an extremely important part of your rental agreement because it is connected to your security deposit.

- It should accurately describe in detail the current condition of your new home

- Discrepancies should be discussed immediately with your landlord so you are not taking responsibility for damage that happened before you moved in

- It should be signed and dated by you and your landlord. Your landlord must provide you with a copy

- This checklist will be used by your landlord when it's time for you to move out to determine if you have caused any damage to the unit

It is unlawful to collect a security deposit without a signed and dated move-in checklist.



# Rental Agreement



Congratulations! Your application for the rental home was successful and now it's time to sign a rental agreement.  Review it thoroughly before signing. Remember, it is a legally binding contract.

- Pay attention to what costs you are responsible for in addition to your rent, such as utilities, and how they are billed

- Examine the rules carefully to make sure you understand the policies around guests, pets, parking, etc

- Get help understanding your rental agreement if you need to, especially if English is not your first language

This Renter's Handbook (printed copy) must be provided to you at the time you sign the initial rental agreement. Electronic copies are allowed for subsequent rental agreements; whenever the handbook is updated, or annually for month-to-month renters.



22

# Types of Rental Agreements

All rental agreements in Seattle are regulated by the *Just Cause Eviction Ordinance*. This means a landlord must have a legal reason or 'Just Cause' to terminate a month-to-month rental agreement or not renew an expiring lease. The notice period required depends on the specific just cause reason. Those reasons and the required notice a landlord must give are on pg. 46

## Month-to-Month

This type of agreement renews each month. You can terminate the rental agreement with a minimum of 20 days' written notice before the end of the monthly rental period. For example, if you want to move out in February, your landlord would have to receive your written notice no later than February 8. You might appreciate the flexibility of this arrangement but, be aware that the terms of your rental agreement, including the amount of rent, can change with proper notice during a month-to-month agreement.

## Term Lease

This type of rental agreement is for a specific period of time. The terms remain fixed for the duration of the lease unless changed by mutual agreement between you and the landlord. The landlord must offer you a lease renewal 60-90 days before your current lease expires unless they have just cause not to do so. See Just Cause pg. 46

## Initial term lease converting to month-to-month automatically

This occurs when the rental begins as a term lease and reverts automatically to a month-to-month lease at the end. You have a right to remain after the initial term unless the landlord has a just cause to end the rental agreement.

## No rental agreement?

It is never a good idea to move into a rental unit without a written agreement. If you find yourself in that situation, you are considered a month-to-month tenant by verbal agreement and have renter rights. However, the definition of a tenant is someone entitled to occupy a rental unit under a rental agreement. While verbal agreements are not unlawful, it may be difficult to prove you are a tenant without a written rental agreement if a dispute arises.

23

# Move-In Cost

In Seattle, there are strict limits to what you can be charged for move-in costs. Move-in charges cover the security deposit, fees, and pet deposit.

- The security deposit and fees combined cannot equal more than one month's rent

- Fees can only be charged for screening (background check when you apply to rent) and/or cleaning

- If fees are charged for cleaning at the beginning of the agreement, you cannot be charged again for cleaning upon move-out

- Total fees cannot exceed 10% of one month's rent

- The maximum you can be charged for a pet deposit is 25% of one month's rent regardless of how many pets

**Examples:**



Tracy is a single-person household with a dog. The rent for the unit she's moving into is $1200 per month.

Tracy's landlord can charge:
- $45 screening fee
- $75 cleaning fee
- $1080 security deposit
- $300 pet deposit

Tracy's total move-in costs can equal up to a maximum of $1,500.



Hamid and Fatima with their two children are a four-person household. Rent is $2,200 per month.

Their landlord can charge:
- $90 ($45 x 2) screening fee
- $130 cleaning fee
- $1980 security deposit

The family's total move-in costs can equal up to a maximum of $2,200.

24

## Installment Payments

It can be difficult to pay what typically amounts to three months' rent for moving into a new place. In Seattle, you have a right to pay your move-in costs (deposit and fees), last month's rent, and pet deposit in installments.

A landlord cannot refuse to rent to you because you decide to use installment payments. It is important to remember that in addition to your monthly rent, installment payments must be made on time or you risk getting a 14 Day Pay or Vacate Notice. The installment payment schedule is based on the length of your tenancy.

### Deposits & Fees

- 30 days - six-month tenancy = four equal consecutive installments of equal duration.

- Month to month = two equal installments

- No installments for deposit/fees if the total does not exceed 25% of one month's rent

- Pet deposit = three equal installments

### Last Month's Rent

- Six-month+ tenancy = six equal, consecutive, monthly installments

- 60 days - six-month tenancy = four equal payments of equal duration

- No fees, penalties, interest may be charged for installment payments

- Failure to pay installments as agreed is a breach of the rental agreement and you can receive a 14 Day Pay or Vacate Notice

- Alternatively, you and your landlord can make a payment schedule by mutal agreement. Get it in writing.





Case 25-01081-CMA    Doc 40-1    Filed 09/23/25    Ent. 09/23/25 11:25:27    Pg. 66 of 144

# Utility Accounts



## Seattle City Light

Seattle City Light (SCL) is the City department responsible for electricity accounts. You can open an account in your own name. You are responsible for letting SCL know when you move out. Failure to pay your bill to the utility or the landlord on time can result in a shutoff notice from the utility and/or a *14 Day Notice to Pay or Vacate* by your landlord.

> **TIP:**
> SCL also has discount programs and payment assistance for qualified customers. Visit their web site at **www.seattle.gov/light/assistance/** or call (206) 684-3000.

## Seattle Public Utilities

Seattle Public Utilities (SPU) is the City department responsible for water, sewer, and garbage accounts. Since 2011, new tenants cannot open accounts in their own names. The landlord is responsible for the overall account. You may be responsible for paying the cost of the utility charges if provided in your rental agreement. You should be provided with a copy of the actual bill if the landlord charges you directly. Failure to pay your bill on time can result in a shut-off notice and/or a *14 Day Pay or Vacate Notice* by your landlord as utilities are treated like rent for eviction purposes.

> **TIP:**
> Never flush anything besides toilet paper. Avoid getting grease, hair, and large items down the drain. A plumbing clog is expensive to repair and your landlord can charge you the entire cost if you or someone in your household flushes something other than toilet paper. Don't believe the marketing claims on products for 'flushable' wipes, etc.

> **Good to Know!**
> SPU has programs to help with utility discounts and payment assistance for qualified customers.  Visit  **www.seattle.gov/utilities** or call (206) 684-3000.

26

**TIP:**
Failure to pay your utility bill on time can result in eviction.

**TIP:**
Failure to report leaks, running toilets, and other service issues to the landlord promptly can make you responsible for some or all of the cost.

**TIP:**
Food scraps and recyclable items are not allowed in the garbage. All buildings should have separate containers for those items.



### Puget Sound Energy
Puget Sound Energy (PSE) is the natural gas provider for the city. You can open an account in your own name.  PSE has information on their website about programs to assist with bills, visit **www.pse.com** or call 1(888) 225-5773.

### Utility Billing Protections

The City's *Third Party Billing Ordinance* protects renters who pay a landlord or a billing company for water, sewer, garbage, or electrical services in residential buildings with 3 or more units.  If you do not get the required billing information or you think you are charged improperly, you should first talk to your landlord or the billing company.

Complaints of violations are made to the:

**Office of the Hearing Examiner**
**Seattle Municipal Tower**
**700 5th Ave**
**Suite 4000**
**Seattle, WA 98104**

You can contact the hearing examiner at (206) 684-0521 or e-mail **Hearing.Examiner@seattle.gov**

Learn more about the code:
**http://www.seattle.gov/Documents/Departments/HearingExaminer/ResidentialThirdPartyBillingQuestionsandAnswers.pdf**

Case 25-01081-CMA    Doc 40-1    Filed 09/23/25    Ent. 09/23/25 11:25:27    Pg. 68 of 144

## What should a tenant's utility bill include?

In some rentals, you pay for utilities (such as water) to the landlord or a billing company, rather than directly to the utility. The City's *Third Party Billing Ordinance* protects renters who pay a landlord or a billing company for water, sewer, garbage, or electrical services in residential buildings with 3 or more units.

What should a tenant's utility bill include?

- The name, business address, and telephone number of the landlord or third-party billing agent, whichever one sent the bill to the tenant

- The basis for each separate charge, including service charges and late fees, if any, as a line item, and the total amount of the bill

- If the units are sub-metered (each unit has its own meter), the current and previous meter readings, the current read date, and the amount consumed

- The due date, the date upon which the bill becomes overdue, the amount of any late charges or penalties that may apply, and the date upon which such late charges or penalties may be imposed

- Any past-due dollar amounts

- The name, mailing address, and telephone number for billing inquiries and disputes, the business hours and days of availability, and the process used to resolve disputes related to bills

- When billing separately for utilities, Landlords must: provide an explanation how the bill is calculated and common area utility costs are distributed; notify residents of changes to billing practices; make a copy of the building's utility bill available to tenants

28

## Common Examples of Utility Billing

The way your utilities are billed should be explained in your rental agreement. Here are some common ways tenants pay for utilities.

**Renting a single-family home with gas, electric, and water/sewer/ garbage accounts not included in rent.**

**Electric:** Tenant has bill in their name, and pays the bill directly to SCL

**Gas:** Tenant has bill in their name, and pays the bill directly to PSE

**Water, Sewer, Garbage:** Bill is in property owner's name, but a copy of the bill is sent to the tenant, and the tenant pays the bill directly to SPU



**Unit in an apartment building with utilities not included in rent.**

**Electric:** Tenant has the bill in their name and pays the bill directly to SCL

**Water, Sewer, Garbage:** A third party company uses the information on the building's SPU bill and divides it proportionally to building units based on the number of people on the lease. The tenant pays their portion of the bill to the third party company.

29

Case 25-01081-CMA    Doc 40-1    Filed 09/23/25    Ent. 09/23/25 11:25:27    Pg. 70 of 144



# WHILE YOU RENT

Both you and your landlord have rights and responsibilities according to your rental agreement, City regulations and State law. Most of these are common sense things and require all parties to act in good faith. In addition, State law requires that your landlord provide you with information from the Department of Health about mold and information about fire safety. Larger multi-family buildings must have a diagram showing emergency evacuation routes.

**TIP:** Keep in mind you have a business relationship with your landlord where both of you can be significantly impacted by the actions of the other person. Follow these important guidelines.

- Maintain your important documents such as the rental agreement, move-in checklist, and your Renter's Handbook

- Keep communication clear and respectful

- Document important communications in writing



# Landlord Duties



- Maintain the building and its structural components
- Make timely repairs
- Maintain common areas such as lobbies, stairs, and hallways
- Control pests
- Provide operating smoke and carbon monoxide detectors
- Provide secure entry locks and keys
- Provide common garbage, recycle, and food waste containers



# Tenant Duties

- Pay rent on time and follow the rules of the rental agreement
- Keep the rental unit clean and sanitary
- Maintain smoke and carbon monoxide detectors
- Prevent illegal or hazardous activity in the rental unit
- Observe quiet hours
- Operate plumbing, electrical, and heating systems properly
- Dispose of garbage, recycle, and food waste properly

**Good to Know!**
Your landlord must provide an alternative payment method if you can't pay your rent electronically.

**TIP:**
Remember to get a receipt for your rent it's your right.

32

## Repairs

  

Your rental agreement should state clearly who you contact for emergencies and repair requests. Reporting needed repairs promptly is important as you could be held financially responsible for the damage caused by delayed repairs you failed to report.

State law requires you make a repair request in writing. It's a good practice to create a record of the repair request which then obliges the landlord to respond. You can also call the landlord if it helps expedite the issue, but make sure there is a written request as well.

The landlord is required to start repairs within:

- 24 hours if you are without water, electricity, or heat during the winter, or if there is a life/safety issue
- 72 hours if your appliances are not working or you have a major plumbing issue with your sink or bathtub
- 10 days for any other repair request

If your landlord does not respond or refuses to make a necessary repair, you can contact the Helpline at (206) 684-5700.

- For emergencies like no power or water, an inspector will try to inspect your unit on the same day or next business day and contact the landlord immediately
- For other issues, an inspector will call to make an appointment with you to inspect your unit for housing violations, usually within five to ten business days
- The inspector will then prepare a notice directing the landlord to make the repairs

While it may seem justified to withhold rent when your landlord is not responsive nor making necessary repairs, it is not advisable. Though the State's Residential Landlord Tenant Act discusses repair and deduct remedies for tenants, it is a very specific process and a big risk to withhold rent because the landlord might choose to evict for non-payment. Make a complaint to the City by calling the Helpline (206) 684-5700 and zconsult an attorney before exercising any rights that potentially jeopardize your tenancy

33

# Adding Roommates



Seattle housing can be expensive and finding an affordable place to call home can be a real challenge. You can add roommates to your household which may help if you struggle to pay your housing costs.

Be cautious when adding a new roommate, it could prove complicated and difficult removing them if it does not go well. Remember, everyone who pays rent has rights whether they are on the rental agreement or not.

Additionally, your tenancy could be jeopardized if the landlord decides to evict your roommate. It's good practice to work with your landlord when you want to bring in a roommate.

Your can add:

- Immediate family
- One additional non-family roommate
- Immediate family of the additional roommate
- Any other roommates that the landlord agrees to
- Not to exceed legal occupancy standards

**Immediate family is broadly defined to include:**

Spouses, domestic partners, former spouses, former domestic partners, adult persons related by marriage, siblings, persons 16 years of age or older who are presently residing together or who have resided together in the past and who have or have had a dating relationship, and persons who have a parent-child relationship, including parents, stepparents, grandparents, adoptive parents, guardians, foster parents, or custodians of minors.

For purposes of this definition, "dating relationship" means a social relationship of a romantic nature. Factors a court may consider in determining the existence of a dating relationship include: (a) the length of time the relationship has existed; (b) the nature of the relationship; and (c) the frequency of interaction between the parties.

There are important steps and timelines you must follow to add a roommate. You must inform your landlord in writing within 30 days of adding someone to your household. Your landlord can screen the new household member using the same screening criteria originally used for your rental application. ·

- A non-family roommate (a) can be screened and (b) can be denied occupancy based on screening

- Immediate family (a) can be screened and (b) cannot be denied occupancy. Screening charges are allowed in compliance with the *Rental Agreement Regulation Ordinance* (SMC 7.24) and the state landlord tenant act.

- The landlord can require a non-family roommate to join the rental agreement with 30-days written notice.

- If the roommate does not join the rental agreement in 30 days, they must vacate within 15 days. (45 days total)

- Immediate family cannot be required to join a rental agreement nor be denied occupancy.

Except for a screening fee, no other move-in charges can be applied to the added household member. All original terms of the rental agreement remain the same.



35

# Notices from Your Landlord



There are several kinds of notices you can receive from your landlord, some more urgent than others.

- Consider any written notice from the landlord important and worth your immediate attention. Review it right away and take quick action if necessary.

- Notices requiring action usually provide a short window of time to comply. Not responding in time may lead to serious consequences, such as eviction.

- Notices from your landlord must comply with City regulations.

- Notices that impact tenants' rights such as:

    - Notices to terminate, quit, comply and/or vacate

    - Notice to increase housing costs (rent etc.)

- Notices to enter must include the following language:

If you need help understanding this notice or information about your renter rights, call the Renting in Seattle Helpline at (206) 684- 5700 or visit the web site at **www.seattle.gov/ rentinginseattle**.

- Notices that attempt to terminate a tenancy such as a 14 Day Pay or Vacate, 10 Day Comply or Vacate etc. must additionally include the following language:

RIGHT TO LEGAL COUNSEL: CITY LAW PROVIDES RENTERS WHO ARE UNABLE TO PAY FOR AN ATTORNEY THE RIGHT TO FREE LEGAL REPRESENTATION IN AN EVICTION LAWSUIT.



36

Case 25-01081-CMA    Doc 40-1    Filed 09/23/25    Ent. 09/23/25 11:25:27    Pg. 77 of 144



*SEATTLE MUNICIPAL CODE (SMC 7.24.034)*

## Fees for notices and late rent

*To: Renters and Landlords in the City of Seattle*

### New rules for all landlord-issued notices as of June 6, 2023

No fees allowed for preparing a notice

No fees allowed for delivering a notice

Late fees for rent cannot exceed $10 per month

*For information about your renter rights, call the Renting in Seattle Helpline at (206) 684-5700 or visit the web site at* **www.seattle.gov/rentinginseattle**

Since June, 2023 your landlord cannot charge you for preparing or delivering a notice and late fees are limited to $10 a month.

Call the Helpline (206) 684-5700 if you would like assistance reviewing a notice. You can also call 2-1-1 for information about free or low-cost legal services. The next section discuss the most common types of notices.

37

Case 25-01081-CMA    Doc 40-1    Filed 09/23/25    Ent. 09/23/25 11:25:27    Pg. 78 of 144

## Notice of a Housing Cost Increase

"Housing costs" include rent and any monthly fees you pay your landlord, like storage or parking. Utility charges based on usage are not included in this type of notice. If you already pay for utilities, but there is a change to a different billing company for example, your landlord is required to provide you with a 30-day notice to change your rental terms.

If you have a lease for a specific term, the landlord cannot change your housing costs for the duration. If your rental agreement gives you the choice to stay as a month-to-month tenant at the end of the term, and the landlord wants to increase your housing costs at that time, the landlord must send you a housing cost increase notice before the term expires.

- All housing cost increases require a minimum of 180 days' advance notice
- The notice must include required language (see pg. 36) about tenant rights and information
- Call the Helpline (206) 684-5700 to see if the increase notice is valid. Paying the new rent amount may imply you agree to the increase.
- Increases must coincide with the start of a rental period. For example, If your rent is due on the 1st and your landlord gives you a 180 day notice on January 5th, the earliest the increase could take effect would be August 1st.
- No increase is allowed if your rental unit does not meet the *Rental Registration and Inspection Ordinance (RRIO).* See **www.seattle.gov/rrio**. You must notify your landlord in writing and contact the Helpline to schedule an inspection before the increase goes into effect.

## Economic Displacement Relocation Assistance ordinance (EDRA)

Income-qualified tenant households (at or below 80% AMI adjusted annually) whose housing costs are raised by 10% or more in a year, are eligible for relocation assistance to move.

| Household | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 |
|---|---|---|---|---|---|---|---|---|
| Income | $70,650 | $80,750 | $90,850 | $109,000 | $117,050 | $125,150 | $133,200 | $125,800 |

- Households that apply must have a notice of housing cost increase dated July 1, 2022 (or later).
- The 10% increase can be a single increase or a combination of increases that take effect within the same 12 month period.
- Relocation assistance is approximately 3x monthly housing cost and is advanced by the City to qualified households.
- To learn more or to apply for EDRA visit www.seattle.gov/rentinginseattle/edra or call the helpline if you do not have access to the internet.

Case 25-01081-CMA    Doc 40-1    Filed 09/23/25    Ent. 09/23/25 11:25:27    Pg. 79 of 144

### Notice of Changes to the Terms of Your Rental Agreement

If you signed a rental agreement for a fixed term, also known as a lease, the terms cannot change until the lease expires unless both you and your landlord mutually agree otherwise. If you have a month-to-month rental agreement, the landlord can change the terms with a notice 30 days before the start of a new rental period.

Changes might include rules around smoking, guests, or pets to name some examples. Any changes that increase your housing costs must comply with the housing cost increase notice requirements. See pg. 38.



### Notice of Intent to Enter

Your rental agreement gives you the right to control access to your home. That means the landlord cannot enter without proper notice unless there is an emergency situation. The landlord has a right to seek access for repairs, inspections, or showing the unit to prospective tenants or contractors. Your landlord needs to give you:

- At least 2 days' notice for agreed upon or necessary repairs or inspections (minimum 48 hours)
- At least 1 days' notice for showing the unit (minimum 24 hours)

Notices to enter must include:

- The date the landlord wants to come in
- The earliest and latest time that they may arrive
- A telephone number you can call in case you need to reschedule

If the date or time does not work for you and you have a valid reason for not wanting to give the landlord access, you should provide dates and times that will work. Valid reasons might be that you have planned a family event in your home at that time or you want to be there during access and need more notice to take time off work.

Your landlord can issue you a 10 Day Notice to Comply if you fail to grant reasonable access.

Case 25-01081-CMA    Doc 40-1    Filed 09/23/25    Ent. 09/23/25 11:25:27    Pg. 80 of 144

**TIP:**
The law requires both parties to be reasonable and act in good faith. You and your landlord should make every effort to have clear, respectful communication. Consider the other person's needs, and find agreement on the reason, time, and manner to enter your home. Make sure you document the communication to show you have been co-operative.

In cases of an emergency, a landlord can enter the tenant's unit without notice. Examples of an emergency may include:

 

- A major plumbing leak

- A fire

- Police wellness check of the tenant (that requires the landlord to allow officers to enter the unit)



In cases of abandonment, a landlord can enter if they have given notice to enter and received no response after several attempts and evidence exists to reasonably indicate abandonment.

Evidence of abandonment include two or more of the following:

- Your landlord has not received a rent payment

- Your mail has not been collected

- Your utilities have been disconnected for non-payment



40

### Notice to Comply or Vacate (10 Days)

A landlord will use a 10-day notice when you violate the rental agreement. Examples might include:



- Smoking in a non-smoking unit/building
- Keeping a pet when no pets are allowed
- Creating loud noise during quiet hours

The notice needs to state clearly what you have done to violate the rental agreement and what you need to do to comply with the notice. The 10-day period for compliance includes weekends.

- 3 or more 10-day notices within a 12 month period is just cause for termination of a month-to-month tenancy or non-renewal of your lease.

### Notice to Pay or Vacate (14 Days)

A landlord will use a 14-day notice when rent, utilities, or installment payments are late. Those are the only charges permitted on this type of notice. It allows a very small window of time to pay what you owe.

- You should do whatever you can to pay within that time.

- If you anticipate not being able to pay your rent on time, it is usually best to let your landlord know beforehand. Your landlord may agree to a payment plan, the worst that can happen is that your landlord says no.

- If you need help with paying your rent, call 2-1-1 for a list of rent help resources. See pledges on pg. 42. If you can secure some  financial help from a third party, it may also give you a little extra time.

- 4 or more 14-day notices within a 12 month period is just cause for termination of a month-to-month tenancy or non-renewal of your lease.

> ### Tip:
> Pay attention to the date rent is due on your rental agreement. Rent is usually due on the first of the month. It's common to see late fees assessed on the third or fifth day. This does not mean you get a "grace period" which is a common misconception some renters have. It just means you can't be charged a late fee until then. You can receive a 14-day notice any time after midnight of the day the rent is due. See late fee pg. 37

Case 25-01081-CMA    Doc 40-1    Filed 09/23/25    Ent. 09/23/25 11:25:27    Pg. 82 of 144

### Notice to Quit for Waste Nuisance or Criminal Activity (3 Days)

A landlord will use this 3-day notice in very serious situations, like when criminal activity occurs on the property or severe damage is caused to the rental unit. There is no cure for this notice; the only way to comply is to move out or secure an attorney immediately to defend you in an eviction lawsuit.

Landlords must provide a copy of notices for criminal activity to the Seattle Department of Construction and Inspections. There needs to be clear evidence that this type of notice is appropriate for the circumstances.

### Notice to Terminate Tenancy for Just Cause

There are specific just cause reasons a landlord can use to terminate a month-to-month rental agreement in Seattle. The notice period required depends on the specific just cause.

The *Just Cause Eviction Ordinance* is discussed under the 'Moving Out' section pg. 46.



### Notice of Intent to Sell

Owners of properties with two or more rented units, with at least one unit rented at 80% AMI (average median income) must notify Seattle Office of Housing of their intent to sell at least 90 days before listing the building.

The City, in partnership with the Seattle Housing Authority and community providers, can use the notification information to evaluate properties and deploy a range of property preservation tools, including incentives and acquisition.

This also provides notice to tenants who may be affected by the sale.

Visit **www.seattle.gov/housing/intent-to-sell** to learn more.

Case 25-01081-CMA    Doc 40-1    Filed 09/23/25    Ent. 09/23/25 11:25:27    Pg. 83 of 144

## Pledges of Rent Assistance

If you are behind on rent and receive a 14-day notice to pay or vacate, your landlord must accept a written pledge of payment from a third party. A third party can be a church or a non-profit.

- The pledge must be in writing
- The pledge must be received before the 14-day notice expires
- The source must commit to paying the pledge within 5 days
- The source must not commit the landlord to anything other than providing information for payment
- The payment must be enough to allow you to become current on all costs on its own or in combination with other sources of income or subsidies

### Good to Know!
There are additional state laws that require landlords accept pledges of assistance even after a 14- day notice expires right up through the eviction court process. These protections are not enforced by the City. (See RCW 59.18.410)

## Domestic Violence Victim Protection

- Tenants experiencing domestic violence cannot be held liable for damages to their rental unit caused by their abuser.
- The tenant must provide documentation to the landlord that they or an occupant was a victim of domestic violence and the perpetrator caused the damage.
- The documentation must be signed by a qualified 3rd party Seattle Police Department, Licensed mental health professionals, domestic violence program advocates, clergy, social service case managers.



43

Case 25-01081-CMA    Doc 40-1    Filed 09/23/25    Ent. 09/23/25 11:25:27    Pg. 84 of 144

# MOVING OUT

Most rental agreements will state how you must give notice to your landlord when you want to move out. If you are a month-to-month tenant, you need to inform your landlord in writing a minimum of 20 days before the end of the month you want to leave. For example, if you wanted to move out by July 31, the landlord must be in receipt of your notice not later than July 11.

Remember if you don't provide proper notice, you may be responsible for rent for the next monthly rental period.







If your landlord unexpectedly issues you a notice to terminate your rental agreement, review it right away. Notices given in the Seattle must comply with City regulations. For help to review your notice call the Helpline at (206) 684-5700.

- If you are a month-to-month tenant or you have a lease that automatically converts to a month-to-month agreement your landlord must give you a just cause reason to terminate your tenancy.

- If you have a terminating lease agreement, the landlord must make a reasonable renewal offer 60-90 days prior to the expiration date or give a just cause for non-renewal.

> **Good to know**
> landlords that share their home or live on the same property as their tenants have just cause to terminate a month-to-month tenancy with 20 days' notice and can decline to renew a lease when it expires.

## Just Cause Eviction Ordinance

Seattle's *Just Cause Eviction Ordinance* prevents arbitrary eviction of renters. It requires landlords to have a legal reason or *just cause* to terminate to your month-to-month rental agreement or decline to renew your lease. Your landlord must give you a written notice commonly called a *Notice to Terminate Tenancy* and state the specific just cause. The amount of advance notice depends on the specific cause. Unless otherwise stated, a minimum of 20 days' notice before the end of the rental period is required. The following are the only just cause reasons your landlord can terminate your month-by-month rental agreement.

- Late rent: you receive a 14-day notice to pay or vacate and fail to comply.

- Habitual failure to pay rent on time. You receive 4 or more 14-day pay or vacate notices in the most recent 12 month period for late rent.

- Violation of your rental agreement: You receive a 10-day notice to comply with the rules of your rental agreement or vacate and you fail to comply.

46

- Habitual failure to comply with your rental agreement. You have received 3 or more 10-day notices to comply or vacate in the most recent 12-month period for failure to comply with the rules of your rental agreement.

- Your landlord or a member of their immediate family needs to move into your unit. This requires a 90-day notice. Your landlord can be required by the City to certify (sign a sworn declaration) if they use this just cause and you suspect they do not intend to occupy your unit or move a qualified family member in when you move out.

- Your landlord wants to sell the unit you rent. This requires a 90-day notice and only applies to single-family dwelling units, defined by City code as detached structures that contain one dwelling unit. If you live in a condo, apartment, duplex, triplex, or townhome, your landlord cannot use this as a just cause reason to end your rental agreement.

- Your occupancy of a unit depends on being employed on the property and your employment is terminated. This would typically apply to property managers who live on site.

- Your landlord rents a portion of their own home or an accessory dwelling unit to their own home and no longer wishes to share with you.

- Your landlord wants to substantially remodel your unit or the building where you live displacing you permanently. This requires your landlord to apply to the City for a relocation license which is approximately a 6-month process. The license requirements include giving you an information packet and paying you relocation assistance if your income is at or below 50% of the median income for King County.

- Your landlord wants to demolish the property where you live or change the use to non-residential. This requires a relocation license the same as displacement from a substantial remodel. See above.

- Your landlord wants to change the use of the building to non-residential. This requires a relocation license the same as displacement from a substantial remodel. See above.

47

- Your landlord wants to convert your unit to a condo or a co-op. These conversions require their own procedure under the *Condominium Conversion Ordinance and Co-op erative Conversion Ordinance* SMC 22.903.030 and SMC 22.903.035.

- Your landlord receives a notice of violation for housing standards in a permitted accessory dwelling unit and wants to discontinue renting it. The landlord must pay you relocation assistance in the amount of $2,000 or the equivalent of 2 months' rent two weeks before you move out.

- Your landlord receives a notice of violation for an unauthorized housing unit, commonly called an "illegal unit," and must discontinue renting your unit. The landlord must pay you relocation assistance of either $2,000 or the equivalent of 2 months' rent 2 weeks before you move out.

- Your landlord must reduce the number of renters in a dwelling unit to comply with the legal limit. This requires a 30-day notice and payment of relocation assistance of $2,000 or the equivalent of 2 months' rent 2 weeks prior to move out.

- Your landlord is issued an emergency order by the City to vacate and close your housing unit due to hazardous conditions. The notice requirement depends on the specific circumstances of the emergency, but it is always a very short period of time. You may get relocation assistance if the emergency condition is found to be the landlord's responsibility. Relocation assistance is adjusted for cost of living each year.

- Your landlord issues you a *3 Day Notice to Quit* for engaging in criminal activity on the property. The landlord must specify the crime and facts supporting the allegation in the notice of termination and provide a copy to the City.

### Good to Know!
Your just cause rights cannot be waived. Any rental agreement that attempts to do so is unenforcable.

It is a violation of the *Just Cause Eviction Ordinance* for a landlord to rely on a just cause reason to end a rental agreement and fail to follow through, whether that means not moving into the unit, not listing it for sale, etc. Fines and penalties will apply, and renters have the right to sue for $2,000 in damages in Small Claims Court.

Notices to terminate a tenancy must include specific language (see pg. 36)  and information. If you receive a notice, contact the Helpline at (206) 684-5700 for help to determine if it is a proper notice.

48

# Defenses to eviction

## Winter Eviction

The winter eviction defense ordinance exists to protect vulnerable renters in Seattle from being made homeless during the coldest weather months. Between December 1st and March 1st moderate income households can rely on this defense to eviction except for the following:

- The landlord owns less than four rental units within the City of Seattle.

- The owner or a member of their immediate family needs to occupy the rental unit.

- The owner wishes to sell the rental unit.

- The City requires the owner to discontinue renting the unit (for various reasons). In some cases, displaced tenants are paid relocation assistance

- The owner issues a 3 Day Quit notice for criminal activity, nuisance/waste or for posing an imminent threat to health and safety and filed a copy with the City.

If you need help with rent or move-in assistance, call 2-1-1 for a comprehensive referral list to agencies with funds and other resources.

## School Year Eviction

If your household has students (daycare - high school), educators, or educational support staff, you may raise this as a defense to eviction during the Seattle School District calendar year. The following exceptions apply:
- The owner or their immediate family needs to occupy the rental unit
- The City requires the owner to discontinue renting the unit for various reasons (in some cases displaced tenants are paid relocation assistance)
- The City requires an owner to reduce the number of tenants in a unit.
- The owner issues a 3 Day Quit notice for criminal activity, nuisance/waste or for posing an imminent threat to healthy and safety

## Covid-19 related economic hardship

* Experienced during the Civil Emergency period

## Other Eviction Defenses

Exist in City code typically due to some failure by the landlord, such as failure to register the rental property, or failure to certify a just cause termination, as examples.

49



## Unlawful Detainer

An eviction, or unlawful detainer, is the legal process a landlord must follow to ask a court to restore their possessory right to a rental unit. It is illegal for a landlord to attempt to evict a tenant without going through the unlawful detainer process. Actions like changing the locks, removing tenant's belongings, or disconnecting utilities are all strictly prohibited.

Before the court process can begin, the landlord must first give you a notice. The notice may attempt to end your rental agreement for just cause, collect late rent, or enforce the rules of your rental agreement. See types of notices on pg.36. If you fail to comply with a valid notice, the landlord can then proceed with an with an unlawful detainer lawsuit which asks the court to restore possession of the rental unit to the owner.

The landlord must attempt to serve you a court document called summons and complaint that explains the just cause reason or reasons they have to evict you. Often it will ask for legal costs in addition to the eviction order.

It is extremely important that you seek advice from a qualified attorney immediately after receiving a summons and complaint. The document will contain a deadline for your response. If you do not respond by that deadline, you could be evicted by default.

The City partners with the Housing Justice Project to provide a right to counsel for any tenant household being evicted that can't afford an attorney.

To access your right to counsel, you can contact HJP in four different ways: Complete an online form on www.kcba.org to request legal assistance. Call (206) 580-0762 to leave a message. Email hjpstaff@kcba.org. Visit the walk-in legal clinic M-F, 9am-12pm at the King County Courthouse in Seattle.

50

## Return of Your Security Deposit

When you move out, you must return the rental unit to the same condition as when you rented, except for reasonable wear and tear. Reasonable wear and tear naturally occurs over time through normal usage. Examples are paint fading, scuff marks on linoleum, wear patterns on carpet, etc. Damage, on the other hand, generally occurs suddenly and as a result of negligence, misuse, or by accident. Examples are holes in the wall, broken windows, or burn marks on surfaces.

Your landlord must use the checklist you both signed at the time you moved in to determine if you are responsible for damage to the unit. The landlord is not required to do an exit walk-through with you, but you can ask for one if you think it's useful. It's always a good idea to take pictures of the unit to document the condition you returned it in, including cleanliness. If your landlord charged you for cleaning when you moved in, you cannot be charged for cleaning at move out. If you owe outstanding utility charges, your deposit may be used to cover those.

1. Your landlord has 30 days from your move-out to return your deposit and /or provide you with a statement specifying the basis for retaining any portion of your deposit. Be sure to return all keys to clearly signal that you are restoring possession to the owner.

2. If the landlord needs additional time to get quotes for repair or for a final utility bill to arrive, they must notify you within the 30-day period.

3. Your landlord must consider depreciated value when calculating deductions for damage. For example, the age, condition and useful life remaining of flooring, appliances etc. must be factored into assessing charges for damage.

4. It's your responsibility to provide your landlord a correct mailing address for your deposit refund. If you don't, the landlord must use your last known mailing address.

51

# Final Thoughts

Our homes are fundamental to our sense of security and quality of life. Regulations and fair housing laws exist to protect your right to a safe and healthy environment where you are entitled to the quiet enjoyment of your home.

Having a positive business-like relationship with your landlord contributes to the stability of your rental agreement. Sometimes when conflicts arise, you may have reason to seek information, guidance and even intervention. The Renting in Seattle Helpline (206) 684-5700 is your valuable resource for help whether you are just looking for information or you are ready to make a complaint.

The City protects your ability to exercise your renter rights. Your landlord cannot prevent you from communicating and organizing with other tenants in your building, distributing leaflets or holding meetings. Retaliation by your landlord for exercising your housing rights is strictly prohibited and could result in fines, penalties and/or investigation.

We hope this Renter's Handbook is a useful reference tool. Being informed about your rights and responsibilities is important for the success of your renting experience. Everyone deserves a happy and healthy home.



52

# Renter Resources

### 2-1-1

Clearinghouse for comprehensive information and referral to financial assistance, legal help, and housing advocacy resources in King County.

### Be:Seattle

Provides renter bootcamps and grassroots tenant organizing.

https://beseattle.org
206-487-4060

### Housing Justice Project King County Bar Association

Provides legal representation for low-income tenants facing eviction.

516 Third Ave Suite W-314, Seattle, WA 98104
https:/housingjusticeproject.org
206-580-0762

### Interim Community Development Association

Provides homeless prevention and housing services for low-income Asian, Pacific-Islanders, immigrant and refugee communities.
601 S King St, Seattle, WA 98104

https://interimcda.org/
206-623-5132

### Queer Power Alliance

Promoting fair and equitable housing access for LGBTQIA community. Provides tenant education workshops and support.

https://queerpoweralliance.org/
1200 12th Ave S Suite 1101, Seattle, WA 98144
206-395-6658

### Solid Ground

Solid Ground works to keep people in their current homes through information, advocacy, case management and limited financial support.
1501 N 45th Street, Seattle, WA 98103

https://www.solid-ground.org/
206-694-6700

53

### Somali Community Services of Seattle

Non-profit organization that works to improve the quality of life for low-income families and members of the Somali refugee and immigrant community.
8810 Renton Ave S, Seattle, WA 98118

https://www.somcss.org/
206-760-1181

### Tenant Law Center Catholic Community Services of Western Washington

Provides legal services to low-income tenants facing eviction, subsidy termination and needing reasonable accommodation requests.
100 23rd Ave S, Seattle, WA 98144

https://ccsww.org/get-help/specialized-services/tenant-law-center/
206-580-0762

### Tenants Union of Washington

Provides tenant counseling services, political advocacy and tenant organizing help.
5425 Rainier Ave S, Suite B, Seattle, WA 98118

https://tenantsunion.org/
206-723-0500

### United Indians of All Tribes Foundation Homeless Prevention Program

Social service provider, community center, and cultural home for urban Indians.
5011 Bernie Whitebear Way, Seattle, WA 98199 (Discovery Park)

https://unitedindians.org
206 285 4425

### Villa Comunitaria

Helps Latinx immigrants navigate the complexities of the United States immigration, housing, health, education, and legal system so they can thrive and prosper.
8201 10th Ave South, Suite 8, Seattle, WA 98108

https://villacomunitaria.org
206-767-7445

### Washington Law Help

Free legal information and self-help court forms written by lawyers to guide you through the court processes of eviction and security deposit disputes

https://washingtonlawhelp.org/

54

# Index



## A

**Accessibility  18**
**Adverse Action  14**
**Advertising  13**
**Affordable Housing  6**
**Application**
Fair Chance Housing  12
First in Time  16
Get Ready To Rent  14
Holding Deposit  18
Income to Rent Ratio  17
Rental Housing Ads  11
Service Animals  19
**Asbestos  9**

## B

**Background Check**
Fair Chance Housing  12
Screening Report  14, 24

## C

**Carbon Monoxide Detec-**
**tors**
Landlord/Tenant Duties  32
Minimum Standards  9
**Checklist**
Deposit Return  51
Move-in  21
**Cleaning**

Deposit Return  51
Move-In Charges  24
**Common Areas  32**
**Criminal History  12, 13**

## D

**Disability**
Accessibility  18
Service Animals  19
Source of income protection  11–12
**Development**
**Displacement** 38,47

## E

**Eviction**
Just Cause  41, 46–49
Unlawful Detainer Eviction  50
Defenses  49

## F

**Fair Housing**
Discrimination  11
Service Animals  19
**Fees**
First in Time  16
Late Fees  28, 40
Move-In  24–25
Notice fees 37

Case 25-01081-CMA    Doc 40-1    Filed 09/23/25    Ent. 09/23/25 11:25:27    Pg. 96 of 144

**G**

**Garbage**
Billing  26–29
Landlord/Tenat Duties  32

**H**

**Holding Deposit  18**
**Housing and Building–
    Maintenance Code  8**
**Housing Choice Voucher**
Discrimination  11
Seattle Housing Authority  6
Source of Income Protections  12
**Housing Cost Increase  37, 38**

**I**

**Income to Rent Ratio**
Calculation  17
Source of Income Protections  12
**Installment Payments  25**

**L**

**Landlord Duties  32**
**Lead Paint  9**
**Lease - See Rental Agreement**

**M**

**Minimum Standards  8–9**
**Month-to-Month**
Just Cause Eviction  46–49
Moving out  44
Notice From Your Landlord  37–41
Types of Rental Agreements  23

**Move-In Charges**
Adding Roommates  34
Installment Payments  25
Limits  24

**N**

**Notice**
Changes to the Terms of Your Rental Agree-
    ment  38
Comply or Vacate  40
Fee  36
Housing Cost Increase  37
Intent to Enter  38
Intent to Sell  41
Notice to Terminate Tenancy  46
Pay or Vacate  40, 42
Quit for Waste or Nuisance  41
Terminate Tenancy for Just Cause  41

**O**

**Occupancy**
Adding Roommates  34–35
Minimum Standards  10

**P**

**Pests  32**
**Pet Deposit  24–25**
**Puget Sound Energy  27**

**R**

**Reasonable Accommodation**
Accessibility  18
Rental Housing Ads  11
Service Animals  19

Case 25-01081-CMA    Doc 40-1    Filed 09/23/25    Ent. 09/23/25 11:25:27    Pg. 97 of 144

**Receipt**
Holding Deposit to Secure Occupancy 18
Landlord/Tenant Duties  32
Rent
Assistance pledges 43
Economic displacement 37
Increase 37
Payment 32
Receipt 32
Withholding 33

**Rental Agreement**
First in Time  16
Holding Deposit  18
Just Cause  46–49
Landlord/Tenat Duties  32–34
Moving In  21
Notices From Your Landlord  37–41
Types of  23–24
Unlawful Detainer  50
Utility Billing  26–27

**Rental Registration**
Requirements  10

**Repairs**
Landlord/Tenant Duties  32
Notice to Enter  38

**Rights**
Tenant Organizing  52
To Legal Counsel  36

**S**

**Screening**
Adding Roommates  34
Fees  24
First in Time  16
Holding Deposit  18
Report  11–14

**Seattle City Light  26**
**Seattle Housing Authority**
Affordable Housing  6
Is the Unit Registered?  10
**Seattle Public Utilities  26**
**Security Deposit**
Holding Deposit  18
Installment Payments  25
Move-In Charges  24
Return  51
The Move-in Checklist  21
**Service Animals  19**
**Smoke Detectors**
Landlord/Tenant Duties  32
Minimum Standards  9
**Source of Income 12**

**T**

**Third Party Billing  27–28**

**U**

**Utilities  26–29**

Case 25-01081-CMA    Doc 40-1    Filed 09/23/25    Ent. 09/23/25 11:25:27    Pg. 98 of 144

# Notes



# Notes





HELPLINE: (206) 684-5700
www.seattle.gov/rentinginseattle

SEATTLE AQUARIUM

**Vero Management LLC**

1414 E Yesler Way • Unit A • Seattle, WA 98122
(253) 880-7873

# 18

RentersHandbook_English-2024.pdf

X _Yaminah Oddie-Johnson_
     Lessee                  IP Address: 174.224.193.209
                            04/22/2024 01:16pm PDT

## Attention Landlords and Tenants

This document is to supplement Information for Tenants which landlords are required to provide to rental applicants and upon signing a rental agreement. Recent changes to both Washington landlord-tenant law and City of Seattle rental ordinances are summarized below.

It does not include information on temporary COVID-19 related laws. Please visit Renting in Seattle for our most up-to-date information.

Information for Tenants is being replaced this year with a Renters Handbook. Until that occurs, landlords are compliant using Information for Tenants with this document attached.

- **Termination of Tenancy**

  State law requires a 14-day notice to pay rent or vacate (no longer 3-day)

- **Rent Increases**

  State law requires landlords to give 60 days' notice for all rent increases

- **Notices**

  Notices that impact tenants' rights such as:

  - Notices to Terminate, Quit, Comply and/or Vacate
  - Notice to Increase Housing Costs (Rent etc.)
  - Notices to Enter

  Must include the following language:

  *If you need help understanding this notice or information about your renter rights, call the Renting in Seattle Helpline at (206) 684- 5700 or visit the web site at  www.seattle.gov/rentinginseattle.*

- **Rental Inspection Regulation Ordinance**

  Rental properties must be registered with the City of Seattle before a landlord issues a termination notice or tries to evict a tenant.

- **Rent Payments**

  - Landlords must apply any payment to rent first
  - Landlords must offer tenants a non-electronic way to pay rent

- **Evictions**

  - 14-day notices to pay rent or vacate must be in the form required by State law (RCW 59.18.057) that includes language for getting legal help.
  - Landlords may not evict or threaten to evict a tenant for failure to pay non-rent charges such as late fees, damages, deposits, legal costs, or other fees, including attorneys' fees

- **Domestic Violence Protections**

  Tenants experiencing domestic violence cannot be held liable for damages to their rental unit caused by their abuser

- **Roommates**

  Renters can add roommates to help with housing affordability. Landlords must allow a tenant's immediate family, one additional unrelated roommate, and the unrelated roommate's family members to live together, in accordance with all applicable occupancy and screening standards.

# Information for Tenants


**Seattle** Department of Construction & Inspections

**TRANSLATIONS**

*For copies of this document in Amharic, Cambodian, Chinese, Korean, Laotian, Oromiffa, Russian, Somali, Spanish, Tagalog, Thai, Tigrinya and Vietnamese, visit SDCI's website at www.seattle.gov/dpd/rentinginseattle or call (206) 684-8467.*

*This summary of Washington state and City of Seattle landlord/tenant regulations must be provided to tenants by owners of residential rental property located in Seattle on at least an annual basis. Please note that City and State laws may not be identical on any particular topic; therefore, both sets of laws should be consulted. For legal advice, please consult an attorney.*

*October 2018*

## Seattle Landlord-Tenant Laws

### OBLIGATIONS OF LANDLORDS

Building owners must provide safe, clean, secure living conditions, including:

- Keeping the premises fit for human habitation and keeping common areas reasonably clean and safe
- Controlling insects, rodents and other pests
- Maintaining roof, walls and foundation and keeping the unit weather tight
- Maintaining electrical, plumbing, heating and other equipment and appliances supplied by the owner
- Providing adequate containers for garbage and arranging for garbage pickup
- When responsible for providing heat in rental units, from September through June maintaining daytime (7:00 a.m.-10:30 p.m.) temperatures at 68°F or above and nighttime temperatures at not less than 58°F
- In non-transient accommodations, providing keys to unit and building entrance doors and, in most cases, changing the lock mechanism and keys upon a change of tenants
- Installing smoke detectors and instructing tenants in their maintenance and operation

Owners are not required to make cosmetic repairs after each tenancy, such as installing new carpets or applying a fresh coat of paint.

### OBLIGATIONS OF TENANTS

Tenants must maintain rental housing in a safe, clean manner, including:

- Properly disposing of garbage
- Exercising care in use of electrical and plumbing fixtures
- Promptly repairing any damage caused by them or their guests
- Granting reasonable access for inspection, maintenance, repair and pest control
- Maintaining smoke detectors in good working order
- Refraining from storing dangerous materials on the premises

### THE JUST CAUSE EVICTION ORDINANCE

This ordinance requires landlords to have good cause in order to terminate a month-to-month tenancy. It specifies the <u>only reasons</u> for which a tenant in Seattle may be required to move, and requires owners to state the reason, in writing, for ending a tenancy when giving a termination notice. A property owner cannot evict a tenant if the property is not registered with the City of Seattle. Unless otherwise noted, an owner must give a

## Table of Contents

**Seattle Landlord-Tenant Laws**

*Obligations of landlords*...................................................... 1
*Obligations of tenants*......................................................... 1
*The Just Cause Eviction Ordinance* ................................ 1
*Actions considered to be harassment or retaliation* .......... 3
*The Rental Agreement Regulation Ordinance*......................4
*Other City ordinances that affect tenants and landlords*........................................................................... 7

**Washington State Law**

*Rights of All Tenants* .......................................................... 8
*Types of Rental Agreements* ............................................. 8
*Illegal Discrimination*.......................................................... 8
*Liability*................................................................................ 9
*Illegal Provisions in Rental Agreements* ............................ 9
*Privacy—Landlord's Access to the Rental* ........................ 9
*Deposits and Other Fees* ................................................... 9
*Landlord's Responsibilities* ................................................ 9
*Tenant's Responsibilities* ................................................. 10
*Threatening Behavior by a Tenant or Landlord* ................ 10
*Making Changes to Month-to-Month Agreement*.............. 10
*Making Changes to Leases* ............................................. 10
*How to Handle Repairs* .................................................... 11
*Illegal Landlord Actions*.................................................... 11
*Ending the Agreement*...................................................... 12
*Return of Deposits* .......................................................... 12
*Evictions* .......................................................................... 13
*Abandonment*................................................................... 13
*Receipts* ........................................................................... 15
*Copies of Documents* ...................................................... 15
***Voter Registration*** ......................................................... **15**

**Seattle Department of Construction and Inspections**

Seattle Municipal Tower, 700 Fifth Ave., Suite 2000, P.O. Box 34019, Seattle, WA 98104-4019     www.seattle.gov/sdci
*SDCI complies with the Americans with Disabilities Act. Accommodations for people with disabilities provided on request.*

termination notice at least 20 days before the start of the next rental period. Good causes include:

1. The tenant fails to pay rent within 3 days of receiving a notice to pay rent or vacate.

2. The owner has notified the tenant in writing of overdue rent at least 4 times in a 12-month period.

3. The tenant does not comply with a material term of a lease or rental agreement within 10 days of receiving a notice to comply or vacate.

4. The tenant does not comply with a material obligation under the *Washington State Residential Landlord-Tenant Act* within 10 days of a notice to comply or vacate.

5. The owner has notified a tenant in writing at least 3 times in a 12-month period to comply within 10 days with a material term of the lease or rental agreement.

6. The tenant seriously damages the rental unit (causes "waste"), causes a nuisance (including drug-related activity), or maintains an unlawful business and does not vacate the premises within three days of notice to do so.

7. The tenant engages in criminal activity in the building or on the premises, or in an area immediately adjacent to the building or premises. The alleged criminal activity must substantially affect the health or safety of other tenants or the owner; illegal drug-related activity is one crime specified by the ordinance. An owner who uses this reason must clearly state the facts supporting the allegation, and must send a copy of the termination of tenancy notice to the SDCI Property Owner Tenant Assistance (POTA) Unit.

8. The owner wishes to occupy the premises personally, or the owner's immediate family will occupy the unit, and no substantially equivalent unit is vacant and available in the same building, and gives the tenant written notice at least 90 days prior to the end of a rental period. Immediate family includes the owner's spouse or owner's domestic partner, and the parents, grandparents, children, brothers and sisters of the owner or owner's spouse or owner's domestic partner. SDCI may require a property owner to sign a certification of the intent to have a family member move in if a tenant has reason to believe the owner will not follow through with this reason. It is a violation if the designated person does not occupy the unit for a continuous period of 60 days out of the 90 days after the tenant vacates. A tenant whose tenancy is ended for this reason has a private right of action if he or she feels the owner has failed to comply with these requirements.

9. The owner wishes to terminate a tenant who lives in the same housing unit with the owner or the owner's agent; or the owner desires to stop sharing his or her house with a tenant living in an approved accessory dwelling unit (ADU) in an owner-occupied house.

10. The tenant's occupancy is conditioned upon employment on the property and the employment is terminated.

11. The owner plans major rehabilitation and has obtained required permits and a Tenant Relocation License. A tenant terminated for this reason has a private right of action if he or she feels the owner has failed to comply with these requirements.

12. The owner decides to convert the building to a condominium or a cooperative.

13. The owner decides to demolish a building or to convert it to non-residential use and has obtained the necessary permit and a Tenant Relocation License.

14. The owner desires to sell a single family residence (does not include condominium units) and gives the tenant written notice at least 90 days prior to the end of a rental period. The owner must list the property for sale at a reasonable price in a newspaper or with a realty agency within 30 days after the date the tenant vacates. Property owners may be required to sign a certification of the intent to sell the house if SDCI receives a complaint. There is a rebuttable presumption of a violation if the unit is not listed or advertised, or is taken off the market or re-rented within 90 days after the tenant leaves. A tenant terminated for this reason has a private right of action if he or she feels an owner has failed to comply with these requirements.

15. The owner seeks to discontinue use of a unit not authorized under the Land Use Code, after receiving a Notice of Violation. The owner must pay relocation assistance to tenants who have to move so that the owner can correct the violation. Relocation assistance for low-income tenants is $2,000; for other tenants it is an amount equal to two months' rent.

16. The owner needs to reduce the number of tenants sharing a dwelling unit in order to comply with Land Use Code restrictions (i.e., no more than 8 people per dwelling unit if any are unrelated).

17. The owner must terminate a tenancy in a house containing an approved ADU in order to comply with the development standards for ADUs, after receiving a Notice of Violation of the Land Use Code. (If the violation is that the owner has moved out of the house and has rented both units, one unit must either be reoccupied by the owner or be removed.) The owner must pay relocation assistance to displaced tenants in the amount of $2,000 for low-income tenants, or two months' rent in other cases. SDCI may require a property owner to sign a certification of his or her intent to discontinue the use of the ADU.

18. An Emergency Order to Vacate and close the property has been issued by SDCI and the tenants have failed to vacate by the deadline given in the Order.

**Failure to carry out stated cause:** If an owner terminates a tenant because of (1) the sale of a single family

residence is planned, (2) the owner or a family member is to move in, (3) substantial rehabilitation is planned, (4) the number of residents must be reduced to eight, or (5) the owner is discontinuing the use of an ADU
after receipt of a notice of violation, and the owner fails to carry out the stated reason for terminating the tenancy, he or she may be subject to enforcement action by the City and a civil penalty of up to $2,500.

**Private right of action for tenants:** If an owner terminates a tenant because of (1) the sale of a single family residence is planned, (2) the owner or a family member is to move in, or (3) substantial rehabilitation is planned, and if the owner fails to carry out the stated reason for terminating the tenancy, the tenant can sue the owner for up to $3,000, costs, and reasonable attorney's fees.

For additional information on the Just Cause Eviction Ordinance, call SDCI at (206) 615-0808 or visit the SDCI website at www.seattle.gov/sdci.

## ACTIONS CONSIDERED TO BE HARASSMENT OR RETALIATION

City law prohibits retaliatory actions against either a tenant or a landlord.

A landlord is prohibited from harassing or retaliating against a tenant by:

1. Changing or tampering with locks on unit doors
2. Removing doors, windows, fuse box, furniture or other fixtures
3. Discontinuing utilities supplied by the owner
4. Removing a tenant from the premises except through the formal court eviction process
5. Evicting, increasing rent or threatening a tenant for reporting code violations to SDCI or the Police Department or for exercising any legal rights arising out of the tenant's occupancy
6. Entering a tenant's unit, except in an emergency, or except at reasonable times after giving at least two days notice, or a one-day notice when showing units to prospective purchasers or tenants
7. Prohibiting a tenant, or a tenant's authorized agent who is accompanied by that tenant, from distributing information in the building, posting information on bulletin boards in accordance with building rules, contacting other tenants, assisting tenants to organize and holding meetings in community rooms or common areas
8. Increase the monthly housing costs without advance written notice; 30 days for a rent increase of less than 10%, 60 days for a rent increase of 10% or more
9. Increase monthly housing costs where a housing unit does not meet basic standards for habitability

In most instances the law assumes that a landlord is retaliating if the landlord takes any of these actions within 90 days after a tenant reports a violation to SDCI

or to the Seattle Police Department, or within 90 days after a governmental agency action, such as making an inspection.

A tenant is prohibited from harassing or retaliating against a landlord by:

1. Changing or adding locks on unit doors
2. Removing owner-supplied fixtures, furniture, or services
3. Willfully damaging the building

For more information or to file a complaint, call SDCI at (206) 615-0808.

## DEFINITION OF TENANT

With the exception of the Tenant Relocation Assistance Ordinance, a tenant is defined as a person occupying or holding possession of a building or premises pursuant to a rental agreement. This includes residents of transient lodgings who remain in residence for one month or longer. A rental agreement may be oral or in writing.

## DEFINITION OF HOUSING COSTS

Housing costs include rent and any other periodic or monthly fees such as storage, parking, or utilities, paid to the landlord by a tenant.

## INCREASE IN HOUSING COSTS

In the City of Seattle, a landlord must give a tenant 30 days' advance written notice of an increase in housing costs (rent, parking, storage, and other fees associated with the rental) of less than 10%; 60 days' notice is required for increases of 10% or more. An increase can only begin at the beginning of rental period, typically at the beginning of the month. These notices must include information about how the tenant
can access information about their rights and responsibilities

A landlord cannot increase housing costs for any housing unit that does not meet the minimum habitability standards of the Residential Rental Inspection Program. (http://www.seattle.gov/dpd/cs/groups/pan/@pan/documents/web_informational/s048492.pdf)

Property owners and developers cannot increase housing costs to avoid applying for a Tenant Relocation License where a rental property is going to be demolished, rehabilitated, changed in use, or where use restrictions are going to be removed. (http://www.seattle.gov/dpd/codesrules/commonquestions/tenantrelocation/default.htm)

## THE RENTAL AGREEMENT REGULATION ORDINANCE

The City of Seattle Rental Agreement Regulation Ordinance (SMC Chapter 7.24) regulates certain aspects of residential rental agreements.  It requires a landlord to provide sixty (60) days' advance written notice of an increase in housing costs of 10% or more within a twelve (12) month period;  prohibits month-to-month rental agreements that require a tenant to stay a minimum period greater than one (1) month or be subject to the loss of deposits or other penalties; limits the amount of security and pet damage deposits, and move-in fees that can be charged to a tenant upon move in; allows a tenant to pay security and pet damage deposits, move-fees, and last month's rent on installment plans; requires a landlord to take and return a deposit pursuant to state law; and to distribute a summary of state and local landlord-tenant laws prepared by the City of Seattle to each prospective tenant, to each tenant upon move-in, and at the time a rental agreement is renewed.  A landlord cannot retaliate against a tenant or a prospective tenant for exercising or attempting to exercise the tenant's rights under this Ordinance.  The Seattle Department of Construction and Inspections enforces this ordinance.  For more information call the Department's Code Compliance Division at (206) 615-0808 or follow this link:  http://www.seattle.gov/dpd/codesrules/commonquestions/rental-housingproblems/default.htm

### Rent Increases

The City of Seattle does not regulate or control rent.  However, the Rental Agreement Regulation Ordinance does require a landlord to provide at least sixty (60) days' advance written notice of any increase in housing costs of 10% or more in a twelve (12) month period; increases of less than 10% require an advance written notice of at least thirty (30) days consistent with state law.  These notices must include information on how the tenant can access information on the tenant's rights and responsibilities.  Housing costs include rent, parking and storage fees, and other periodic fees associated with a tenancy.  Failure to provide a required sixty (60) day notice is a violation of SMC 7.24.030.A and SMC 22.206.180.

### Prohibited Rental Agreement Provisions

Month-to-month rental agreements, whether verbal or in writing, cannot require a tenant to stay beyond the initial period of the agreement.  A landlord cannot withhold a deposit or impose other penalties solely on the basis that a tenant moves out at the end of the initial rental period.

However, a tenant who desires to terminate a month-to-month tenancy must provide the landlord with a written notice at least twenty (20) days in advance of the end of a rental period.  Landlords are not obligated to pro-rate rent when a tenant moves out after the beginning of a rental period.

### Security Deposits

If a landlord wishes to collect a security deposit, the deposit and its amount must be identified in a written rental agreement.  The total amount of a security deposit and move-in fees cannot exceed the amount of the first full month's rent.  Additionally, the landlord must prepare and provide a tenant with a written checklist or statement describing the condition, cleanliness, and existing damage of the tenant's housing unit at the commencement of the tenancy.  This statement must be signed and dated by the landlord and the tenant.  The landlord must provide a copy of the checklist to the tenant for the tenant's records, and, upon request, one free replacement copy.

All security deposits must be placed in a trust account and the landlord must provide the tenant with the name, address, and location of the depository.  The landlord must inform the tenant of any subsequent changes of the location of the deposit.

Security deposits must be returned in accordance with RCW 59.18.280 at the end of a tenancy.

### Pet Damage Deposits

A landlord can charge a pet damage deposit, but it cannot exceed 25% of the first full month's rent.  A pet damage deposit cannot be required for an animal if it serves as an assistance animal to the tenant.  However, the tenant is responsible for any damage created by the tenant's assistance animal or the assistance animal of a guest of the tenant.  A pet damage deposit may be charged in addition to any security deposit.

An agreement to pay a pet damage deposit must be included in a written rental agreement or in a written addendum to the agreement, identify the amount of the deposit, and allow the tenant to pay the deposit in installments if requested by the tenant.

If the pet's occupancy begins at the commencement of the tenancy, the deposit must be identified in the rental agreement.  If the pet's occupancy begins after the commencement of the tenancy, the landlord must provide a written addendum to the rental agreement.

A landlord may not retain any portion of a pet damage deposit for damages not caused by the pet for which the tenant is responsible.

Pet damage deposits must be returned in accordance with RCW 59.18.280 at the end of a tenancy.

### Pet Rent

The payment of rent to keep a pet is allowed.

### Parking Unbundling

Landlords must specify the amount of any parking fee in a separate parking agreement or in a rental agreement addendum.

### Move-in Fees

Move-in fees are by state and city definition non-refundable.

Allowable move-in fees are limited to the cost of obtaining a tenant screening report, criminal background check, or credit report and to pay to clean the rental unit upon termination of a tenancy.

The cost for obtaining a tenant screening report cannot exceed the customary cost for obtaining such a report in the City of Seattle; a Landlord cannot charge a tenant more than the report's actual cost. The landlord must provide the tenant a receipt for any fees charged for obtaining the tenant screening report. The landlord must also provide the tenant the name and address of the reporting agency that prepared the report and the prospective tenant's right to obtain a free copy of it.

If the landlord chooses to charge a non-refundable cleaning fee, the landlord may not deduct additional cleaning fees from the tenant's security deposit at the end of a tenancy.

Landlords are prohibited from charging any one-time fee at the beginning of a tenancy other than a security deposit, pet damage deposit, an authorized non-refundable move-in fee, or last month's rent.

Move-in fees cannot exceed 10% of the first full month's rent except in the case where the actual cost for obtaining a tenant screening report, criminal background check, or credit report exceeds 10%, the cost may be included in the non-refundable fee. However, the total amount of a security deposit and move-in fees cannot exceed the amount of the first full month's rent.

### Summary of Limitations on Security Deposits, Pet Damage Deposits, and Move-In Fees

The total amount of a security deposit and move-in fees cannot exceed the amount of the first full month's rent. Non-refundable move-in fees cannot exceed 10% of the first full month's rent. A pet damage deposit may not exceed 25% of the rent for the first full month. Limits on the amount of charges for security deposits and non-refundable move-in fees does not apply to a tenant who rents a housing unit in a single family residence if the residence is the principal residence of the landlord.

### Installment Payments

*Security Deposits and Move-In Fees*

If the total amount of a security deposit and non-refundable move-in fees exceeds 25% of the first full month's rent, a tenant may choose to pay the total amount in installments as follows:

- For tenancies that are six (6) months or longer, a tenant may elect to pay in six (6) consecutive and equal monthly installments beginning at the commencement of the tenancy.
- For tenancies between thirty (30) days and six (6) months, a tenant may elect to pay in no more than four (4) equal installments of equal duration at the commencement of the tenancy.
- For tenancies that are month-to-month, the tenant may elect to pay in two (2) equal installments, with the first payment due at the commencement of the tenancy and the second payment due on the first day of the second monthly rental period.

A tenant may propose an alternative installment schedule to which the landlord may agree. If an alternative plan is mutually agreed to, it must be described in a written rental agreement or a written addendum to the agreement. Failure to pay an installment of the security deposit and/or non-refundable fees is a breach of the rental agreement and may subject the tenant to a 10-day comply or vacate notice issued pursuant to RCW 59.12.030(4).

A landlord cannot impose any cost on a tenant for an installment plan.

The requirement to allow an installment plan for the payment of deposits and move-in fees does not apply to tenants who rent a housing unit in a single-family house or attached accessory dwelling unit if the owner resides in the house as the owner's principal residence.

*Last Month's Rent*

Tenants may choose to pay last month's rent in installments.

For tenancies that are six (6) months or longer, a tenant may elect to pay in six (6) consecutive and equal monthly installments beginning on the first month of the tenancy; tenancies between sixty (60) days and six (6) months, the tenant may elect to pay in no more than four (4) equal installments of equal duration beginning at the commencement of the tenancy.

A tenant may propose an alternative installment schedule to which the landlord may agree. If an alternative plan is mutually agreed to, it must be described in a written rental agreement or a written addendum to the agreement.

A landlord cannot impose any cost on a tenant for an installment plan.

The requirement to allow an installment plan for the pay-

ment of last month's rent does not apply to tenants who rent a housing unit in a single-family house or attached accessory dwelling unit if the owner resides in the house as the owner's principal residence.

*Pet Damage Deposits*

A tenant may elect to pay a pet damage deposit in three (3) equal monthly installments beginning on the first full month the pet occupies the housing unit. A tenant may propose an alternative installment schedule to which the landlord may agree. If an alternative plan is mutually agreed to, it must be described in a written rental agreement or a written addendum to the agreement.

If a tenant wants to pay a security deposit, move-in fees, a pet damage deposit, or last month's rent in installments, the tenant must request such a payment plan.

## Summary of Landlord and Tenant Rights

A landlord must distribute a summary of state landlord tenant law and City of Seattle rental housing codes describing the rights, obligations, and remedies of landlords and tenants under these laws. This requirement can be met by distributing the current version of the Seattle Department of Construction and Inspections Publication *Information for Tenants*. This document must be given to each prospective tenant, to a tenant at the time a rental agreement is offered, and when a rental agreement is renewed. Month-to-month tenants must receive the most current version of this document at least once a year. When a rental agreement is renewed, *Information for Tenants* maybe be distributed electronically. The current version of *Information for Tenants* can be accessed at: awww.seattle.gov/dpd/cms/groups/pan/@pan/documents/web_informational/dpdd016420.pdf

If a landlord fails to distribute the summary in accordance with these requirements, a tenant may terminate the rental agreement by written notice. In addition, the tenant may recover, in a civil action against the landlord, actual damages, attorney fees, and a penalty of up to $500. If a court determines that the landlord deliberately failed to comply with this requirement, the penalty may be up to $1,000.

## Violations

A violation of the Rental Agreement Regulation Ordinance is subject to a citation in the amount of $500 for an initial violation and $1,000 for each subsequent violation occurring within five (5) years of the first violation. Citations can be appealed to the City of Seattle Hearing Examiner. Violations also are subject to a Notice of Violation after the issuance of two (2) citations.

## Tenant's Private Right of Action

If a landlord attempts to enforce provisions of a rental agreement which are contrary to:

1. The requirement that a rental agreement contain certain specific provisions;
2. The limitations imposed on security deposits, pet damage deposits, and non-refundable move-in fees; or
3. The requirement to adopt an installment payment plan

The landlord shall be liable to the tenant for:

1. Actual damages incurred by the tenant because of the landlord's attempted enforcement;
2. Double the amount of any penalties imposed by the City of Seattle;
3. Double the amount of any security deposit unlawfully charged or withheld by the landlord;
4. Up to $3,000; and
5. Reasonable attorney fees and court costs.

## Tenant Waiver of Rights or Remedies

No residential rental agreement, whether oral or written, can waive rights or remedies under the Rental Agreement Regulation Ordinance. However, a landlord and tenant may agree to waive certain specific requirements of the Ordinance. In order to do this, the following conditions must be met:

1. The agreement must specify in writing the specific provisions to be waived;
2. The agreement cannot appear in a standard form, lease, or rental agreement;
3. There can be no substantial inequity in the bargaining positions of the landlord and tenant; and
4. The tenant must be represented by an attorney who has approved the agreement as being in compliance with the requirements of the Ordinance.

## Exceptions

The provisions of this Ordinance limiting and restricting the amount of charges for security deposits and non-refundable move-in fees, and the payment of security deposits and move-fees on an installment basis do not apply to a tenant who rents a housing unit in a single-family residence if the residence is the principal residence of the property owner.

Also, exempted from regulation are the return or retention of a security deposit, the requirement to provide a unit condition checklist, and the requirement to place a security deposit in a trust account and disclose to the tenant the location of the account. However, the Washington State Residential Landlord-Tenant Act still regulates these requirements.

## OTHER CITY ORDINANCES THAT AFFECT TENANTS AND LANDLORDS

### 1. Open Housing and Public Accommodations Ordinance

This ordinance prohibits discrimination based on race, color, creed, religion, ancestry, national origin, age, sex, marital status, parental status, sexual orientation, gender identity, political ideology, participation in the Housing Choice Vouchers Program (Section 8), or disability; requires landlords to rent a housing unit on first-come-first-served basis; and to accept subsidies and alternative sources of income to pay for the tenant's housing costs. Inquiries about this ordinance and complaints of violations should be directed to the Seattle Office for Civil Rights at (206) 684-4500.

### 2. Condominium and Cooperative Conversion Ordinances

When a residential building is being converted to condominium or cooperative units, the Condominium and Cooperative Conversion ordinances require a housing code inspection.

Additionally, in a condominium conversion, a tenant must receive a written 120-day notice of the conversion. If the tenant decides not to buy his or her unit, the tenant may be eligible to receive the equivalent of three (3) months' rent in relocation assistance if the tenant's annual income, from all sources, does not exceed 80 percent of the area median income, adjusted for household size. A household which otherwise qualifies to receive relocation benefits and which includes a member sixty-five (65) years of age or older or an individual with "special needs," as defined in the ordinance, may qualify for additional assistance.

In a cooperative conversion, a tenant must receive a 120-day notice of intention to sell the unit. If the tenant decides not to buy his or her unit, the tenant must be paid $500.00 in relocation assistance.

Relocation assistance is paid directly to the tenant by the property owner or developer. The assistance must be paid no later than the date on which a tenant vacates his or her unit.

For further information, contact SDCI Code Compliance at (206) 615-0808.

### 3. Tenant Relocation Assistance Ordinance

This ordinance applies when tenants are displaced by housing demolition, change of use, substantial rehabilitation, or by removal of use restrictions from subsidized housing. A property owner who plans development activity must obtain a tenant relocation license and a building or use permit before terminating a tenancy. All tenants must receive a 90-day notice of the activity that will require them to move. Eligible low income tenants, whose annual income cannot exceed 50% of the area median income, receive cash relocation assistance. It is a violation of this ordinance to increase housing costs for the purpose of avoiding applying for a Tenant Relocation License. Call SDCI at (206) 615-0808 for more information.

### 4. Repair and Maintenance—Housing and Building Maintenance Code

This ordinance requires owners to meet certain minimum standards and keep buildings in good repair. If an owner does not make necessary repairs, a tenant can report needed repairs by calling SDCI at (206) 615-0808. If an inspector finds code violations, the owner will be required to make needed corrections.

### 5. Third Party Billing Ordinance

This ordinance defines rules for landlords who, by themselves or through private companies, bill tenants for City provided utilities (water, sewer, garbage, electric services) separately from their rent. The ordinance applies to all residential buildings having three or more housing units.

The rules require a landlord or billing agent to provide tenants with specific information about their bills and to disclose their billing practices, either in a rental agreement or in a separate written notice. It is a violation of the ordinance if a landlord imposes a new billing practice without appropriate notice.

A tenant can dispute a third-party billing by notifying the billing agent and explaining the basis for the dispute. This must be done within 30 days of receiving a bill. The billing agent must contact the tenant to discuss the dispute within 30 days of receiving notice of the dispute. A tenant can also file a complaint with the Seattle Office of the Hearing Examiner or take the landlord to court. If the Hearing Examiner or court rules in favor of the tenant, the landlord could be required to pay a penalty.

### 6. Rental Registration and Inspection Ordinance (RRIO)

The purpose of the Rental Registration and Inspection program is to ensure that all rental housing in the City of Seattle is safe and meets basic housing maintenance requirements. Beginning in 2014 all owners of residential housing in Seattle, with certain limited exceptions, must register their properties with the City. A registration is good for five years. No tenant can be evicted from a property if the property is not registered with the City. With a few exceptions, all properties must be inspected at least once every ten years. These inspections can be conducted by City-approved inspectors or by City housing/zoning inspectors. Information about the RRIO Program can be obtained by calling (206) 684-4110 or going to the program website at www.seattle.gov/RRIO.

## The Washington Residential Landlord-Tenant Act

### Chapter 59.18 RCW.
#### GOOD FAITH OBLIGATION

State law requires landlords and tenants to act in good faith toward one another.

Most tenants who rent a place to live come under the Washington State Residential Landlord-Tenant Act. However, certain renters are specifically excluded from the law.

Residents who are generally not covered by the Act are:

- Renters of a space in a mobile home park are usually covered by the state's Mobile Home Landlord-Tenant Act (RCW 59.20). However, renters of both a space and a mobile home are usually covered by the residential law.
- Residents in transient lodgings such as hotels and motels; residents of public or private medical, religious, educational, recreational or correctional institutions; residents of a single family dwelling which is rented as part of a lease of agricultural land; residents of housing provided for seasonal farm work.
- Tenants with an earnest money agreement to purchase the dwelling. Tenants who lease a single family dwelling with an option to purchase, if the tenant's attorney has approved the face of the lease. Tenants who have signed a lease option agreement but have not yet exercised that option are still covered.
- Tenants who are employed by the landlord, when their agreement specifies that they can only live in the rental unit as long as they hold the job (such as an apartment house manager).
- Tenants who are leasing a single family dwelling for one year or more, when their attorney has approved the exemption.
- Tenants who are using the property for commercial rather than residential purposes.

## RIGHTS OF ALL TENANTS

Regardless of whether they are covered by the Residential Landlord-Tenant Act, all renters have these basic rights under other state laws: the Right to a livable dwelling; Protection from unlawful discrimination; Right to hold the landlord liable for personal injury or property damage caused by the landlord's negligence; Protection against lockouts and seizure of personal property by the landlord.

## TYPES OF RENTAL AGREEMENTS

**Month-to-Month Agreement.** This agreement is for an indefinite period of time, with rent usually payable on a monthly basis or other short term period. The agreement itself can be in writing or oral, but if any type of fee or refundable deposit is collected, the agreement must be in writing. [RCW 59.18.260]

A month-to-month agreement continues until the tenant gives the landlord written notice at least 20 days before the end of the rental period. In the situation of a conversion to a condominium or a change in the policy excluding children the landlord must provide 90 days written notice to the tenant. [RCW 59.18.200] The rent can be increased or the rules changed at any time, provided the landlord gives the tenant written notice at least 30 days before the effective date of the rent increase or rule change. [RCW 59.18.140]

**Fixed Term Lease.** A lease requires the tenant to stay for a specific amount of time and restricts the landlord's ability to change the terms of the rental agreement. A lease must be in writing to be valid. During the term of the lease, the rent cannot be raised or the rules changed unless both landlord and tenant agree. Leases for longer than one year must be notarized.

## ILLEGAL DISCRIMINATION

Federal law prohibits most landlords from refusing to rent to a person or imposing different rental terms on a person because of race, color, religion, sex, handicap, familial status (having children or seeking custody of children), or national origin. [Fair Housing Act 42 USC s. 3601 et.seq. 1988] State law recognizes protection to the same individuals as well as for marital status, creed, the presence of sensory, mental, or physical disability. If you think you have been denied rental housing or have been the victim of housing discrimination file a written complaint with the Washington State Human Rights Commission. You may also file a complaint with the federal Fair Housing Section of the Department of Housing and Urban Development or your local city human rights department.

## LIABILITY

Once a tenant has signed a rental agreement, the tenant must continue to pay the rent to maintain eligibility to bring actions under this act. The tenant should also understand what he or she is responsible for in the maintenance of the property. While the landlord is responsible for any damage which occurs due to the landlord's negligence, the tenant must be prepared to accept responsibility for damages he or she causes. [RCW 59.18.060]

## ILLEGAL PROVISIONS IN RENTAL AGREEMENTS

Some provisions which may appear in rental agreements or leases are not legal and cannot be enforced under the law. [RCW 59.18.230] These include:

- A provision which waives any right given to tenants by the Landlord-Tenant Act or that surrenders tenants' right to defend themselves in court against a landlord's accusations.
- A provision stating the tenant will pay the landlord's attorney's fees under any circumstances if a dispute goes to court.
- A provision which limits the landlord's liability in situations where the landlord would normally be responsible.
- A provision which requires the tenant to agree to a particular arbitrator at the time of signing the rental agreement.
- A provision allowing the landlord to enter the rental unit without proper notice.
- A provision requiring a tenant to pay for all damage to the unit, even if it is not caused by tenants or their guests.
- A provision that allows the landlord to seize a tenant's property if the tenant falls behind in rent.

## PRIVACY—LANDLORD'S ACCESS TO THE RENTAL [RCW 59.18.150]

The landlord must give the tenant at least a two day written notice of their intent to enter at reasonable times. However, tenants must not unreasonably refuse to allow the landlord to enter the rental where the landlord has given at least one-day's notice of intent to enter at a specified time to exhibit the dwelling to prospective or actual purchasers or tenants. The law says that tenants shall not unreasonably refuse the landlord access to repair, improve, or service the dwelling. In case of an emergency, or if the property has been abandoned, the landlord can enter without notice.

## DEPOSITS AND OTHER FEES

### Refundable deposits

Under the Landlord-Tenant Act, the term "deposit" can only be applied to money which can be refunded to the tenant. If a refundable deposit is collected, the law requires:

- The rental agreement must be in writing. It must say what each deposit is for and what the tenant must do in order to get the money back. [RCW 59.18.260]
- The tenant must be given a written receipt for each deposit. [RCW 59.18.270]
- A checklist or statement describing the condition of the rental unit must be filled out. The landlord and the tenant must sign it, and the tenant must be given a signed copy. [RCW 59.18.260]
- The deposits must be placed in a trust account in a bank or escrow company. The tenant must be informed in writing where the deposits are being kept. Unless some other agreement has been made in writing, any interest earned by the deposit belongs to the landlord. [RCW 59.18.270]

### Non-refundable fees

These will not be returned to the tenant under any circumstances. If a non-refundable fee is being charged, the rental agreement must be in writing and must state that the fee will not be returned. A non-refundable fee cannot legally be called a "deposit." [RCW 59.18.285]

## LANDLORD'S RESPONSIBILITIES [RCW 59.18.060]

The landlord must:

- Maintain the dwelling so it does not violate state and local codes in ways which endanger tenants' health and safety
- Maintain structural components, such as roofs, floors and chimneys, in reasonably good repair.
- Maintain the dwelling in reasonably weather tight condition
- Provide reasonably adequate locks and keys.
- Provide the necessary facilities to supply heat, electricity, hot and cold water
- Provide garbage cans and arrange for removal of garbage, except in single family dwellings
- Keep common areas, such as lobbies, stairways and halls, reasonably clean and free from hazards
- Control pests before the tenant moves in. The landlord must continue to control infestations except in single family dwellings, or when the infestation was caused by the tenant
- Make repairs to keep the unit in the same condition as when the tenant moved in—except for normal wear and tear

- Keep electrical, plumbing and heating systems in good repair, and maintain any appliances which are provided with the rental
- Inform the tenant of the name and address of the landlord or landlord's agent
- Supply hot water as reasonably required by tenant
- Provide written notice of fire safety and protection information and ensure that the unit is equipped with working smoke detectors when a new tenant moves in. (Tenants are responsible for maintaining detectors.) Except for single family dwellings, the notice must inform the tenant on how the smoke detector is operated and about the building's fire alarm and/or sprinkler system, smoking policy, and plans for emergency notification, evacuation and relocation, if any. Multifamily units may provide this notice as a checklist disclosing the building's fire safety and protection devices and a diagram showing emergency evacuation routes.
- Provide tenants with information provided or approved by the Department of Health about the health hazards of indoor mold, including how to control mold growth to minimize health risks, when a new tenant moves in. The landlord may give written information individually to each tenant, or may post it in a visible, public location at the dwelling unit property. The information can be obtained at www.doh.wa.gov/ehp/ts/IAQ/mold-notification.htm.
- Investigate if a tenant is engaged in gang-related activity when another tenant notifies the landlord of gang-related activity by serving a written notice and investigation demand to the landlord. [RCW 59.18.180]
- Provide carbon monoxide detectors.

## TENANT'S RESPONSIBILITIES [RCW 59.18.130]

A tenant is required to:

- Pay rent, and any utilities agreed upon
- Comply with any requirements of city, county or state regulations
- Keep the rental unit clean and sanitary
- Dispose of the garbage properly
- Pay for fumigation of infestations caused by the tenant
- Properly operate plumbing, electrical and heating systems
- Not intentionally or carelessly damage the dwelling
- Not permit "waste" (substantial damage to the property) or "nuisance" (substantial interference with other tenant's use of property)
- Maintain smoke and carbon monoxide detection devices including battery replacement
- Not engage in activity at the premises that is imminently hazardous to the physical safety of other

persons on the premises and that entails a physical assault on a person or unlawful use of a firearm or other deadly weapon resulting in an arrest [RCW 59.18.352]
- When moving out, restore the dwelling to the same conditions as when the tenant moved in, except for normal wear and tear

## THREATENING BEHAVIOR BY A TENANT OR LANDLORD  (RCW 59.18.352 and 354)

If one tenant threatens another with a firearm or other deadly weapon, and the threatening tenant is arrested as a result of the threat, the landlord may terminate the tenancy of the offending tenant  (although the landlord is not required to take such action).  If the landlord does not file an unlawful detainer action, the threatened tenant may choose to give written notice and move without further obligation under the rental agreement.  If a landlord threatens a tenant under similar circumstances, the tenant may choose to give notice and move.  In both cases, the threatened tenant does not have to pay rent for any day following the date of leaving, and is entitled to receive a pro-rated refund of any prepaid rent.

## MAKING CHANGES TO THE MONTH-TO-MONTH AGREEMENT

Generally speaking, if the landlord wants to change the provisions of a month-to-month rental agreement, such as raising the rent or changing rules, the tenant must be given at least 30 days notice in writing.  These changes can only become effective at the beginning of a rental period (the day the rent is due).  Notice which is less than 30 days will be effective for the following rental period.

If the landlord wishes to convert the unit to a condominium, the tenant must be given a 120-day notice. [RCW 59.18.200]

## MAKING CHANGES TO A FIXED LEASE TERM

Under a lease, in most cases, changes during the lease term cannot be made unless both landlord and tenant agree to the proposed change.

**If the property is sold.**  The sale of the property does not automatically end a tenancy.  When a rental unit is sold, tenants must be notified of the new owner's name and address, either by certified mail, or by a revised posting on the premises.  All deposits paid to the original owner must be transferred to the new owner, who must put them in a trust or escrow account.  The new owner must promptly notify tenants where the deposits are being held.

## HOW TO HANDLE REPAIRS

A tenant must be current in the payment of rent including all utilities to which the tenant has agreed in the rental agreement to pay before exercising any statutory remedies, such as repair options.  [RCW 59.18.080]

**Required Notice** [RCW 59.18.070]  When something in the rental unit needs to be repaired, the first step is for the tenant to give written notice of the problem to the landlord or person who collects the rent.

The notice must include the address and apartment number of the rental; the name of the owner, if known; and a description of the problem.  After giving notice, the tenant must wait the required time for the landlord to begin making repairs.  Those required waiting times are:  24 hours for no hot or cold water, heat or electricity, or for a condition which is imminently hazardous to life; 72 hours for repair of refrigerator, range and oven, or a major plumbing fixture supplied by landlord; 10 days for all other repairs.

**Tenant's Options** [RCW 59.18.090] If repairs are not started within the required time and if the tenant is paid up in rent and utilities, the following options can be used:

1) Tenant can give written notice to the landlord and move out immediately. Tenants are entitled to a pro-rated refund of their rent, as well as the deposits they would normally get back.
2) Litigation or arbitration can be used to work out the dispute.
3) The tenant can hire someone to make the repairs. In many cases the tenant can have the work done and then deduct the cost from the rent. [RCW 59.18.100] (This procedure cannot be used to force a landlord to provide adequate garbage cans.)

   **An Important Note:**  If the repair is one that has a 10-day waiting period, the tenant cannot contract to have the work done until 10 days after the landlord receives notice, or five days after the landlord receives the estimate, whichever is later.

   To follow this procedure a tenant must: Submit a good faith estimate from a licensed or registered tradesperson, if one is required, to the landlord. After the waiting period, the tenant can contract with the lowest bidder to have the work done.  After the work is completed, the tenant pays the tradesperson and deducts the cost from the rent payment.  The landlord must be given the opportunity to inspect the work.  The cost of each repair cannot exceed one month's rent; total cost cannot exceed two month's rent in any 12-month period.

   If a large repair which affects a number of tenants needs to be made, the tenants can join together, follow the proper procedure, and have the work done.  Then each can deduct a portion of the cost from their rent.

4) The tenant can make the repairs and deduct the cost from the rent, if the work does not require a licensed or registered tradesperson.  The same procedure is followed as for (2) above.  However, the cost limit is one half of one month's rent.
5) Rent in Escrow - After notice of defective conditions, and after appropriate government certification of defect, and waiting periods have passed, then tenants may place their monthly rent payments in an escrow account.  It is wise to consult an attorney before taking this action.

## ILLEGAL LANDLORD ACTIONS

**Lockouts.** [RCW 59.18.290]  The law prohibits landlords from changing locks, adding new locks, or otherwise making it impossible for the tenant to use the normal locks and keys.  Even if a tenant is behind in rent, such lockouts are illegal.

A tenant who is locked out can file a lawsuit to regain entry.  Some local governments also have laws against lockouts and can help a tenant who has been locked out of a rental.  For more information contact your city or county government.

**Utility shutoffs.** [RCW 59.18.300]  The landlord may not shut off utilities because the tenant is behind in rent, or to force a tenant to move out.  Utilities may only be shut off by the landlord so that repairs may be made, and only for a reasonable amount of time.  If a landlord intentionally does not pay utility bills so the service will be turned off, that could be considered an illegal shutoff.  If the utilities have been shut off by the landlord, the tenant should first check with the utility company to see if it will restore service.  If it appears the shutoff is illegal, the tenant can file a lawsuit. If the tenant wins in court, the judge can award the tenant up to $100 per day for the time without service, as well as attorney's fees.

**Taking the tenant's property.** [RCW 59.18.310]  The law allows a landlord to take a tenant's property only in the case of abandonment.  A clause in a rental agreement which allows the landlord to take a tenant's property in other situations is not valid.  If the landlord does take a tenant's property illegally, the tenant may want to contact the landlord first.  If that is unsuccessful, the police can be notified.  If the property is not returned after the landlord is given a written request, a court could order the landlord to pay the tenant up to $100 for each day the property is kept — to a total of $1,000. [RCW 59.18.230(4)]

**Renting condemned property.** [RCW 59.18.085]  The landlord may not rent units which are condemned or unlawful to occupy due to existing uncorrected code violations.  The landlord can be held liable for three months rent or treble damages, whichever is greater, as well as costs and attorneys fees for knowingly renting the property.

**Retaliatory actions.** [RCW 59.18.240 -.250]  If the tenant exercises rights under the law, such as complaining to a government authority or deducting for repairs, the law prohibits the landlord from taking retaliatory action. Examples of retaliatory actions are raising the rent, reducing services provided to the tenant, or evicting the tenant.  The law initially assumes that these steps are retaliatory if they occur within 90 days after the tenant's action, unless the tenant was in some way violating the statute when the change was received.  If the matter is taken to court and the judge finds in favor of the tenant, the landlord can be ordered to reverse the retaliatory action, as well as pay for any harm done to the tenant and pay the tenant's attorney fees.

## ENDING THE AGREEMENT

**Proper Notice to Leave for Leases.** If the tenant moves out at the expiration of a lease, in most cases it is not necessary to give the landlord a written notice. However, the lease should be consulted to be sure a formal notice is not required.  If a tenant stays beyond the expiration of the lease, and the landlord accepts the next month's rent, the tenant then is assumed to be renting under a month-to-month agreement.

A tenant who leaves before a lease expires is responsible for paying the rent for the rest of the lease term.  However, the landlord must make an effort to re-rent the unit at a reasonable  price.  If this is not done, the tenant may not be liable for rent beyond a reasonable period of time.  [RCW 59.18.310(1)]

**Proper Notice to Leave for Leases—Armed Forces Exception.**  A lease can be terminated when the tenant is a member of the armed forces (including the national guard or armed forces reserve), if the tenant receives reassignment or deployment orders, provided the tenant informs the landlord no later than seven days after the receipt of such orders.  In these circumstances, the tenancy may also be terminated by the tenant's spouse or dependent.  [RCW 59.18.220]

**Proper Notice to Leave for Month-to-Month Agreements.**  When a tenant wants to end a month-to-month rental agreement, written notice must be given to the landlord.

The notice must be received at least 20 days before the end of the rental period (the day before the rent is due). The day which the notice is delivered does not count.  A landlord cannot require a tenant to give more than 20 days notice when moving out.  When a landlord wants a month-to-month renter to move out, a 20-day notice is required (only outside of Seattle).  If a tenant moves out without giving proper notice, the law says the tenant is liable for rent for the lesser of: 30 days from the day the next rent is due, or 30 days from the day the landlord learns the tenant has moved out.  However, the landlord has a duty to try and find a new renter.  If the dwelling is rented before the end of the 30 days, the former tenant must pay only until the new tenant begins paying rent.

**Proper Notice to Leave for Month-to-Month Agreements—Armed Forces Exception.**  A month-to-month tenancy can be terminated with less than 20 days written notice when the tenant is a member of the armed forces (including the national guard or armed forces reserve), if the tenant receives reassignment or deployment orders that do not allow for a 20-day notice.  In these circumstances, the tenancy may also be terminated by the tenant's spouse or dependent. [RCW 59.18.200]

**Domestic Violence Protection.** If a tenant or a household member is a victim of an incident of domestic violence, sexual assault, unlawful harassment, or stalking, the tenant may terminate their rental agreement without penalty, change the locks on their unit at their own expense, or both. The tenant must notify the landlord in writing that they or a household member were a victim of one of the above crimes and either provide a copy of a valid order for protection or a report of the incident from a qualified third party to the landlord. Qualified third parties include law enforcement officers, court officials, licensed mental health professionals, doctors, and victim advocates. The tenant must terminate the rental agreement within 90 days of the incident leading to the protection order or report to a qualified third party. The protection order or third party's report must be made available to the landlord within 7 days of the tenant moving out of the unit or at the same time the tenant gives notice to the landlord that the locks have been changed.  [RCW 59.18.570 - 585]

## RETURN OF DEPOSITS [RCW 59.18.280]

After a tenant moves out, a landlord has 21 days in which to return a deposit, or give the tenant a written statement of why all or part of the money is being kept. It is advisable for the tenant to leave a forwarding address with the landlord when moving out.

The rental unit should be restored to the same condition as when the tenant moved in, except for normal wear and tear.  Deposits cannot be used to cover normal wear and tear; or damage that existed when the tenant moved in.

The landlord is in compliance if the required payment, statement, or both, are deposited in the U.S. Mail with First Class postage paid, within 21 days.  If the tenant takes the landlord to court, and it is ruled that the landlord intentionally did not give the statement or return the money, the court can award the tenant up to twice the amount of the deposit.

## EVICTIONS

**For not paying rent.** If the tenant is even one day behind in rent, the landlord can issue a three-day notice to pay or move out. If the tenant pays all the rent due within three days, the landlord must accept it and cannot evict the tenant. A landlord is not required to accept a partial payment.

**For not complying with the terms of the rental agreement.** If the tenant is not complying with the rental agreement (for example, keeping a cat when the agreement specifies no pets are allowed), the landlord can give a 10-day notice to comply or move out. If the tenant satisfactorily remedies the situation within that time, the landlord cannot continue the eviction process.

**For creating a "waste or nuisance."** If a tenant destroys the landlord's property, uses the premises for unlawful activity including gang- or drug-related activities, damages the value of the property or interferes with other tenant's use of the property, the landlord can issue a three-day notice to move out. The tenant must move out after this kind of notice. There is no option to stay and correct the problem.

**For violations within drug and alcohol free housing.** If a tenant enrolled in a program of recovery in drug and alcohol free housing for less than two years uses, possesses, or shares alcohol or drugs the landlord can give a three-day notice to move out. If the tenant cures the violation within one day, the rental agreement does not terminate. If the tenant fails to remedy the violation within one day, he or she must move out and the rental agreement is terminated. If the tenant engages in substantially the same behavior within six months, the landlord can give a three-day notice to move out and the tenant has no right to cure the subsequent violation.

**Notice.** In order for a landlord to take legal action against a tenant who does not move out, notice must be given in accordance with RCW 59.12.040.

If the tenant continues to occupy the rental in violation of a notice to leave, the landlord must then go to court to begin what is called an "unlawful detainer" action. If the court rules in favor of the landlord, the sheriff will be instructed to move the tenant out of the rental if the tenant does not leave voluntarily. The only legal way for a landlord to move a tenant physically out of a unit is by going through the courts and the sheriff's office.

## DESIGNATION OF AN INDIVIDUAL TO ACT ON BEHALF OF A TENANT UPON THE DEATH OF THE TENANT (RCW 59.18.590)

A tenant who is the sole occupant of a dwelling unit can designate a person to act on the tenant's behalf upon the death of the tenant independently or at the request of a landlord. The designation must be in writing separate from any rental agreement. It must include the designated person's name, mailing address, an address used for the receipt of electronic communications, a telephone number, and a signed statement authorizing the landlord in the event of the tenant's death (when the tenant is the sole occupant of the dwelling unit) to allow the designated person to access the tenant's dwelling unit, remove the tenant's property, receive refunds of amounts due to the tenant, and to dispose of the tenant's property consistent with the tenant's last will and testament and any applicable intestate succession law, and a conspicuous statement that the designation remain in effect until it is revoked in writing by the tenant or replaced with a new designation. The designated person's right to act on the behalf of the deceased tenant terminates upon the appointment of a personal representative for the deceased tenant's estate or the identification of a person reasonably claiming to be a successor of the deceased tenant pursuant to law.

## ABANDONMENT RELATED TO FAILURE TO PAY RENT [RCW 59.18.310]

Abandonment occurs when a tenant has both fallen behind in rent and has clearly indicated by words or actions an intention not to continue living in the rental.

When a rental has been abandoned, the landlord may enter the unit and remove any abandoned property. It must be stored in a reasonably secure place. A notice must be mailed to the tenant saying where the property is being stored and when it will be sold. If the landlord does not have a new address for the tenant, the notice should be mailed to the rental address, so it can be forwarded by the U.S. Postal Service.

How long a landlord must wait before selling abandoned property depends on the value of the goods. If the total value of property is less than $250, the landlord must mail a notice of the sale to the tenant and then wait seven(7) days. Family pictures, keepsakes and personal papers cannot be sold until forty-five (45) days after the landlord mails the notice of abandonment to the tenant.

If the total value of the property is more than $250, the landlord must mail a notice of the sale to the tenant and then wait forty-five (45) days. Personal papers, family pictures, and keepsakes can be sold at the same time as other property.

The money raised by the sale of the property goes to cover money owed to the landlord, such as back rent and the cost of storing and selling the goods. If there is any money left over, the landlord must keep it for the tenant for one (1) year. If it is not claimed within that time, it belongs to the landlord.

If a landlord takes a tenant's property and a court later determines there had not actually been an abandonment, the landlord could be ordered to compensate the

tenant for loss of the property, as well as paying court and attorney costs.

This procedure does not apply to the disposition of property of a deceased tenant. See "Abandonment Related to the Death of a Tenant" below.

## ABANDONMENT RELATED TO EVICTION [RCW 59.18.312]

When a tenant has been served with a writ of restitution in an eviction action, the tenant will receive written notification of the landlord's responsibilities regarding storing the tenant's property that is left behind after the premises is vacant. Tenants will be provided with a form to request the landlord store the tenant's property.

A landlord is required to store the tenant's property if the tenant makes a written request for storage within three (3) days of service of the writ of restitution or if the landlord knows that the tenant is a person with a disability that prevents the tenant from making a written request and the tenant has not objected to storage. The written request for storage may be served by personal delivery, or by mailing or faxing to the landlord at the address or fax number identified on the request form provided by the landlord.

After the Writ of Restitution has been executed, the landlord may enter the premises and take possession of any of the tenant's remaining belongings. Without a written request from the tenant, the landlord may choose to store the tenant's property or deposit the tenant's property on the nearest public property. If the landlord chooses to store the tenant's property, whether requested or not, it may not be returned to the tenant until the tenant pays the actual or reasonable costs of moving and storage, whichever is less within thirty (30) days.

If the total value of the property is more than $250, the landlord must notify the tenant of the pending sale by personal delivery or mail to the tenant's last known address. After thirty (30) days from the date of the notice, the landlord may sell the property, including personal papers, family pictures, and keepsakes and dispose of any property not sold.

If the total value of the property is $250 or less, the landlord must notify the tenant of the pending sale by personal delivery or mail to the tenant's last known address. After seven (7) days from the date of the notice, the landlord may sell or dispose of the property except for personal papers, family pictures, and keepsakes.

The proceeds from the sale of the property may be applied towards any money owed to the landlord for the actual and reasonable costs of moving and storing of the property, whichever is less. The costs cannot exceed the actual or reasonable costs of moving and storage, whichever is less. If there are additional proceeds, the landlord must keep it for the tenant for one (1) year.

If no claim is made by the tenant for the recovery of the additional proceeds within one (1) year, the balance will be treated as abandoned property and deposited with the Washington State Department of Revenue.

See RCW 59.18.312.

## ABANDONMENT RELATED TO THE DEATH OF A TENANT (RCW 59.18.595)

When a landlord learns of the death of a tenant who is the sole occupant of a dwelling unit, the landlord must promptly mail or personally deliver a written notice to any known personal representative, designated person, emergency contact person, or known successor to the tenant. The notice must include the name of the deceased tenant and address of the dwelling unit, the approximate date of the tenant's death, the amount of the monthly rent and the date to which it is paid. The notice must include a statement that the tenancy will terminate 15 days from the date the notice is mailed or personally delivered, or the date through which the rent has been paid, whichever is later, unless during this 15 day period a tenant representative makes arrangements with the landlord to pay rent in advance for no more than 60 days from the date of the tenant's death in order to arrange for the removal of the deceased tenant's property, and that the tenancy will be over at the end of the period for which the rent has been paid. The notice must also include a statement that failure to remove the tenant's property before the tenancy is terminated or ends will permit the landlord to enter the dwelling unit and take possession of any property found on the premises, store it in a reasonably secure place, and charge the actual or reasonable costs, whichever is less, for moving and storage of the property, and that after appropriate notice, sell or dispose of the property as provided for in law. A copy of any designation of a person to act on the deceased tenant's behalf must be attached to the notice.

The landlord must turn over possession of the tenant's property to a tenant representative upon receipt of a written request if this request is made prior to the termination or end of the tenancy, or any other date agreed to by the parties. The tenant representative must provide to the landlord an inventory of all the removed property and a signed acknowledgement that the tenant representative has been given possession and not ownership of the property.

If a tenant representative has made arrangements to pay rent in advance, the landlord must mail this second notice to any known personal representative, designated person, emergency contact person, or known successor of the tenant, and to the deceased tenant at the dwelling unit address. This second notice must include the name, address, and telephone number or contact information for the tenant representative who made arrangements to pay rent in advance, the amount of

rent paid in advance, and date through which the rent is paid.  The notice must include a statement that the landlord may sell or dispose of the property on or after the date through which the rent is paid or at least 45 days after the second notice is mailed, whichever date comes later, if the tenant representative does not claim or remove the property.

If the landlord places the property in storage, the landlord must mail a second written notice (if this has not already been done) to any known personal representative, designated person, emergency contact person, or known successor of the tenant, and to the deceased tenant at the dwelling unit address.  This notice must include a statement that the landlord may sell or dispose of the property on or after a specified date that is at least 45 days after the second notice is mailed, if the tenant representative does not claim and remove the property.

The landlord must turn over possession of the deceased tenant's property to the tenant representative if a written request is made in a timely manner.  The tenant representative must pay the actual or reasonable costs, whichever is less, of any moving and storage of the property, and provide to the landlord an inventory of all the removed property and a signed acknowledgement that the tenant representative has been given possession and not ownership of the property.

If a tenant representative does not contact the landlord or remove the deceased person's property in a timely manner, the landlord may sell or dispose of the stored property, except for personal papers and personal photographs.  If the fair market value of the property is more than $1,000, the landlord must sell the property in a commercially reasonable manner.  All unsold property must be disposed of in a reasonable manner.  If the value of the stored property is less than $1,000, the landlord must dispose of the property in a reasonable manner.

The personal papers and photographs that are not claimed by a tenant representative must be retained for 90 days after the sale or disposal of the deceased tenant's property and must either be destroyed or held for benefit of any successor of the deceased tenant.

No landlord or an employee of the landlord may acquire, either directly or indirectly, a deceased tenant's property that is sold or otherwise disposed of.  The landlord may apply the proceeds of the sale of the deceased tenant's property toward any money owed to the landlord for the actual and reasonable cost of moving and storing the property, whichever is less.  If there is excess income, it must be held by the landlord for one year.   If no claim is made on the excess income before the expiration of the one year period, the balance must be deposited with the Washington State Department of Revenue as abandoned property.

The landlord must refund to the tenant representative any unearned rent and  give a full and specific statement of the basis for retaining any deposit together with the payment of any refund due to the deceased tenant within 14 days after the removal of the property by the tenant representative.

If a landlord knowingly violates these abandonment provisions, the landlord can be liable to the deceased tenant's estate for actual damages.  The prevailing party in any action related to these requirements may recover costs and reasonable attorneys' fees.

## RECEIPTS

A landlord must provide a receipt for any payment made in the form of cash by a tenant.   Upon the request of a tenant, a landlord must provide a receipt for any payment made by the tenant in a form other than cash.  This includes payment for rent, deposits, fees, parking, storage, or any other costs associated with a tenancy.  See RCW 59.18.063.

## COPIES OF DOCUMENTS

If a checklist describing the physical condition of a rental unit is completed pursuant to RCW 59.18.260 and SMC 7.24.030.C, a copy signed by both the landlord and the tenant must be provided to the tenant.

When there is a written rental agreement for a premises, the landlord must provide a fully executed copy to each tenant who signs the agreement.  A landlord must provide one free replacement copy of the written agreement if requested by a tenant during the tenancy.  See RCW 59.18.065.

## VOTER REGISTRATION INFORMATION

Attached to this publication is information related to registering to vote, and if already registered, how to update your address when you move. For more information go to www.kingcounty.gov/depts/elections.

**Vero Management LLC**

1414 E Yesler Way • Unit A • Seattle, WA 98122
(253) 880-7873

# 19

## Seattle_Landlord_Tenant_Laws.pdf

X _Yaminah Oddie-Johnson_

Lessee                IP Address: 174.224.193.209
                      04/22/2024 01:16pm PDT

# Sorento Tenant

**Property:** 1414 E Yesler Way, Seattle, WA 98122

## Kitchenette

**Refrigerator**

Clean / No Damage

**Sink**

Clean / No Damage Located in Bathroom

**Hot Plate**

Used & Working

**Cabinets**

Clean / Wear resulting from ordinary use

**Countertops**

Granite countertop , Clean / No Damage

## Bathroom

**Toilet**

Clean / No Damage

**Shower/Tub**

Clean / No Damage

## Living Space

**Window & Blinds**

Clean/ No Damage

**Walls**

**Floors** ✓ 🏳

Vinyl Non- Hardwood Flooring Clean / Wear resulting from ordinary use

## Furniture

**Bed Frame & Mattress** ✓ 🏳

**Desk / Table** ✓ 🏳

**Chair** ✓ 🏳

## Additional Information

**Inspection Changes** ✓ 🏳

SHOULD YOU NOTICE SOMETHING THAT IS NOT LISTED IN THIS MOVE IN CHECKLIST, PLEASE KNOW YOU HAVE 72HRS AFTER GAINING POSSESSION OF THE UNIT TO MAKE CHANGES TO THIS INSPECTION REPORT.

# Vero Management LLC

1414 E Yesler Way • Unit A • Seattle, WA 98122
(253) 880-7873

# 20

## Sorento_Flats_Move_In_Check_list.pdf

X _Yaminah Oddie-Johnson_
<div style="padding-left:2em">Lessee</div>

IP Address: 174.224.193.209
04/22/2024 01:16pm PDT

# Seattle Public Utilities

# Where Does it Go?

**206-684-3000**
seattle.gov/util/wheredoesitgo





## Appliances
- **Drop off** at Transfer Station. (Fees apply)
- **Pick up** with weekly collection. (Fees apply) Call 206-684-3000 to schedule pick up.
- **Drop off** for donation and reuse. (Free) Working appliances may be accepted at thrift stores.

## Batteries & Cell Phones
**call2recycle**
Leading the charge for recycling
Rechargeable batteries and cell phones:
- **Drop off** at stores or Household Hazardous Waste (HHW). (Free) **Locations:** Call2Recycle.org, HazWasteHelp.org
Alkaline batteries:
- **Drop off** to recycle at HHW. (Free)
- Accepted in garbage.

## Building Materials
- **Drop off** for donation and reuse at building supply salvage businesses. (Free)
  **Locations:** SecondUse, Earthwise, & Ballard ReUse Check store websites for accepted materials.
- **Drop off** at Transfer Station. (Fees apply)

## Bulky Items
- **Drop off** at Transfer Station. (Fees apply)
- **Pick up** with weekly collection. (Fees apply) Call 206-684-3000 to schedule pick up.
- **Drop off** for donation and reuse. (Free) Clean, working items may be accepted at thrift stores.

## Furniture
- **Drop off** reusable items for donation at thrift stores. (Free)
- **Pick up** with weekly collection. (Fees apply) Call 206-684-3000 to schedule pick up.
- **Drop off** at Transfer Station. (Fees apply)

## Household Goods

- **Drop off** reusable items for donation at thrift stores. (Free)
- Put unusable items in garbage.

## Mattresses
- **Pick up** with weekly collection. (Fees apply) Call 206-684-3000 to schedule pick up.
- **Drop off** at Transfer Station. (Fees apply)

## Used Oil

Put cooking and motor oil in separate 1-gallon plastic jugs labeled with your name and address.
- Oil pick up on recycling collection day. (Free) Set out up to 2 gallons with your carts.

## Clothes/Textiles
**Threadcycle**
Give all your clothes, shoes and linens for reuse or recycling
- **Drop off** reusable items at thrift stores. (Free)
- Damaged items can also be dropped off at participating Threadcycle thrift stores. (Free)
  **Locations:** kingcounty.gov/threadcycle

## Electronics
**E-CYCLE washington**
- **Drop off** for recycling or reuse. Televisions, computers, laptops and computer monitors accepted. (Free) Check website for other acceptable items. (Fees may apply)
  **Locations:** ecyclewashington.org

## Light Bulbs
**LightRecycle WASHINGTON**
Unbroken fluorescent tubes, compact fluorescent and mercury bulbs accepted.
- **Drop off** for recycling. (Free)
  **Locations:** lightrecycle.org

## Medicine
- Do not flush down the toilet or put in the garbage.
- **Drop off** over-the-counter and prescription medications. (Free)
  **Locations:** medicinereturn.org

## Transfer Stations
**North Transfer Station**
1350 N 34th Street
Seattle, WA 98103

**South Transfer Station**
130 South Kenyon Street
Seattle, WA 98108

**Hours & Information**
seattle.gov/util/myservices
206-684-8400


North HHW · North Transfer Station · South HHW · South Transfer Station

## Household Hazardous Waste (HHW)
*Products marked "CAUTION," "WARNING," "DANGER," or "POISON" may require hazardous material disposal.*

Safe Disposal Information and Drop-off Locations:
Call **206-296-4692** or visit HazWasteHelp.org



**NOT ALLOWED IN GARBAGE, RECYCLING OR FOOD & YARD WASTE.**

## Customer Service
206-684-3000   seattle.gov/util/wheredoesitgo

For interpretation services please call 206-684-3000.
如需口譯服務請電 206-684-3000。
통역 서비스를 원하시면 206-684-3000 번으로 전화해 주십시오.
Wixii adeegyada turjubaanka fadlan wac 206-684-3000.
Para servicios de traducción, por favor llame al 206-684-3000.
Para sa serbisyo ng tagapagpaliwanag, tumawag sa 206-684-3000.
Muốn yêu cầu dịch vụ thông dịch xin gọi số 206-684-3000.

@SeattleSPU   @SeattlePublicUtilities        AP3 - 17



**Vero Management LLC**

1414 E Yesler Way • Unit A • Seattle, WA 98122
(253) 880-7873

# 21

## SPU_Where_Does_It_Go.pdf

X *Yaminah Oddie-Johnson*

Lessee
IP Address: 174.224.193.209
04/22/2024 01:16pm PDT

# Vero Management LLC

1414 E Yesler Way • Unit A • Seattle, WA 98122
(253) 880-7873

# 22. Sign and Accept

## 22.1  ACCEPTANCE OF LEASE

Landlord and Tenant agree to the terms and conditions contained in this Rental Agreement, effective as of the date first written hereinabove.

X *Yaminah Oddie-Johnson*

Lessee                                       IP Address: 174.224.193.209
                                             04/22/2024 01:17pm PDT

X *Benisha Randle*

Lessor                                       IP Address: 104.220.248.10
                                             04/22/2024 03:18pm PDT



19 April 2024

Compass Housing Alliance

220 Dexter Ave N

Seattle, WA 98109

(206) 474-1674

Rental Address: <u>1414 E Yesler Way Unit D312</u>

Tenant Name: <u>Yaminah Oddie – Johnson</u>

**I, as landlord/owner/lessor/sub lessor/ or designated representative, of the above address, certify that the above unit meets the provisions outlined in Landlord Tenant Act (RCW 59.18.060) attached.**

Landlord / Owner Signature _____

Landlord / Owner Name Printed _____

Date _____

Phone & Email _____



19 April 2024

To whom it may concern:

Re: 1414 E Yesler Way Seattle, WA 98122

Tenant: Yaminah Oddie – Johnson

Case Manager: Haley Montowski

I attest that the **UNIT D312 1414 E Yesler Way** meets all criteria for habitability based on inspection by case manager and continued Housing Connector Partner. On the occasion Tenant **Yaminah Oddie-Johnson** is in need of advocacy or help with maintenance assistance she will communicate with case manager **Haley Montowski.**

Attached are documents attesting readiness of unit.

Please feel free to reach out with any questions or issues that arise during tenant's first year of residence.

Thank you.

Haley Montowski

Housing Case Manager

Jan & Peter's Place Women's Shelter

P: 206-474-1674 | C: 206-743-5608

HMontowski@compasshousingalliance.org

| Kitchen | | |
|---|---|---|
| **Item** | **Good** | **Negative Comments** |
| Walls | ✓ | |
| Flooring | ✓ | |
| Ceiling | ✓ | |
| Windows | ✓ | |
| Stove | NA | |
| Refrigerator | ✓ | |
| Disposal | — | |
| Cabinets | ✓ | |
| Countertops | ✓ | |
| Lighting | ✓ | |
| Dishwasher | ✓ | |
| Other | | |
| Other | | |

| Bath (1&2) | | | | |
|---|---|---|---|---|
| **Item** | **B1** | **B2** | **Good** | **Negative Comments** |
| Walls | ✓ | | | |
| Flooring | ✓ | | | |
| Ceiling | ✓ | | | |
| Shower/tub | ✓ | | | |
| Sink | ✓ | | | |
| Mirror | ✓ | | | |
| Toilet | ✓ | | | |
| Towel Bars | ✓ | | | |
| Windows | ✓ | | | |
| Lighting | ✓ | | | |

| Bedroom 1 : | | |
|---|---|---|
| **Item** | **Good** | **Negative Comments** |
| Flooring | ✓ | |
| Walls | ✓ | |
| Ceiling | ✓ | |
| Closet | ✓ | |
| Lighting | ✓ | |
| Windows | ✓ | |
| Blinds/drapes | ✓ | |
| Other | | |
| Other | | |

| Bedroom 2 : | | |
|---|---|---|
| **Item** | **Good** | **Negative Comments** |
| Flooring | | |
| Walls | | |
| Ceiling | | |
| Closet | | N/a |
| Lighting | | |
| Windows | | |
| Blinds/drapes | | |
| Other | | |
| Other | | |

| Bedroom 3 : | | |
|---|---|---|
| Item | Good | Negative Comments |
| Flooring | | |
| Walls | | |
| Ceiling | | |
| Closet | | NA |
| Lighting | | |
| Windows | | |
| Blinds/drapes | | |
| Other | | |
| Other | | |

| Bedroom 4 : | | |
|---|---|---|
| Item | Good | Negative Comments |
| Flooring | | |
| Walls | | |
| Ceiling | | |
| Closet | | NA |
| Lighting | | |
| Windows | | |
| Blinds/drapes | | |
| Other | | |
| Other | | |

## Laundry/Utility/Garage :

| Item | Good | Negative Comments |
|---|---|---|
| Flooring/cement | | |
| Walls | | |
| Ceiling | | |
| Closet | | |
| Lighting | | NA |
| Windows | | |
| Washer | | |
| Dryer | | |
| Other | | |

**Exterior Condition:**

_____

_____

**Extra Bath**           NA

_____

_____

_____

_____

_____

**Landlord or Manager**                     **Date**

*Oddie Johnson, Yamivau*                     4/19/24

**Tenant**                                   **Date**

                                             4/19/24

**Prevention Coordinator**                   **Date**

RCW 59.18.030

Definitions

"Landlord" means the owner, lessor, or sub lessor of the dwelling unit or the property of which it is a part, and in addition means any person designated as representative of the owner, lessor, or sub lessor including, but not limited to, an agent, a resident manager, or a designated property manager.

RCW 59.18.060

Landlord — Duties

The landlord will at all times during the tenancy keep the premises fit for human habitation, and shall in particular:

(1) Maintain the premises to substantially comply with any applicable code, statute, ordinance, or regulation governing their maintenance or operation, which the legislative body enacting the applicable code, statute, ordinance or regulation could enforce as to the premises rented if such condition endangers or impairs the health or safety of the tenant;

(2) Maintain the structural components including, but not limited to, the roofs, floors, walls, chimneys, fireplaces, foundations, and all other structural components, in reasonably good repair so as to be usable;

(3) Keep any shared or common areas reasonably clean, sanitary, and safe from defects increasing the hazards of fire or accident;

(4) Provide a reasonable program for the control of infestation by insects, rodents, and other pests at the initiation of the tenancy and, except in the case of a single-family residence, control infestation during tenancy except where such infestation is caused by the tenant;

(5) Except where the condition is attributable to normal wear and tear, make repairs and arrangements necessary to put and keep the premises in as good condition as it by law or rental agreement should have been, at the commencement of the tenancy;

(6) Provide reasonably adequate locks and furnish keys to the tenant; maintain and safeguard with reasonable care any master key or duplicate keys.

(7) Maintain all electrical, plumbing, heating, and other facilities and appliances supplied by him or her in reasonably good working order;

(8) Maintain the dwelling unit in reasonably weather tight condition;

(9) Except in the case of a single-family residence, provide and maintain appropriate receptacles in common areas for the removal of ashes, rubbish, and garbage, incidental to the occupancy and arrange for the reasonable and regular removal of such waste;

(10) Provide facilities adequate to supply heat and water and hot water as reasonably required by the tenant;

(11)(a) Provide a written notice to all tenants disclosing fire safety and protection information. The landlord or his or her authorized agent must provide a written notice to the tenant that the dwelling unit is equipped with a smoke detection device as required in RCW 43.44.110. The notice shall inform the tenant of the tenant's responsibility to maintain the smoke detection device in proper operating condition and of penalties for failure to comply with the provisions of RCW 43.44.110(3). The notice must be signed by the landlord or the landlord's authorized agent and tenant with copies provided to both parties. Further, except with respect to a single-family residence, the written notice must also disclose the following:

(i) Whether the smoke detection device is hard-wired or battery operated;

(ii) Whether the building has a fire sprinkler system;

(iii) Whether the building has a fire alarm system;

(iv) Whether the building has a smoking policy, and what that policy is;

(v) Whether the building has an emergency notification plan for the occupants and, if so, provide a copy to the occupants;

(vi) Whether the building has an emergency relocation plan for the occupants and, if so, provide a copy to the occupants; and

(vii) Whether the building has an emergency evacuation plan for the occupants and, if so, provide a copy to the occupants.

(b) The information required under this subsection may be provided to a tenant in a multifamily residential building either as a written notice or as a checklist that discloses whether the building has fire safety and protection devices and systems. The checklist shall include a diagram showing the emergency evacuation routes for the occupants.

(c) The written notice or checklist must be provided to new tenants at the time the lease or rental agreement is signed;

(12) Provide tenants with information provided or approved by the department of health about the health hazards associated with exposure to indoor mold. Information may be provided in written format individually to each tenant, or may be posted in a visible, public location at the dwelling unit property. The information must detail how tenants can control mold growth in their dwelling units to minimize the health risks associated with indoor mold. Landlords may obtain the information from the department's web site or, if requested by the landlord, the department must mail the information to the landlord in a printed format. When developing or changing the information, the department of health must include representatives of landlords in the development process. The information must be provided by the landlord to new tenants at the time the lease or rental agreement is signed;

(13) The landlord and his or her agents and employees are immune from civil liability for failure to comply with subsection (12) of this section except where the landlord and his or her agents and employees knowingly and intentionally do not comply with subsection (12) of this section; and

(14) Designate to the tenant the name and address of the person who is the landlord by a statement on the rental agreement or by a notice conspicuously posted on the premises. The tenant shall be notified immediately of any changes in writing, which must be either (a) delivered personally to the tenant or (b) mailed to the tenant and conspicuously posted on the premises. If the person designated in this section does not reside in the state where the premises are located, there shall also be designated a person who resides in the county who is authorized to act as an agent for the purposes of service of notices and process, and if no designation is made of a person to act as agent, then the person to whom rental payments are to be made shall be considered such agent. Regardless of such designation, any owner who resides outside the state and who violates a provision of this chapter is deemed to have submitted himself or herself to the jurisdiction of the courts of this state and personal service of any process may be made on the owner outside the state with the same force and effect as personal service within the state. Any summons or process served out-of-state must contain the same information and be served in the same manner as personal service of summons or process served within the state, except the summons or process must require the party to appear and answer within sixty days after such personal service out of the state. In an action for a violation of this chapter that is filed under chapter 12.40 RCW, service of the notice of claim outside the state must contain the same information and be served in the same manner as required under chapter 12.40 RCW, except the date on which the party is required to appear must not be less than sixty days from the date of service of the notice of claim.

No duty shall devolve upon the landlord to repair a defective condition under this section, nor shall any defense or remedy be available to the tenant under this chapter, where the defective condition complained of was caused by the conduct of such tenant, his or her family, invitee, or other person acting under his or her control, or where a tenant unreasonably fails to allow the landlord access to the property for purposes of repair. When the duty imposed by subsection (1) of this section is incompatible with and greater than the duty imposed by any other provisions of this section, the landlord's duty shall be determined pursuant to subsection (1) of this section.







23 April 2024

To whom it may concern:

Re: 1414 E Yesler Way Seattle, WA 98122

Tenant: Yaminah Oddie – Johnson

Case Manager: Haley Montowski

I attest that the **UNIT D216 1414 E Yesler Way** meets all criteria for habitability based on inspection by case manager and continued Housing Connector Partner. On the occasion Tenant **Yaminah Oddie-Johnson** is in need of advocacy or help with maintenance assistance she will communicate with case manager **Haley Montowski.**

Attached are documents attesting readiness of unit.

Please feel free to reach out with any questions or issues that arise during tenant's first year of residence.

Thank you.

Haley Montowski

Housing Case Manager

Jan & Peter's Place Women's Shelter

P: 206-474-1674 | C: 206-743-5608

HMontowski@compasshousingalliance.org



23 April 2024

Compass Housing Alliance

220 Dexter Ave N

Seattle, WA 98109

(206) 474-1674

Rental Address: <u>1414 E Yesler Way Unit D216</u>

Tenant Name: <u>Yaminah Oddie – Johnson</u>

**I, as landlord/owner/lessor/sub lessor/ or designated representative, of the above address, certify that the above unit meets the provisions outlined in Landlord Tenant Act (RCW 59.18.060) attached.**

Landlord / Owner Signature _____

Landlord / Owner Name Printed _____

Date _____

Phone & Email _____

| Kitchen | | |
|---|---|---|
| Item | Good | Negative Comments |
| Walls | ✓ | |
| Flooring | ✓ | |
| Ceiling | ✓ | |
| Windows | ✓ | |
| Stove | NA | hotplate ✓ |
| Refrigerator | ✓ ✓ | marks in freezer |
| Disposal | — | |
| Cabinets | ✓ | |
| Countertops | ✓ | |
| Lighting | ✓ | |
| Dishwasher | ✓ | |
| Other | | |
| Other | | |

| Bath (1&2) | | | | |
|---|---|---|---|---|
| Item | B1 | B2 | Good | Negative Comments |
| Walls | ✓ | | | |
| Flooring | ✓ | | | |
| Ceiling | ✓ | | | |
| Shower/tub | ✓ | | | |
| Sink | ✓ | | | |
| Mirror | ✓ | | | |
| Toilet | ✓ | | | |
| Towel Bars | ✓ | | | |
| Windows | ✓ | | | |
| Lighting | ✓ | | | |

| Bedroom 1 : | | |
|---|---|---|
| Item | Good | Negative Comments |
| Flooring | ✓ | |
| Walls | ✓ | |
| Ceiling | ✓ | |
| Closet | ✓ | |
| Lighting | ✓ | |
| Windows | ✓ | |
| Blinds/drapes | ✓ | |
| Other | | |
| Other | | |

| Bedroom 2 : | | |
|---|---|---|
| Item | Good | Negative Comments |
| Flooring | | |
| Walls | | |
| Ceiling | | |
| Closet | | N/A |
| Lighting | | |
| Windows | | |
| Blinds/drapes | | |
| Other | | |
| Other | | |

| Bedroom 3 : | | |
|---|---|---|
| Item | Good | Negative Comments |
| Flooring | | |
| Walls | | |
| Ceiling | | NA |
| Closet | | |
| Lighting | | |
| Windows | | |
| Blinds/drapes | | |
| Other | | |
| Other | | |

| Bedroom 4 : | | |
|---|---|---|
| Item | Good | Negative Comments |
| Flooring | | |
| Walls | | |
| Ceiling | | NA |
| Closet | | |
| Lighting | | |
| Windows | | |
| Blinds/drapes | | |
| Other | | |
| Other | | |

| Laundry/Utility/Garage : | | |
|---|---|---|
| Item | Good | Negative Comments |
| Flooring/cement | | |
| Walls | | |
| Ceiling | | |
| Closet | | |
| Lighting | | NA |
| Windows | | |
| Washer | | |
| Dryer | | |
| Other | | |

**Exterior Condition:**

_____

**Extra Bath**                    NA

_____

_____

_____

_____

**Landlord or Manager**                                          **Date**

Oddie Johnson Yamirali _____             4/17/24
                                                              4/24/24

**Tenant**                                                        **Date**

_____             4/24/24
                                                              4/19/24

**Prevention Coordinator**                                        **Date**

RCW 59.18.030

Definitions

"Landlord" means the owner, lessor, or sub lessor of the dwelling unit or the property of which it is a part, and in addition means any person designated as representative of the owner, lessor, or sub lessor including, but not limited to, an agent, a resident manager, or a designated property manager.

RCW 59.18.060

Landlord — Duties

The landlord will at all times during the tenancy keep the premises fit for human habitation, and shall in particular:

(1) Maintain the premises to substantially comply with any applicable code, statute, ordinance, or regulation governing their maintenance or operation, which the legislative body enacting the applicable code, statute, ordinance or regulation could enforce as to the premises rented if such condition endangers or impairs the health or safety of the tenant;

(2) Maintain the structural components including, but not limited to, the roofs, floors, walls, chimneys, fireplaces, foundations, and all other structural components, in reasonably good repair so as to be usable;

(3) Keep any shared or common areas reasonably clean, sanitary, and safe from defects increasing the hazards of fire or accident;

(4) Provide a reasonable program for the control of infestation by insects, rodents, and other pests at the initiation of the tenancy and, except in the case of a single-family residence, control infestation during tenancy except where such infestation is caused by the tenant;

(5) Except where the condition is attributable to normal wear and tear, make repairs and arrangements necessary to put and keep the premises in as good condition as it by law or rental agreement should have been, at the commencement of the tenancy;

(6) Provide reasonably adequate locks and furnish keys to the tenant; maintain and safeguard with reasonable care any master key or duplicate keys.

(7) Maintain all electrical, plumbing, heating, and other facilities and appliances supplied by him or her in reasonably good working order;

(8) Maintain the dwelling unit in reasonably weather tight condition;

(9) Except in the case of a single-family residence, provide and maintain appropriate receptacles in common areas for the removal of ashes, rubbish, and garbage, incidental to the occupancy and arrange for the reasonable and regular removal of such waste;

(10) Provide facilities adequate to supply heat and water and hot water as reasonably required by the tenant;

(11)(a) Provide a written notice to all tenants disclosing fire safety and protection information. The landlord or his or her authorized agent must provide a written notice to the tenant that the dwelling unit is equipped with a smoke detection device as required in RCW 43.44.110. The notice shall inform the tenant of the tenant's responsibility to maintain the smoke detection device in proper operating condition and of penalties for failure to comply with the provisions of RCW 43.44.110(3). The notice must be signed by the landlord or the landlord's authorized agent and tenant with copies provided to both parties. Further, except with respect to a single-family residence, the written notice must also disclose the following:

(i) Whether the smoke detection device is hard-wired or battery operated;

(ii) Whether the building has a fire sprinkler system;

(iii) Whether the building has a fire alarm system;

(iv) Whether the building has a smoking policy, and what that policy is;

(v) Whether the building has an emergency notification plan for the occupants and, if so, provide a copy to the occupants;

(vi) Whether the building has an emergency relocation plan for the occupants and, if so, provide a copy to the occupants; and

(vii) Whether the building has an emergency evacuation plan for the occupants and, if so, provide a copy to the occupants.

(b) The information required under this subsection may be provided to a tenant in a multifamily residential building either as a written notice or as a checklist that discloses whether the building has fire safety and protection devices and systems. The checklist shall include a diagram showing the emergency evacuation routes for the occupants.

(c) The written notice or checklist must be provided to new tenants at the time the lease or rental agreement is signed;

(12) Provide tenants with information provided or approved by the department of health about the health hazards associated with exposure to indoor mold. Information may be provided in written format individually to each tenant, or may be posted in a visible, public location at the dwelling unit property. The information must detail how tenants can control mold growth in their dwelling units to minimize the health risks associated with indoor mold. Landlords may obtain the information from the department's web site or, if requested by the landlord, the department must mail the information to the landlord in a printed format. When developing or changing the information, the department of health must include representatives of landlords in the development process. The information must be provided by the landlord to new tenants at the time the lease or rental agreement is signed;

(13) The landlord and his or her agents and employees are immune from civil liability for failure to comply with subsection (12) of this section except where the landlord and his or her agents and employees knowingly and intentionally do not comply with subsection (12) of this section; and

(14) Designate to the tenant the name and address of the person who is the landlord by a statement on the rental agreement or by a notice conspicuously posted on the premises. The tenant shall be notified immediately of any changes in writing, which must be either (a) delivered personally to the tenant or (b) mailed to the tenant and conspicuously posted on the premises. If the person designated in this section does not reside in the state where the premises are located, there shall also be designated a person who resides in the county who is authorized to act as an agent for the purposes of service of notices and process, and if no designation is made of a person to act as agent, then the person to whom rental payments are to be made shall be considered such agent. Regardless of such designation, any owner who resides outside the state and who violates a provision of this chapter is deemed to have submitted himself or herself to the jurisdiction of the courts of this state and personal service of any process may be made on the owner outside the state with the same force and effect as personal service within the state. Any summons or process served out-of-state must contain the same information and be served in the same manner as personal service of summons or process served within the state, except the summons or process must require the party to appear and answer within sixty days after such personal service out of the state. In an action for a violation of this chapter that is filed under chapter 12.40 RCW, service of the notice of claim outside the state must contain the same information and be served in the same manner as required under chapter 12.40 RCW, except the date on which the party is required to appear must not be less than sixty days from the date of service of the notice of claim.

No duty shall devolve upon the landlord to repair a defective condition under this section, nor shall any defense or remedy be available to the tenant under this chapter, where the defective condition complained of was caused by the conduct of such tenant, his or her family, invitee, or other person acting under his or her control, or where a tenant unreasonably fails to allow the landlord access to the property for purposes of repair. When the duty imposed by subsection (1) of this section is incompatible with and greater than the duty imposed by any other provisions of this section, the landlord's duty shall be determined pursuant to subsection (1) of this section.